UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

     Plaintiff,                          :    Criminal Action No.
                              1:17-CR-10129-LTS-1
   v.                                    :

WALTER JOHNSON,                              :

     Defendant.                          :

- - - - - - - - - - - - - - - - - - x


BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


EVIDENTIARY HEARING


Tuesday, January 15, 2019
9:11 a.m.






John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff:

    UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
    BY:  ANNE PARUTI
    John Joseph Moakley Courthouse
    One Courthouse Way, Suite 9200
    Boston, Massachusetts  02210
    (617) 748-3310
    anne.paruti.lohnes@usdoj.gov

On behalf of the Defendant:

    GOOD SCHNEIDER CORMIER & FRIED
    BY:  SYRIE D. FRIED
    83 Atlantic Avenue
    3rd Floor
    Boston, Massachusetts  02110
    (617) 523-5933
    sf@gscboston.com

# TABLE OF CONTENTS

## TRIAL WITNESSES

On behalf of the Plaintiff:                           <u>Page</u>

SPECIAL AGENT JANET CONNOLLY

     By Ms. Paruti                                15

     By Ms. Fried                                 70

     By Ms. Paruti                               109

SPECIAL AGENT JAMES RICHARDSON

     By Ms. Paruti                               111

     By Ms. Fried                                135


On behalf of the Defendant:                           <u>Page</u>

PATRICIA KRYZAK

     By Ms. Fried                                153

     By Ms. Paruti                               170

     By Ms. Fried                                185

WALTER JOHNSON

     By Ms. Fried                                189

     By Ms. Paruti                               215

     By Ms. Fried                                239

**EXHIBITS**

Admitted

Number 1-A                                  8

Number 3 through 8                         36

Number 9                                   50

Number 10 and 11                           57

Number 12                                  26

Number 13 through 19                      157

Number 20                                 185

Number 21 and 22                          194

Number 23                                 240

Number 24                                 245

**P R O C E E D I N G S**

1
2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4     for the District of Massachusetts is now in session, the

5     Honorable Leo T. Sorokin presiding.

6          Today is January 15th, the case of United States v.

7     Walter Johnson, criminal action 17-10129 will now appear

8     before this Court.

9          Counsel, please identify themselves for the record.

10          MS. PARUTI:  Good morning, Your Honor.  Anne Paruti

11     for the Government.

12          MS. FRIED:  Good morning, Your Honor.  Syrie Fried

13     on behalf of Walter Johnson, who's with me at counsel table.

14          My apologies.

15          THE COURT:  That's all right.  Good morning.

16          Good morning, Mr. Johnson.

17          So we're here for the hearing on a portion of

18     the -- well, I guess it's two motions, actually, filed.

19          MS. FRIED:  I filed them separately, yes.

20          THE COURT:  Right.  So with respect to the motion

21     to suppress the statements, we're here for an evidentiary

22     hearing on that.  And the other motion, with respect to the,

23     essentially, search warrant kind of evidence, I don't think

24     we need a hearing.

25          I've listened to what I have -- unless I'm missing

something.  I have two recordings.  One is the sort of first
interview that runs from about 6:04 or 6:08 in the morning,
until about 6:35; and then a second recording that starts at
about 7:30 or 7:35 and runs for just a couple of minutes,
both at Mr. Johnson's house.  So I've listened to both of
those recordings.

      Is there a recording of the --

      MS. PARUTI:  Yes.  So what the Government
submitted, it should have been two exhibits.  The first one
was comprised of the two recordings that you just described.

      THE COURT:  Right.

      MS. PARUTI:  And Exhibit 2 was actually a video
recording of the interview surrounding the defendant's
polygraph interview.  I don't know if some of it got lost in
translation.

      THE COURT:  There were two discs, right?

      MS. PARUTI:  There should have been.

      THE COURT:  Maria, can you ask Mariliz to look for
the -- and bring them into the courtroom.

      I think we got two discs, but we're going to run
that down while we do the hearing.

      MS. PARUTI:  Okay.

      THE COURT:  And if we didn't, you can submit them,
and I will, in any event, watch them either during a break or
this afternoon at some point.

1          MS. PARUTI:  Okay.  I will just let the Court know,

2     the second interview, which the Government has labeled as

3     Exhibit 2, as I said, it's audio.  It's divided up into

4     several clips.  It spans a much longer period of time.

5          THE COURT:  When you say "exhibit," Exhibit 1 is

6     the --

7          MS. PARUTI:  Is the home recording.

8          THE COURT:  Exhibit 1 is the disc with two files.

9          MS. PARUTI:  Uh-huh.

10          THE COURT:  The 6:34 -- the 6:04 and the 7:35

11     recordings, audio recordings.

12          MS. PARUTI:  Correct.

13          THE COURT:  Exhibit 2 is a disc that has a number

14     of files.  And is any of them a complete, like, turn it on,

15     here it is, until the end of the polygraph?

16          MS. PARUTI:  So unfortunately, the way that the

17     program works is the file, probably because its size, I don't

18     know, but the file -- the interview is broken up into

19     multiple files.  They're in sequence, and they're all about

20     ten minutes each.  So if you hit play --

21          THE COURT:  So you see the whole thing.

22          MS. PARUTI:  Correct.

23          THE COURT:  I see.

24          MS. PARUTI:  And it's time stamped.

25          THE COURT:  Right.  Okay.  So that's the he

1   arrives -- he's brought to the station, that's the polygraph
2   at the station.
3            MS. PARUTI:  Correct.  And just one other matter,
4   procedure related to that Exhibit 1, which is the home
5   interviews.  The -- as I think the Court is aware, Ms. Fried
6   provided a transcript of that interview.
7            THE COURT:  Yes.
8            MS. PARUTI:  I have no objection to the Court
9   reading the transcript.  I presume you already have.  I just
10  don't know if, for preservation of the record, you want that
11  marked as a physical exhibit.  If so, I ask that it just be
12  labeled as Exhibit 1-A or something like that.
13           THE COURT:  We'll mark that.  I read it -- I didn't
14  read it while I listened.  I have done it separately.  But I
15  have that copy here, and Maria will mark this as 1-A.
16           (Exhibit No. 1-A admitted into evidence.)
17           MS. FRIED:  That's right.  I'm really submitting it
18  as an aid.
19           THE COURT:  Yes.  Sure.  It's helpful to have.
20           MS. FRIED:  It's worth whatever it's worth.  If
21  there are discrepancies, obviously, the tape controls.
22           THE COURT:  Right.  No, but it's helpful.  And it
23  makes it easier if, for some reason, I need to look back at
24  something and find the spot or quote the language and then
25  listen to the tape -- or the disc.

1          MS. FRIED:  Yes, Your Honor.  The only thing that I

2     want to -- I guess I'm just echoing something that Ms. Paruti

3     said, which is that the second interview, which is the

4     polygraph interview, is much, much longer.

5          THE COURT:  Right.  We don't need it at the

6     hearing, to play either.

7          MS. FRIED:  Right.

8          THE COURT:  You can refer -- and for some reason

9     there's a reason to refer to something, you can, obviously.

10    I'll watch that today.  So I just don't see any reason to all

11    sit here in the courtroom and play it.

12         MS. PARUTI:  Thank you.

13         MS. FRIED:  No.

14         MS. PARUTI:  The other matter -- and I'm sorry, I

15    didn't get an opportunity to confer with Ms. Fried before

16    Your Honor came out.  I'm just providing -- I believe that I

17    just did a check for additional *Jencks* material that hadn't

18    been provided yet.  I expect to call two agents.  Agent

19    Richardson, to my knowledge, does not have any *Jencks*

20    material.  Ms. Fried already has reports that have been

21    authored by Agent Connolly, who is the case agent.  I'm just

22    providing, today, one additional report that is from a

23    substantive point of view, not related to the hearing, but

24    she authored it.  I'm providing that today in unredacted

25    format.

1   I also just want to bring to the Court's attention

2   and to Ms. Fried's attention that when I was reviewing the

3   material, one of the pieces of material, one of the documents

4   that I reviewed was the complaint affidavit in this case.

5   And I noticed that -- which I drafted, along with Agent

6   Connolly.  I noticed that one of the paragraphs referenced

7   the admission or administration of Miranda rights prior to

8   Mr. Johnson's questioning.  I had talked with Agent Connolly,

9   that is -- that was an oversight that is likely due to

10  last-minute drafting in sort of a very harried day.

11  I just want to point that out to the Court, so it

12  doesn't look like Agent Connolly is trying to be dishonest

13  with the Court.

14  THE COURT:  Sure.

15  MS. PARUTI:  If the Court requires any sort of --

16  the complaint is essentially not a live document anymore for

17  charging purposes, because he's been subsequently indicted,

18  but I just wanted to be very transparent to Ms. Fried, where

19  Agent Connolly will be testifying, and to the Court, once I

20  realized that.

21  THE COURT:  Fine.  No problem.

22  MS. FRIED:  Your Honor, could I request that

23  witnesses be sequestered?

24  THE COURT:  Sure.

25  You do don't have any objection to that, do you,

Ms. Paruti?

MS. PARUTI:  No.  Of course not.

THE COURT:  I just don't know who they are -- I mean, I know they're names, but I don't know --

MS. FRIED:  For -- on behalf of Mr. Johnson, there's Mr. Johnson.  I expect he will be testifying.  And there is Pat Kryzak, his significant other, who submitted an affidavit in support.

THE COURT:  All right.  So you're going to call her to testify?

MS. FRIED:  I do intend to call her.

THE COURT:  All right.  So she should step outside until we call her.

MS. FRIED:  And I would ask that the other agent, who's not going to be the first agent --

THE COURT:  Sure.

MS. PARUTI:  Agent Connolly will be first, so if Agent Richardson can step out.

MS. FRIED:  And I'm just going to escort Ms. Kryzak out.

THE COURT:  Sure.  Go ahead.

(Pause.)

THE COURT:  Before we begin the hearing, just two or three sort of preliminary questions about the case that digging into this has got me thinking about.

1        One is, do you have to prove, Ms. Paruti -- not

2   here today but at the trial, do you have to prove that the

3   child or children depicted in a particular picture or video

4   are actual -- an actual child or children?

5        MS. PARUTI:  Yes.  It has to be -- so the way that

6   it's charged, there are different -- the short answer is yes.

7   Yes.  And there are various ways to do that.  Typically, when

8   we're choosing images to charge, we would pick images that

9   are pretty obviously, without the aid of an expert testimony,

10  real children; so videos, typically, or much -- the case law

11  has recognized that you don't need an expert if there's a

12  child who's engaging in a sexual act, and that's in video,

13  motion picture.

14       THE COURT:  I see.  As long as it doesn't look like

15  a video --

16       MS. PARUTI:  Right.  Right.  There are portions of

17  the statute of 2252(a) that allow for prosecutors to charge

18  like morphed images, for example.  Those are not going to be

19  an issue in this particular case.

20       THE COURT:  I see.  So what you would anticipate at

21  trial in this case is the images, which you would be

22  submitting to the jury, would be ones that are videos, and

23  you would be arguing that under the law, that the jury could

24  make its own -- it would have to determine that they are real

25  children, but it could make its own determination, based upon

1   watching the video, that they were real.

2           MS. PARUTI:  Yes.  And frequently, I will say, that

3   this type of case does not go to trial that often.

4           THE COURT:  Right.  I understand.

5           MS. PARUTI:  But I would say frequently, we also,

6   to make sure that doesn't become an issue, we would choose

7   images of known children, so who have been identified by

8   NCMEC, N-C-M-E-C, the National Center for Missing and

9   Exploited Children, which, as the Court probably knows,

10  maintains a database of child victims who have been

11  identified.

12          THE COURT:  If you have a picture or video of a

13  known child that way, then how do you prove that up at the

14  trial?

15          MS. PARUTI:  So there are various ways.  I would

16  say that --

17          THE COURT:  You introduce evidence from those

18  databases?

19          MS. PARUTI:  Yeah.  So often I would say it most

20  likely would come in by stipulation, because otherwise the

21  Government would have to prove it.  And one of the ways to

22  prove it is to show the investigator's knowledge, which would

23  inquire either allowing the investigator to testify about the

24  fact that it was identified by NCMEC, or somebody from NCMEC

25  coming in and explaining how it works, how the children are

identified throughout the world, really, because they're not limited to the US.

THE COURT:  Sort of like a business record.

MS. PARUTI:  Sort of.  Yeah.  And I think for all -- I think from a practical standpoint, that most defendants would stipulate to that piece of it, because, frankly, I think that the evidence that would have to come in to prove that might be more damaging than just saying, "Yes, that's a real child.  That's not what this is about."

THE COURT:  Okay.

MS. PARUTI:  But obviously, I don't know.  We haven't talked about orders of proof or anything like that.

THE COURT:  And then in this case, the statement -- the statements made at the scene are live issues because, if the case goes to trial, even if you win the rest of the motion to suppress, that is, therefore, all the evidence comes in, you would intend to offer at least some of the statements.

MS. PARUTI:  Some of the statements, yes.

THE COURT:  Okay.  All right.  Why don't you call your first witness.

MS. PARUTI:  Thank you.  The Government calls Agent Connolly.

(The witness was duly sworn.)

MS. PARUTI:  Your Honor, may I inquire?

```
 1              THE COURT:  Yes, go right ahead.
 2              MS. PARUTI:  Thank you.
 3                 SPECIAL AGENT JANET CONNOLLY
 4           having been duly sworn, testified as follows:
 5           DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
 6  BY MS. PARUTI:
 7  Q.  Good morning, Agent.  Could you please state your name
 8  and spell your name for the record.
 9  A.  My name is Janet Connolly, C-o-n-n-o-l-l-y.
10  Q.  And where do you work, ma'am?
11  A.  I work for Homeland Security Investigations in Boston.
12  Q.  Is that frequently referred to as HSI?
13  A.  It is.
14  Q.  What's your role there?
15  A.  I'm a special agent.
16  Q.  And how long have you been employed as a special agent
17  with HSI?
18  A.  For ten years.
19  Q.  Are you assigned to any particular group?
20  A.  I am.
21  Q.  Which one is that?
22  A.  The cyber crimes and child exploitation group.
23  Q.  How long have you been working with that group?
24  A.  Approximately four to five years.
25  Q.  And prior to that, what other group or groups were you
```

1    assigned to within HSI?

2    **A.**   I was in the financial group previously.

3    **Q.**   Prior to your experience as a law enforcement agent with

4    HSI, have you done any other sort of professional work?

5    **A.**   Yes.

6    **Q.**   What was that, briefly?

7    **A.**   Prior to being employed with HSI, I was employed by the

8    Boston Police Department as a policy analyst.  And prior to

9    that, I was employed by the Suffolk County District

10   Attorney's Office as a victim witness advocate.

11   **Q.**   And about how long did you do that work, combined?

12   **A.**   Seven years as a victim witness advocate, and about three

13   to four years with the police department.

14   **Q.**   So you said you had been with the child exploitation

15   group for the past five years; is that correct?

16   **A.**   Correct.

17   **Q.**   So on April 27 of 2017, were you working with that group?

18   **A.**   I was.

19   **Q.**   And what -- on that particular date, April 27th of 2017,

20   were you involved in a particular investigation?

21   **A.**   Yes.

22   **Q.**   Who was the target of that investigation, or what was the

23   target of that investigation?

24   **A.**   An individual who used an e-mail account known to us, who

25   we believed to be Walter Johnson.

**Q.** On that particular date, did you and your colleagues execute a search warrant?

**A.** Yes.

**Q.** And what was the address where you executed that warrant?

**A.** 20 Burdette Avenue, in Framingham.

**Q.** Is that B-u-r-d-e-t-t-e?

**A.** Correct.

**Q.** And who did you believe to be the residence of that -- or resident of that address?

**A.** We believed there were two residents, Mr. Johnson, and we weren't sure if it was his wife or girlfriend at the time.

**Q.** Okay. Did you personally attend that execution?

**A.** Yes.

**Q.** Around what time did you set up -- well, not set up.

Around what time did you execute the search warrant?

**A.** Right at 6:00 a.m.

**Q.** What other agencies were represented there, besides HSI?

**A.** We had two task force officers, who were assigned to my group, who are computer forensics examiners, and a Mass. State Police trooper, who's also a computer forensics examiner. And I believe there were four people from the Framingham Police Department, who came with us, as well.

**Q.** Now, from -- what about from HSI? Do you recall approximately how many people were there?

1   **A.**  There were probably between six to eight from HSI.

2   **Q.**  Now the HSI agents --

3          THE COURT:  Including yourself?

4          THE WITNESS:  Including myself, correct.

5   BY MS. PARUTI:

6   **Q.**  So you're a special agent, correct?

7   **A.**  Correct.

8   **Q.**  Are you a forensic agent?

9   **A.**  No, I am not.

10  **Q.**  Are there some agents who work both cases and are also

11  forensically capable?

12  **A.**  Correct.

13  **Q.**  Of the six to eight HSI agents that you mentioned, do you

14  have a memory of approximately what that breakdown was

15  between sort of case agents and forensics agents?

16  **A.**  I'd say about half and half.

17  **Q.**  Were any of the HSI employees wearing any sort of

18  uniform?

19  **A.**  We all had blastic vests on when we first arrived, that

20  had police markings on them.

21  **Q.**  What does it say?  Does it say "police," or what does it

22  say?

23  **A.**  It says "police" and/or "Homeland Security

24  Investigations."

25         THE COURT:  When you say "we," do you mean all the

law enforcement people there?  Or by "we" do you mean the HSI people?

          THE WITNESS:  HSI people would have had vests on that had these police markings.  The local police, I believe, also had -- we definitely had one Framingham uniformed officer who went to the door, and he was in full uniform.

          THE COURT:  Just regular police patrol uniform.

          THE WITNESS:  Correct.  Correct.  And then there were three, I believe, detectives from Framingham, and I can't recall what they were wearing.

          THE COURT:  When you say a "ballistic vest" --

          THE WITNESS:  Yes.

          THE COURT:  -- what exactly do you mean by that?

          THE WITNESS:  It's a vest that can go on over a jacket.

          THE COURT:  Like when I see a SWAT team person?

          THE WITNESS:  Correct.

          THE COURT:  And it's sort of a vest that both looks like it's a bulletproof vest and has various pockets for things to --

          THE WITNESS:  Yes.

          THE COURT:  -- whatever, tools, whatever you want to hold in it.

          THE WITNESS:  Correct.  A lot of pouches.

          THE COURT:  Yes.

1      THE WITNESS:  Yes.  That's so we can put it on over

2  clothing and take it off easily.

3      THE COURT:  I see.  And that would also say

4  "police" on it.

5      THE WITNESS:  Correct.

6      THE COURT:  Were people carrying anything at that

7  time?  This is when you are outside of the house now, right?

8      THE WITNESS:  Yes.

9      THE COURT:  So the six to eight agents -- all of

10  the people from HSI would be wearing those ballistic vests,

11  whether they were agents or forensic people?

12      THE WITNESS:  Yes, that's right.

13      THE COURT:  And what about -- what else were people

14  carrying at that time?  In their hands.

15      THE WITNESS:  Carrying in their hands?  I believe I

16  had a folio in my hand, because I knew that we would -- I

17  would be taking notes.  And otherwise, there are people who

18  first approached the door, who would have breaching

19  equipment, generally.  That's our protocol.  Whenever we

20  conduct a search warrant, the first people --

21      THE COURT:  Breach equipment is like a battering

22  ram?

23      THE WITNESS:  Correct.  That's right.  But that

24  would be one person.  And otherwise, no one else is generally

25  holding anything in their hands.

```
1          THE COURT:  So no weapons in their hand.
2          THE WITNESS:  No.  No.
3          THE COURT:  And no weapons over their shoulders?
4          THE WITNESS:  No.  No.  No long guns or anything
5     like that, no.  No.
6          THE COURT:  Go ahead.
7     BY MS. PARUTI:
8     Q.  So you talked about breaching equipment.
9     A.  Uh-huh.
10    Q.  Did you need to use breaching equipment in this
11    particular execution?
12    A.  No, we did not.
13    Q.  How did the actual entry go?
14    A.  I wasn't directly at the door.  The uniformed police
15    officer and a few other -- a few other -- I'm not sure who
16    from HSI, but someone else from my agency went to the door
17    and knocked and announced themselves.
18    Q.  When you say "knocked and announced," what does that
19    actually mean?
20    A.  That means that they would have probably banged loudly on
21    the door and said --
22         MS. FRIED:  Objection to what they probably would
23    have done.  If this witness can't tell us, perhaps another
24    witness can.
25         THE COURT:  Sustained as to "probably."
```

1          If you know.

2    BY MS. PARUTI:

3    **Q.**  Did you hear anything --

4          THE COURT:  Before you ask that question -- I'm

5    sorry.

6          What was the lighting like at the time that you and

7    the other officers approached the house to knock and

8    announce?

9          THE WITNESS:  It was dawn.  It wasn't sunny out,

10   but it was dawn.

11         THE COURT:  So some amount of light?  No light?

12         THE WITNESS:  Some amount of light, yup.

13         THE COURT:  Okay.  Go ahead.

14   BY MS. PARUTI:

15   **Q.**  Did you hear any part or portion of the announcement at

16   the door?

17   **A.**  Yes.

18   **Q.**  Okay.  Could you tell us what you recall hearing at that

19   time?

20   **A.**  "Police.  Search warrant."

21   **Q.**  And why do you have the uniformed officer up at the

22   front?

23   **A.**  Sometimes it can put people at ease to see a

24   recognizable, uniformed presence at their door.  They know

25   that it's truly the police.

1    **Q.**   Uh-huh.  So at some point, did somebody open the door?

2    **A.**   Yes.

3    **Q.**   Do you recall how much time elapsed between the knock and

4    announce and the person from inside opening the door?

5    **A.**   It was a short amount of time, I don't know exactly.

6                MS. PARUTI:  Okay.

7                THE COURT:  At that moment, when -- rolling back a

8    little bit, when the officer or officers who approached the

9    door are knocking, where are all the other law enforcement

10   personnel?

11               THE WITNESS:  Just down on the lawn.

12               THE COURT:  Okay.  In front of the house.

13               THE WITNESS:  Correct.  That's right.

14               THE COURT:  Okay.  Go ahead.

15   BY MS. PARUTI:

16   **Q.**   And is that where you are, down on the lawn?

17   **A.**   Yes.  Yes.

18   **Q.**   Do you recall who came to the door when it was opened?

19   **A.**   I don't.

20   **Q.**   Okay.  At some point, did you make entry into the house?

21   **A.**   Yes.

22   **Q.**   All right.  And where did you go when you went into the

23   house?

24   **A.**   When I went into the house, I went as far as the dining

25   room, the first room.

**Q.** Okay.

**A.** Once you enter.

**Q.** Okay. And who, if anyone, did you encounter there?

**A.** Ms. Kryzak.

**Q.** And just for clarity, who is Ms. Kryzak, in relation to Mr. Johnson?

**A.** Ms. Kryzak is his long-term girlfriend.

**Q.** And can you describe your interaction with Ms. Kryzak when you first saw her?

**A.** Yes. She was understandably concerned. And I stopped to tell her that we were there for a search warrant. I know I explained that we were there for a search warrant. I believe I showed her the search warrant. And that was about the extent of our conversation.

**Q.** Okay. At some point, did you move on to another room in the house?

**A.** Yes.

**Q.** Which room did you move to?

**A.** The kitchen.

MS. PARUTI: Your Honor, may I approach the witness?

THE COURT: Yes.

MS. PARUTI: Thank you.

MS. FRIED: Your Honor, during this pause, does the Court have exhibit stickers? I have some photographs that I

1   have not marked.

2         THE COURT:  Sure.  Ms. Simeone has them.

3         MS. FRIED:  It makes sense to grab some.

4         THE COURT:  So just going back, while the assistant

5   approaches, to when you're outside the house, so all the

6   firearms are holstered?

7         THE WITNESS:  Yes, they were all holstered.

8   BY MS. PARUTI:

9   **Q.**  I'm showing you what's been premarked as Government's

10   Exhibit 12.  Do you recognize that?

11   **A.**  I do.

12   **Q.**  What is that?

13   **A.**  This is a sketch of the residence.

14   **Q.**  Okay.  And did you prepare the sketch?

15   **A.**  I did not.

16   **Q.**  Did somebody from your agency prepare the sketch?

17   **A.**  Yes.

18   **Q.**  Have you -- when you were in the home that day, did you

19   have the opportunity to walk the layout of the home?

20   **A.**  I did.

21   **Q.**  And based on your observations on that day, do you

22   believe that this sketch, which has been marked as

23   Exhibit 12, represents a fair and accurate depiction of the

24   apartment -- or excuse me, the home, insofar as the layout of

25   the rooms, vis-a-vis each other?

**A.**   Yes.

**Q.**   Is that to scale?

**A.**   No, it's not.

**Q.**   Otherwise, would you say that it's accurate?

**A.**   Yes.

MS. PARUTI:  Your Honor, I move to have this admitted as Government's Exhibit 12.

THE COURT:  Any objection?

MS. FRIED:  No.  Subject to my cross-examination.

THE COURT:  Yes.  Of course.  Admitted.

(Exhibit No. 12 admitted into evidence.)

THE COURT:  Could I just see it for a moment?  That would be helpful for me.

MS. PARUTI:  Yes.  And with the Court's permission, I have labels that I'd ask the witness to place on each of the rooms that are represented by letter, such as dining room, kitchen, bath.

THE COURT:  Sure.

I don't know if counsel has any problem with that.

MS. FRIED:  Well, if I can just see.

THE COURT:  You don't have an extra copy, do you?

MS. PARUTI:  I do.

THE COURT:  Can I have one copy while you examine her?  That would be helpful for me to follow along.

MS. PARUTI:  Yes.

          THE COURT:  Thank you.

BY MS. PARUTI:

**Q.**  Agent Connolly, you said that you encountered Ms. Kryzak

in which room of the home?

**A.**  The dining room.

**Q.**  And on the diagram, how is that -- how is that labeled?

**A.**  On the diagram, it's "Room C."

          MS. PARUTI:  And just for the record, Your Honor, I

have a number of exhibits premarked.  I'll give them to the

clerk now.

          THE COURT:  Great.

          MS. PARUTI:  So you have them.

          THE COURT:  But this copy of the sketch is an extra

one.

          MS. PARUTI:  All of those exhibits are extra, just

for the Court's --

          THE COURT:  All right.  And I'm sorry, you said the

dining room is which letter?

          THE WITNESS:  C, Your Honor.

BY MS. PARUTI:

**Q.**  While we are talking, if you wouldn't mind just labeling

them as you're describing them?

**A.**  Okay.

          THE COURT:  Pause for one more question.  Sorry.

          You made entry through the front door?

1          THE WITNESS:  Correct.

2          THE COURT:  And is the front door at the bottom or

3   the top of the sketch?

4          THE WITNESS:  The front door is -- I believe there

5   were just a few steps to get up to the front door.

6          THE COURT:  But on the sketch, where is the front

7   door?

8          THE WITNESS:  Oh, I'm sorry.  The front door would

9   be where "Entryway" is written.

10         THE COURT:  I see.  So down near the bottom of the

11  picture.

12         THE WITNESS:  Correct.

13         THE COURT:  Thank you.

14         Go ahead.

15  BY MS. PARUTI:

16  **Q.**   So you proceeded from the dining room to which room?

17  **A.**   To the kitchen.

18  **Q.**   Okay.  And where is -- how is that labeled on Exhibit 12?

19  **A.**   That is "Room G."

20  **Q.**   Okay.  Just while we're on this diagram, can you tell us

21  what the other rooms are, as they are identified on the

22  document?

23  **A.**   Yes.  Off of the hallway, there was "Room F."  Room F was

24  referred to as a second bedroom.

25  **Q.**   Okay.  So we'll call that "bedroom 2"?

1    **A.**   Yes.

2    **Q.**   And what about the room designated as "E"?

3    **A.**   E is the bathroom.

4    **Q.**   And what about "D"?

5    **A.**   D is the main bedroom.

6    **Q.**   Okay. And when you say the "main bedroom," who occupied,

7    to your knowledge, that bedroom?

8    **A.**   Mr. Johnson and Ms. Kryzak.

9    **Q.**   And what about "B"?

10    **A.**   B was the living room.

11        MS. PARUTI: Thank you.

12        THE COURT: Is there a second floor to this home?

13        THE WITNESS: No.

14        THE COURT: And is there a basement?

15        THE WITNESS: Not that I saw.

16        THE COURT: Okay. Go ahead.

17        MS. PARUTI: And I'll actually, Your Honor, if you

18    like, I can leave this exhibit with the Court, with the

19    labels.

20        THE COURT: That's all right, I marked up my copy.

21    BY MS. PARUTI:

22    **Q.**   Now, Agent Connolly, why is it that you went into the

23    kitchen next?

24    **A.**   I went into the kitchen because I was made aware that

25    Mr. Johnson was in the kitchen.

1   **Q.**  And when you went in there, was he, in fact, there?

2   **A.**  Yes.

3   **Q.**  Who was he there with, if anyone?

4   **A.**  Other -- other people who had made entry before me.

5   **Q.**  Okay.  So who was that?  Who was with Mr. Johnson in that

6   room, in the kitchen?

7   **A.**  Special Agent Richardson, and there may have been one or

8   two other people who left shortly after I walked in.

9   **Q.**  Now, when you left Ms. Kryzak, that was in the dining

10   room?

11   **A.**  Yes.

12   **Q.**  And do you have any knowledge of where she went after you

13   left that room to go to the kitchen?

14   **A.**  No.

15         THE COURT:  Did you leave her alone?

16         THE WITNESS:  There were other people who were in

17   the home at that point.

18         THE COURT:  Other law enforcement?

19         THE WITNESS:  Other law enforcement.

20         THE COURT:  So when you left the room, there were

21   other law enforcement in the room there?

22         THE WITNESS:  Yes.

23   BY MS. PARUTI:

24   **Q.**  To your knowledge, did a member of law enforcement stay

25   with Ms. Kryzak, throughout the execution of the search

1  warrant?

2  **A.**  I wasn't aware at the time.

3  **Q.**  Now, have you executed search warrants prior to this

4  particular date?

5  **A.**  Yes.

6  **Q.**  Do you -- does your team have a particular practice about

7  accompanying civilians who are in a home when you're

8  executing a search warrant?

9  **A.**  Yes.

10  **Q.**  Okay.  And what's that practice?

11  **A.**  They are able to move in the home, but not unaccompanied,

12  while the search is being conducted.

13  **Q.**  And why is that?

14  **A.**  That is two reasons, one is officer safety, and the

15  second is because we don't want evidence or potential

16  evidence hidden or destroyed.

17  **Q.**  If one of the civilians in a home during a search warrant

18  wants to leave, is it your practice to allow them to leave?

19  **A.**  If they want to, yes.

20  **Q.**  Okay.  Now, when you went into the kitchen, did you have

21  a conversation with Mr. Johnson?

22  **A.**  Yes.

23  **Q.**  Do you remember anything at that point, as you were

24  starting to talk to him, what his demeanor was like?

25  **A.**  He was quiet, but calm.  He was conversational.

1    **Q.**  And do you remember anything about what he was wearing

2    that day?

3    **A.**  I don't specifically remember.  I'm sure he was in

4    pajamas when we first arrived.

5    **Q.**  Did you ask him if he would speak with you?

6    **A.**  Yes.

7    **Q.**  Can you tell us how that conversation went?

8    **A.**  When myself and Special Agent Richardson were alone in

9    the kitchen with Mr. Johnson, I explained that we were there

10   to conduct a search warrant.  I explained that he was not

11   under arrest.  I told him that we wanted to speak with him

12   about the nature of the search warrant, and he agreed to do

13   so.

14   **Q.**  Was that portion of your conversation recorded?

15   **A.**  That was prior to turning on the recording.

16   **Q.**  Okay.  Did you Mirandize him at that point?

17   **A.**  No.

18   **Q.**  Why not?

19   **A.**  He wasn't under arrest.

20   **Q.**  Did you go in there planning to place him under arrest?

21   **A.**  No.

22   **Q.**  Once he agreed to speak with you, what did you do?

23   **A.**  Special Agent Richardson began the audio recorder, and we

24   proceeded to speak with him about our investigation.

25   **Q.**  Okay.  Have you listened to the recording of the

1   conversations that you had -- of the recorded conversations

2   that you had with Mr. Johnson at his home that day?

3   **A.**   Yes.

4   **Q.**   And are you aware that those recordings have been

5   provided as Exhibit 1 for purposes of this hearing?

6   **A.**   Yes.

7   **Q.**   Okay.  Now, where --

8           MS. PARUTI:  Actually, may I approach, Your Honor?

9           THE COURT:  You may.

10  BY MS. PARUTI:

11  **Q.**   I'm showing you a series of photographs, first Exhibit 3.

12  Can you tell --

13          MS. PARUTI:  And I think the Court has copies at

14  the bench.

15  BY MS. PARUTI:

16  **Q.**   Can you tell us which room is depicted in Exhibit 3?

17  **A.**   That's the living room.

18  **Q.**   And just for ease of presentation, how about Exhibit 4?

19  **A.**   This is the dining room.

20  **Q.**   Is that the room where you first encountered Ms. Kryzak?

21  **A.**   Yes.

22  **Q.**   And you can see in Exhibit 4, a doorway, and what looks

23  like a counter.  What room is that?

24  **A.**   The kitchen.

25  **Q.**   Okay.  Exhibit 5?

```
1                THE COURT:  I'm sorry, I just missed that.

2                MS. PARUTI:  Sorry.

3                THE COURT:  So Exhibit 3 is the living room.

4                THE WITNESS:  Correct.

5                THE COURT:  Exhibit 4 is D, the dining room?

6                THE WITNESS:  The dining room, correct.

7                MS. FRIED:  I'm sorry, D?

8                THE COURT:  And looking through the the doorway

9      that's depicted in the picture, that's the kitchen?

10               MS. FRIED:  I'm sorry, did I hear "D"?

11               THE WITNESS:  I don't remember the letter of the

12     dining room.

13               THE COURT:  But in any event, Exhibit 4 is the

14     dining room?

15               THE WITNESS:  Correct.

16               THE COURT:  And looking through that doorway, we're

17     looking into the kitchen?

18               THE WITNESS:  That's correct.

19               THE COURT:  I see.

20     BY MS. PARUTI:

21     Q.  So now Exhibit 5?

22     A.  5 is the kitchen.

23               THE COURT:  I misspoke earlier, the dining room is

24     labeled C, not D.

25               MS. PARUTI:  Thank you.
```

BY MS. PARUTI:

**Q.** Exhibit 6?

**A.** That is also the kitchen.

**Q.** So what piece of furniture is visible there in Exhibit 6?

**A.** That's the kitchen island, where we spoke to Mr. Johnson.

**Q.** Okay. Exhibit 7?

**A.** Also the kitchen and the island.

**Q.** And Exhibit 8?

**A.** Again, the kitchen with the island.

**Q.** Okay. No you, you can see on the right-hand side of that image, you can see a door that looks like it goes to the outside. Is that reflected on the diagram?

**A.** Yes.

**Q.** Okay. And then there's another door here, on the left-hand side?

**A.** Correct.

**Q.** And do you recall where that goes to?

**A.** That led into the hallway.

        MS. FRIED: Was that Exhibit 8? I'm sorry.

        MS. PARUTI: Exhibit 8.

BY MS. PARUTI:

**Q.** Based on the observations that you made on the day that you were there for the search warrant, do you believe that all of these exhibits, 3 through 8, are a fair and accurate depictions of the home as you saw it that day?

**A.**  Yes.

          MS. PARUTI:  I move to admit Exhibits 3 through 8
into evidence.

          THE COURT:  Any objection?

          MS. FRIED:  No objection.

          THE COURT:  Admitted.

          (Exhibit Nos. 3 through 8 admitted into evidence.)

          THE COURT:  When you came into the kitchen, where
was Mr. Johnson?

          THE WITNESS:  I believe he was already seated at
the kitchen island.

          THE COURT:  Do you recall, from looking at
Exhibit 8, if it's helpful, where he was seated at the
island?

          THE WITNESS:  I do remember where everyone was
seated when we spoke with him.

          THE COURT:  Okay.

          THE WITNESS:  He was on the end of the island,
which is in the right-hand side of the photo.

          THE COURT:  Where there's just a single chair.

          THE WITNESS:  Correct.

          THE COURT:  All right.

BY MS. PARUTI:

**Q.**  And then where were you seated?

**A.**  I was seated kitty-corner to him, if that's the right

term, just around the corner; and Special Agent Richardson

was in the stool close -- in the foreground of the photo.

**Q.** So there was a stool in between you and Agent Richardson?

**A.** Yes, I believe so.

**Q.** Now, you said that when you had entered the home -- let

me just get to a microphone for the court reporter.

You said that when you had entered the home you

were wearing a ballistics vest?

**A.** Yes.

**Q.** Did you take that off at any point?

**A.** I did.

**Q.** When was that?

**A.** Before I sat down.

**Q.** Just to be clear, before you sat down where?

**A.** Sorry. Before I sat down at the kitchen island, I took

that off and set it down on the floor behind me.

**Q.** All right. Were you wearing any weapons at that time

during your conversation with Mr. Johnson?

**A.** I had my duty weapon.

**Q.** Okay. And where did you have that physically on your

body?

**A.** That was on my waist.

**Q.** At any point during your conversation with him, did you

take it off of your waist?

**A.** No.

1   **Q.** When you say it was on your waist, specifically, where

2   was it?

3   **A.** It was holstered and attached to my belt.

4         MS. PARUTI: Okay.

5         THE COURT: On your right?

6         THE WITNESS: On my right-hand side, yes.

7         THE COURT: Were you wearing any sort of jacket

8   that would cover that, or would that be visible when you were

9   standing up?

10        THE WITNESS: I did have a jacket on that day, but

11  I don't know if I kept the jacket on. And I don't recall if

12  it was -- if I had a shirt or something covering it or not.

13  BY MS. PARUTI:

14  **Q.** When you were seated at that island, looking at

15  Exhibit 8, if it assists you, do you have any memory of what

16  part of your body was visible above the island?

17  **A.** From my, probably, waist or a little higher up.

18  **Q.** Okay. Would your weapon have been below or above that

19  counter line?

20  **A.** It would have been below.

21  **Q.** Did you notice whether or not Special Agent Richardson

22  removed his vest or kept it on during your conversation?

23  **A.** I believe his vest was off.

24  **Q.** And was he seated, as well, during the conversation?

25  **A.** Yes.

1    **Q.**  Okay.  Now, prior to -- as you were talking -- as you and

2    Agent Richardson were talking to Mr. Johnson, based on the

3    answers that he gave you in response to your questions, did

4    you have any opinion as to whether or not he understood what

5    you were saying to him?

6    **A.**  He did.

7    **Q.**  Going into the search warrant, did you have any knowledge

8    about his level of education?

9    **A.**  I did.

10   **Q.**  And what was that knowledge?

11   **A.**  I knew that he was a Harvard graduate.

12             THE COURT:  Harvard College -- college?

13             THE WITNESS:  Yes.

14   BY MS. PARUTI:

15   **Q.**  Now, at some point right near the beginning of the

16   recording --

17             You've reviewed it, correct, the recording?

18   **A.**  Correct.  Yes.

19   **Q.**  Would you agree with me that you can hear you getting up

20   and saying, "Oh, let me just shut that door," or something to

21   that effect?

22   **A.**  Yes.

23   **Q.**  Which door was that?

24   **A.**  That was -- there were two doors that led into the

25   kitchen.  One is shown in Exhibit A, that led into the

1  hallway.

2          THE COURT:  A exhibit?

3          THE WITNESS:  8.

4          MS. PARUTI:  8.

5          THE WITNESS:  I'm sorry.  And the second led into

6  the lining room.  So I believe I was closing -- my best

7  memory is I was closing the hallway door, because it was --

8  there was noise, and I just wanted some privacy.

9  BY MS. PARUTI:

10 **Q.**  Why did you want privacy?

11 **A.**  One, so that Mr. Johnson wasn't distracted by the noise

12 of people conducting the search; and secondly, because I knew

13 Ms. Kryzak was -- it's a fairly small home, and I knew she

14 was either in the dining room still, or, you know, close

15 enough.  I didn't want her to overhear our conversation.

16 **Q.**  Why did you not want her to overhear your conversation?

17          MS. FRIED:  Objection.  Relevance.

18          THE COURT:  Overruled.

19          THE WITNESS:  The nature of our investigation and

20 the subjects that we cover when we interview people can be

21 very sensitive, oftentimes very embarrassing, and I just

22 wanted to have privacy to have that discussion.

23 BY MS. PARUTI:

24 **Q.**  Sorry to interrupt.

25          Just to be clear, what was the nature of this

1  investigation?

2  **A.**  Child pornography.

3        THE COURT:  Was there a door between the kitchen

4  and the dining room?

5        THE WITNESS:  Yes, I believe there was a door.  But

6  I can't remember if it was closed or not.

7  BY MS. PARUTI:

8  **Q.**  Do you know where Ms. Kryzak was at that point?

9  **A.**  No.

10  **Q.**  But fair to say she was not invited to join the

11  conversation?

12  **A.**  That's right.

13  **Q.**  And why was she not -- I know you just said it was

14  sensitive, but why was she not invited to join that

15  conversation?

16  **A.**  We never interview people together.  We interview people

17  separately.

18  **Q.**  Do you know whether she, in fact, was interviewed by

19  anybody on scene?

20  **A.**  Subsequently, I know that someone spoke with her.

21  **Q.**  Okay.  Were you involved in that?

22  **A.**  No.

23  **Q.**  Now, after -- you can hear on the recording that after

24  about 25 minutes or so, you and Agent Richardson suspend or

25  take a break, pause the recording.  What did you do after you

1  stopped that first clip of the interview?

2  **A.**  After we paused, I went out to confer with the computer

3  forensics agents.  Because during our interview, Mr. Johnson

4  stated that the contraband that we would be looking for could

5  be found on a folder named "CL Perv," and I wanted to pass

6  that information along to the computer forensics agents.

7  **Q.**  Okay.  Did you have conversations -- without saying

8  really what you talked about, did you have conversations with

9  any other members of the search team?

10  **A.**  I probably conferred with my supervisor who was there

11  that day.  I most likely would have made a phone call to the

12  US Attorney's Office at that point.  But the search was still

13  ongoing.

14  **Q.**  Okay.  At some point did you become aware that forensics

15  agents had found any evidence that was relevant to your

16  investigation?

17  **A.**  At that point, no.

18  **Q.**  At some point did that happen?

19  **A.**  Yes.

20  **Q.**  Do you remember approximately how much time had passed

21  once that occurred?

22  **A.**  Possibly 30 minutes or so.

23          THE COURT:  Before or after you completed the first

24  recorded interview of Mr. Johnson?

25          THE WITNESS:  Yes, that's right.  After the first

part of the recording, I would estimate about 30 minutes or so.

THE COURT: So during the course of that recording, you hadn't heard about any results from the search team finding contraband?

THE WITNESS: Correct. Correct.

THE COURT: Then this report you received was after the first recording, but it was before the second recording.

THE WITNESS: Yes, that's right.

THE COURT: Go ahead.

BY MS. PARUTI:

Q. So to be clear, in between the two recordings. So the first recording --

Well, do you remember approximately what time you ended the first recording?

A. I believe it was a little after 6:30.

Q. Okay. And so do you remember when you went back on tape the second time around?

A. I think it was about 7:30.

Q. Okay. So within that hour-ish range.

A. Yeah.

Q. You said that you consulted with the forensics people to tell them about the CL Perv folder?

A. Correct.

Q. You probably consulted with your supervisor at some

1  point, probably the US Attorney's Office.  At any point did
2  you talk with Agent Richardson about other steps you would
3  take, vis-a-vis Mr. Johnson?
4  **A.**  Yes.
5  **Q.**  What was that?
6  **A.**  During that break, Special Agent Richardson asked me if I
7  could give my thoughts about a polygraph, offering a
8  polygraph interview to Mr. Johnson, because he worked closely
9  with a polygrapher who was not too far away.
10  **Q.**  Agent Richardson worked with a polygrapher?
11  **A.**  Yes.
12  **Q.**  And what was the reasoning for contemplating or using a
13  polygrapher in this type of situation?
14  **A.**  Due to the nature of Mr. Johnson's work with children,
15  our concern was that we wanted to rule out any contact
16  offenses.
17  **Q.**  Okay.  And what was your knowledge at that point about
18  his work with children?
19  **A.**  I knew that he taught special education and was a girls'
20  track coach at a local high school.
21  **Q.**  Okay.  Now, at some point -- well, when you -- doing
22  those things you just described, was that happening in the
23  kitchen with Mr. Johnson?
24  **A.**  No.
25  **Q.**  Where was that -- those things -- where were those things

1  happening?

2  **A.**  We were either in the dining room or the living room.

3  **Q.**  When you left the kitchen, where did Mr. Johnson go, if

4  anywhere?

5  **A.**  I don't know.

6  **Q.**  Okay.  Would -- do you know whether Mr. Johnson was

7  allowed to sort of roam around his house freely during the

8  time that you were -- you and your colleagues were conducting

9  the search?

10  **A.**  I don't -- I didn't see him at all, but that wouldn't be

11  our protocol.

12  **Q.**  Okay.  During the time that you were in the presence of

13  Mr. Johnson, was he ever handcuffed?

14  **A.**  No.

15  **Q.**  Was he ever physically restrained in any manner?

16  **A.**  No.

17  **Q.**  You said that you hadn't displayed your firearm.  At any

18  point, did you observe Agent Richardson display his firearm?

19  **A.**  No.

20  **Q.**  At any point that you were in the house, did you see any

21  other agent display their firearm?

22  **A.**  No.

23  **Q.**  What about at the entry?  Did the entry team display

24  firearms?

25  **A.**  Not that I'm aware of.  Not that I saw.

1  **Q.** And is that something that you would typically do in this
2  type of investigation?
3  **A.** No. Unless there's cause, if we know that someone has
4  firearms in the home, we generally do not have weapons drawn.
5          MS. PARUTI: Okay.
6          THE COURT: Did you have any such knowledge as to
7  Mr. Johnson?
8          THE WITNESS: Yes. We always check.
9          THE COURT: And as a result of that, what, if
10 anything, did you know about Mr. Johnson's possession of
11 firearms at the time you made entry?
12         THE WITNESS: We did not believe that he had
13 firearms.
14 BY MS. PARUTI:
15 **Q.** And same with respect to other members of the household?
16 **A.** Correct.
17 **Q.** Now, you said that you discussed the possibility of a
18 polygraph with Agent Richardson. At some point, did you or
19 he broach that with Mr. Johnson?
20 **A.** Yes.
21 **Q.** And where did that happen?
22 **A.** That happened in the kitchen. I believe we had the same
23 seating arrangement. And Special Agent Richardson described
24 to Mr. Johnson that there -- that there was an option, if he
25 so choose, chooses, to take a polygraph.

1  **Q.**  And were you there when he was explaining that?

2  **A.**  Yes.

3  **Q.**  What, if anything, by way of detail, did he tell -- or

4  what explanations did he give to Mr. Johnson as to why he

5  might do that?

6  **A.**  He explained to Mr. Johnson what I just stated earlier,

7  that there's a concern, given the nature of his employment

8  and his accessibility to children, that we wanted to rule out

9  any contact offenses.  And he explained that as much as it

10  could answer yes, it could answer no.  In other words,

11  Mr. Johnson could see it as an opportunity to clear any

12  confusion or doubt about that.

13  **Q.**  Okay.  And what was -- you heard Agent Richardson,

14  obviously, on the recording, correct?

15  **A.**  Correct.

16  **Q.**  How would you compare Agent Richardson's tone during this

17  conversation with Mr. Johnson, to his tone on the recording?

18  **A.**  It was the same.

19  **Q.**  Now, how would you describe Mr. Johnson's demeanor during

20  that particular conversation?

21  **A.**  His was the same.

22  **Q.**  And how would you describe that?

23  **A.**  He was quiet but relaxed, and we were all very mutually

24  respectful.

25  **Q.**  Okay.  Did he agree -- when you had that conversation,

1 did he agree to take a polygraph?

2 **A.** Yes.

3 **Q.** Now, how long did that conversation last?

4 **A.** Probably less than a minute.

5 **Q.** Okay. Did you do anything after you --

6 Now, that particular conversation was not recorded,

7 correct?

8 **A.** Correct.

9 **Q.** Did you do anything to memorialize that conversation that

10 you had with Mr. Johnson?

11 **A.** Yes.

12 **Q.** What did you do?

13 **A.** We put the audio recording back on.

14 **Q.** Okay. And is that the second clip that's involved --

15 that's included in Exhibit 1?

16 **A.** That's correct.

17 **Q.** And fair to say that's a quick, maybe, three minutes or

18 so?

19 **A.** That's right.

20 **Q.** And in that particular clip -- so the second clip on --

21 of Exhibit 1, you're describing a statement of rights,

22 essentially, correct?

23 **A.** That's right.

24 MS. PARUTI: May I approach, Your Honor?

25 THE COURT: You may.

BY MS. PARUTI:

**Q.**  So I'm approaching you with what's been premarked as Exhibit 9.

**A.**  Okay.

**Q.**  What is that?

**A.**  This is a form that our agency uses to provide someone a statement of their rights, which they can sign a waiver or not.

**Q.**  Okay.  Is that what we sort of colloquially now refer to as Miranda rights?

**A.**  That's correct.

**Q.**  Now, did you read the rights out loud to him at any point in this particular case?

**A.**  Not out loud.

**Q.**  Why didn't you read them out loud to him?

**A.**  Because at that point, we had been speaking, and I knew Mr. Johnson was articulate in our conversation; and I knew he was intelligent, and I knew he could read.

**Q.**  Did you have any concern that he'd be able to understand the rights as written?

**A.**  No.  But we did ask him that he initial each line so that he could -- he could mark that he understood each line of these rights.

**Q.**  Okay.  And then you see a signature that appears to be Walter Johnson, and then below that, is that your signature?

**A.**   It is.

**Q.**   Is this a fair and accurate copy of the form that you executed with him on that day?

**A.**   Yes, it is.

          MS. PARUTI:  Your Honor, I'd ask to admit what's been previously marked as 9 into evidence.

          THE COURT:  Any objection, subject to cross?

          MS. FRIED:  Subject to cross, no objection.

          THE COURT:  Admitted.

          (Exhibit No. 9 admitted into evidence.)

BY MS. PARUTI:

**Q.**   Now, after -- why is it that you decided to administer him his Miranda rights at that point in your -- in the whole day?

**A.**   So at that point, it was after Mr. Johnson had informed Special Agent Richardson that the contraband was located on a thumb drive.  That statement was made during our break.

**Q.**   Let me stop you there.  Can we just go back to that.

**A.**   Uh-huh.

**Q.**   So you're talking about a break.  Do you mean between the 6:30 stop of clip 1, and the 7:30ish start of clip 2?

**A.**   That's right.

**Q.**   Can you explain to the Court what you're talking about when you're referencing Mr. Johnson's statement to Agent Richardson?

1    **A.**   Yes.  I was outside of the kitchen.  I was talking to the

2    computer forensics agents.  We have a mobile forensics van,

3    so some of them were in the van.  It's kind of like a box

4    truck that was parked out on the street.  I was out there

5    talking to them.  And there were a couple who were located in

6    another room of the house.

7            And at some point, Special Agent Richardson came

8    over to me and said that Mr. Johnson clarified where,

9    exactly, the contraband was located.  It wasn't on a

10   particular computer device, it was on a USB thumb drive.

11   **Q.**   Okay.  And to your knowledge -- before you Mirandized

12   Mr. Johnson, to your knowledge, had the forensics agents

13   found any incriminating evidence at that point?

14   **A.**   No.

15   **Q.**   Okay.  At some point during any sort of on-scene preview,

16   do you know whether any of the forensics people found any

17   incriminating evidence?

18   **A.**   I believe it was all located on the thumb drive, during

19   the preview.

20   **Q.**   And that was done on scene?

21   **A.**   On scene.

22           THE COURT:  Before or after the second recorded

23   conversation?

24           THE WITNESS:  It was located before the second

25   recorded conversation.

```
1              THE COURT:  The thumb drive was located?
2              THE WITNESS:  Yes.
3              THE COURT:  And then was it previewed before the
4    second recorded conversation?
5              THE WITNESS:  Yes.
6              THE COURT:  So when you administered the Miranda
7    form during the second recorded conversation, you were
8    already aware that the thumb drive had been discovered and
9    had been previewed and contraband had been found on it?
10             THE WITNESS:  Yes.
11   BY MS. PARUTI:
12   Q.   Okay.  So after you went off tape that second time, for
13   the second clip, did you have further conversation with
14   Mr. Johnson?
15   A.   Yes.
16   Q.   Okay.  What was that conversation?
17   A.   I'm sorry, during the second recording?
18   Q.   After you turned the recording off.
19             THE COURT:  After the second recording.
20             THE WITNESS:  Oh, after the second recording.  I'm
21   sorry.
22             MS. FRIED:  After the second recording.  Okay.  I'm
23   just --
24             THE WITNESS:  I am, too.
25             After the second recording, I believe at that
```

point, Mr. Johnson -- Mr. Johnson was informed some time
after the recording ended that he was going to be placed
under arrest.

                    MS. PARUTI:  Uh-huh.

                    THE WITNESS:  And --

BY MS. PARUTI:

**Q.**  Who informed -- did you inform him that, or did somebody
else?

**A.**  It was myself or Agent Richardson.

**Q.**  Was he actually placed into custody, immediately after
you told him he was going to be arrested?

**A.**  No.

**Q.**  So he was allowed to stay?

**A.**  Yes.  He stayed in the kitchen -- after we -- I'm sorry.
After we ended the second recording, I conferred, again, with
the US Attorney's Office, and at that point, once they were
aware we now had forensic evidence, we were given
authorization to arrest him.  And at that point, I went back
to the kitchen.

**Q.**  And did what?

**A.**  Yes.

**Q.**  And did what?

**A.**  And spoke with Mr. Johnson, and we advised him that he
was going to be arrested.

**Q.**  Okay.  Do you recall any change in demeanor once you

1  delivered that news?

2  **A.**  No, I don't.

3  **Q.**  Was he -- at some point was he placed into physical

4  custody?

5  **A.**  Yes.

6  **Q.**  When did that happen, approximately?

7  **A.**  That happened some time between 8:00 and 8:30.

8  **Q.**  Okay.  And how do you know that specific time frame?

9  **A.**  I know that time frame because our -- our recordings

10  ended at about 7:30, or shortly thereafter, 7:30.  And when

11  he got to the Framingham police station, which was probably a

12  two-minute drive from there, it was about 8:30.

13  **Q.**  Okay.  Did you place him in handcuffs?

14  **A.**  No.

15  **Q.**  Who placed him in handcuffs, if you know?

16  **A.**  Someone from the Framingham Police Department.

17  **Q.**  And how did he actually get to the Framingham Police

18  Department?

19  **A.**  Framingham police transported him.

20  **Q.**  Is there some reason why Framingham did the transport if

21  it was a federal arrest?

22  **A.**  Oftentimes a local police department will offer a

23  courtesy booking.

24  **Q.**  And did you do that in this case?

25  **A.**  Yes.

1   **Q.** So after he was booked --

2         And was he actually booked at the Framingham PD?

3   **A.** Yes, he was.

4   **Q.** After he was booked, did you participate in another

5   interview with Mr. Johnson?

6   **A.** Yes.

7   **Q.** And what was the nature of that interview?

8   **A.** That was the polygraph interview.

9   **Q.** Okay. And was that a recorded interview?

10   **A.** Yes, it was.

11   **Q.** And was that one actually video recorded?

12   **A.** Yes, it was.

13   **Q.** And have you had, at some point, the opportunity to

14   review the actually recording of the interview with him at

15   the Framingham PD?

16   **A.** Yes. Yes. I'm sorry.

17   **Q.** And are you aware that that's been submitted as

18   Exhibit 2?

19   **A.** Yes.

20   **Q.** For purposes of this hearing.

21         Now, who actually participated in the interview of

22   Mr. Johnson at the Framingham Police Department?

23   **A.** That was myself, and it was led by Special Agent Braga

24   from the FBI.

25   **Q.** Braga?

1  **A.**  Correct.

2  **Q.**  And where, specifically, at Framingham PD was that

3  conducted?

4  **A.**  It was in an interview room.

5  **Q.**  Okay.  Now, you told us that you had administered Miranda

6  rights before you left the house, essentially.  Did Agent

7  Braga administer additional -- an additional set of rights to

8  him?

9  **A.**  Yes.

10           MS. PARUTI:  May I approach, Your Honor?

11           THE COURT:  Yes.  You don't need to ask again.

12           MS. PARUTI:  Thank you.

13  BY MS. PARUTI:

14  **Q.**  I'm placing before you Exhibit 10.  What is that?

15  **A.**  This is an FBI form, showing the advice of rights.

16  **Q.**  Okay.  And is that one of the forms --

17           Actually, did you sign that form?

18  **A.**  I did.

19  **Q.**  And did you observe Mr. Johnson sign that form?

20  **A.**  I did.

21  **Q.**  And is that whole administration of rights actually on

22  Exhibit 2?

23  **A.**  Yes, it is.

24  **Q.**  Fair to say that's a printout of the computer-generated

25  form?

**A.** That's right.

**Q.** Okay. Does this appear to be a fair and accurate copy of what you signed that day?

**A.** Yes, it is.

**Q.** I'm placing before you Exhibit 11, which is -- excuse me.

What is that?

**A.** This is another FBI form, consent to interview with polygraph.

**Q.** Okay. And is that another consent that was executed on tape, which has been documented as Exhibit 2?

**A.** Yes.

**Q.** Does this appear to be a fair and accurate copy of what you saw signed in your presence on that day?

**A.** Yes, it is.

MS. PARUTI: Your Honor, I'd move Exhibits 10 and 11 into evidence at this point.

THE COURT: Any objection?

MS. FRIED: No objection, Your Honor.

THE COURT: All right. 10 and 11 are admitted.

(Exhibit Nos. 10 and 11 admitted into evidence.)

THE COURT: Ms. Paruti, just as a side note, I don't think I have the second disc. Ms. Montez checked, and what I have here, filed under seal, is one disc that has Exhibits 1 and 2, which are the two recordings at Mr. Johnson's home.

```
 1              MS. PARUTI:  Okay.  With the Court's permission,
 2    I'll submit it --
 3              THE COURT:  Yes, you can submit it some time today.
 4              MS. PARUTI:  Okay.  We'll fix the numbering.
 5              THE COURT:  We can call disc 1, Exhibit 1.
 6              MS. PARUTI:  Perfect.
 7              THE COURT:  And even though to the motion -- for
 8    the purpose of the hearing, it's Exhibit 1, and it's also
 9    docket number 100.
10              MS. PARUTI:  Okay.
11              THE COURT:  And you don't need to submit another
12    copy of that.
13              MS. PARUTI:  Okay.
14              THE COURT:  And then 1-A is the transcript.  We've
15    marked that.
16              So Exhibit 2, to keep the numbering in order, can
17    be the other disc with the video -- the series of files of
18    the video recording.
19              And just at some point today --
20              MS. PARUTI:  I will.  I will do that.
21              THE COURT:  -- submit that to Ms. Simeone.
22    BY MS. PARUTI:
23    Q.  Just for orientation of the Court when he's watching that
24    video, was that interview -- fair to say that was much longer
25    than the interview at the home?
```

1  **A.**  Yes.

2  **Q.**  Okay.  How many different parts made up that interview?

3  **A.**  Oh --

4  **Q.**  Let me rephrase that.  I don't mean how many files.  I

5  mean how many portions -- when you were sitting there in the

6  interview room with him, how many distinct parts of the

7  interview were there?

8  **A.**  Oh.  There was a prepolygraph interview that was recorded

9  and a subsequent recording postpolygraph.

10  **Q.**  Okay.  Was the actual polygraph administration itself

11  recorded?

12  **A.**  No.

13  **Q.**  Okay.  Just the interviews?

14  **A.**  That's right.

15          THE COURT:  I'm sorry, just so I'm clear, because I

16  haven't watched that video --

17          THE WITNESS:  Uh-huh.

18          THE COURT:  -- so there's an interview, video

19  recording, one or more files, of Special Agent Braga talking

20  to Mr. Johnson, before the administration of the polygraph.

21          THE WITNESS:  That's right.  And I was present, as

22  well.

23          THE COURT:  And you were present for that.

24          THE WITNESS:  Uh-huh.

25          THE COURT:  But then the recording stops; is that

1    correct?

2            THE WITNESS:  That's correct.

3            THE COURT:  Then Special Agent Braga administers

4    the polygraph.

5            THE WITNESS:  That's correct.

6            THE COURT:  And during the administration of the

7    polygraph, you were present?

8            THE WITNESS:  No.

9            THE COURT:  No.  You left the room.

10           THE WITNESS:  That's right.

11           THE COURT:  So as far as you know, it was just the

12   two of them in the room.

13           THE WITNESS:  Yes.

14           THE COURT:  And then, at some point, did you

15   reenter the room?

16           THE WITNESS:  Yes.

17           THE COURT:  And why did you reenter the room?

18           THE WITNESS:  It was a separate room.  The

19   polygraph was conducted in a separate room from the

20   interviews.

21           THE COURT:  I see.  And how did you know they were

22   done with the polygraph?

23           THE WITNESS:  They came back out.

24           THE COURT:  Special Agent Braga and Mr. Johnson?

25           THE WITNESS:  That's right.

```
1            THE COURT:  I see.  And then there was another

2  interview?

3            THE WITNESS:  Yes.

4            THE COURT:  And that was video recorded?

5            THE WITNESS:  That's right.

6            THE COURT:  I see.  Okay.  Go ahead.

7  BY MS. PARUTI:

8  Q.  And would it be fair to say, just for orientation

9  purposes, the pre-interview started at about 10:27 or so?

10 A.  Yes.

11 Q.  And the post-interview started about 12:20 or so?

12 A.  Yes.

13 Q.  And it ends at about 1:36 p.m.?

14 A.  That's right.

15           THE COURT:  So I'm clear, are there statements made

16 during the unrecorded polygraph that are being offered?

17           MS. PARUTI:  No.

18           THE COURT:  Are there statements from the

19 pre-interview recording that are offered?

20           MS. PARUTI:  That -- maybe.

21           THE COURT:  Maybe.  And from the post-interview?

22           MS. PARUTI:  Maybe.

23           THE COURT:  I see.  Okay.  But not from the

24 unrecorded polygraph.

25           MS. PARUTI:  Not from the polygraph itself, which,
```

1  as the Court knows, is not admissible.

2          THE COURT:  In any event.  But there are not

3  statements.

4          MS. PARUTI:  Correct.

5          THE COURT:  Okay.  Go ahead.

6  BY MS. PARUTI:

7  **Q.**  All right.  Fair to say -- well, when you were done with

8  the polygraph, did you then transport him to this courthouse?

9  **A.**  Yes.

10  **Q.**  Now, you said that Mr. Johnson had not been handcuffed

11  prior to when he was actually placed under arrest by

12  Framingham PD; is that correct?

13  **A.**  That's right.

14  **Q.**  At any other point in your interaction with him, did you

15  observe or did you become aware of any other physical

16  restraint on his movement?

17  **A.**  No.

18  **Q.**  Do you know whether he was allowed, for example, to use

19  the bathroom at any point?

20  **A.**  Yes.

21  **Q.**  Was he required to stay in that kitchen area?

22  **A.**  No.

23  **Q.**  If he -- are you aware of whether or not he asked to

24  leave the kitchen area?

25  **A.**  Not that I ever heard.

1  **Q.**  Okay.  And based on your practice, if he had asked to

2  leave the kitchen area, would he have been allowed to?

3  **A.**  Yes.

4  **Q.**  Do you know -- you said that you initially had an

5  interaction with Ms. Kryzak, correct?

6  **A.**  Yes.

7  THE COURT:  What do you mean by that, he would be

8  allowed to leave the kitchen?

9  THE WITNESS:  If he needed -- for instance, if he

10  needed to go use the bathroom, he wouldn't have been

11  prevented from going to use the bathroom.  People would

12  accompany him, but he would have been able to --

13  THE COURT:  I see.

14  THE WITNESS:  He was able to do that.

15  BY MS. PARUTI:

16  **Q.**  Can I clarify that.  When you say, "People could would

17  accompany him," to the bathroom, what do you mean?

18  **A.**   I mean while a search warrant is being conducted, while

19  we're actively still searching for evidence, we don't allow

20  residents or occupants to freely roam throughout the

21  premises.

22  **Q.**  But specifically with respect to, for example, using the

23  bathroom, would somebody go into the bathroom with him?

24  **A.**  No.

25  **Q.**  How would that work?

1    **A.**   Generally speaking -- I wasn't there in this particular

2    instance, but we would -- someone, usually one agent, would

3    accompany them to the room and just stand outside the door.

4    **Q.**   Okay.  Would the door be closed or open or something

5    else?

6    **A.**   Usually ajar.

7    **Q.**   But not wide open?

8    **A.**   No, no, no.

9    **Q.**   You said that you wouldn't have let Ms. Kryzak be part of

10   the interview with Mr. Johnson.  Was -- to your knowledge,

11   was Ms. Kryzak otherwise prevented from being with or hanging

12   out with or seeing Mr. Johnson during the times you were in

13   the home, when you weren't speaking with him?

14   **A.**   After we spoke with him?  No.

15   **Q.**   To your knowledge, did Ms. Kryzak ever ask to join

16   Mr. Johnson?

17   **A.**   Not that I know of.

18           MS. PARUTI:  Okay.  I have no further questions at

19   this time, Your Honor.

20           THE COURT:  Just one or two, before you begin,

21   Ms. Fried, and then you can follow-up on everything.

22           So just in terms of -- coming back to moving around

23   the house, do you have any recollection of Mr. Johnson being

24   anywhere, other than in the kitchen, during the time that you

25   were at the home?

1          THE WITNESS:  No.

2          THE COURT:  And did -- do you have any -- you don't

3     have any recollection of him, for example, going to the

4     bathroom, getting dressed, making phone calls, or how about

5     anything like that?

6          THE WITNESS:  I did not see him go to use the

7     bathroom.  I learned after that he did.  I didn't witness it.

8          THE COURT:  Okay.  And prior to you -- in your

9     view, was Mr. Johnson free to leave the home?

10          THE WITNESS:  Yes.  If he asked me if he could

11     leave, he would have been allowed to leave.

12          THE COURT:  I see.  So he could just say, "I want

13     to go down to the corner store," "I want to go to work," "I

14     just want to get in my car and leave or I could walk and

15     leave."

16          THE WITNESS:  Yes.  Yes.  We've have other

17     instances where people opt to leave, and that's fine.

18          THE COURT:  So in terms of standard protocol, that

19     would be permissible?

20          THE WITNESS:  Yes.

21          THE COURT:  And in terms of this particular

22     instance, prior to you placing him under arrest, in your

23     view, if Mr. Johnson had said, "I wish to leave," or if he

24     just got up and walked out the back door of the kitchen,

25     outside and walked away, that would be permissible?

1          THE WITNESS:  Prior to us placing him under arrest,
2     yes.
3          MS. PARUTI:  Can I just follow-up on that, Your
4     Honor.
5          THE COURT:  You can.  Let me just have one
6     follow-up.
7          MS. PARUTI:  Oh.  I'm sorry.  I thought you were
8     done.
9          THE COURT:  And then Ms. Fried can ask whatever she
10    wants.
11         MS. PARUTI:  Thank you.
12         THE COURT:  Is there a practice by which some of
13    the -- why were some conversations recorded and others not?
14         THE WITNESS:  The conversation, when I explained to
15    him that they were -- that we were present to conduct a
16    search warrant, that was just all preliminary.  And we
17    usually do some sort of ice breaking conversation before we
18    just pull out a recording device and start recording it.
19         And during the pause, during the break, when
20    Special Agent Richardson went back into the kitchen and
21    Mr. Johnson disclosed that there were USB drives that
22    contained contraband, that was kind of -- from my
23    understanding, that was a spontaneous conversation.  It
24    wasn't --
25         MS. FRIED:  Objection.

1          THE COURT:  Overruled.

2          THE WITNESS:  It wasn't -- it wasn't part of our

3    interview.  I think -- Special Agent Richardson can explain

4    it, also, but --

5          THE COURT:  So when you left --

6          THE WITNESS:  I'm sorry.

7          THE COURT:  Go ahead, finish your answer.

8          THE WITNESS:  Mr. Johnson was made aware that we

9    were still in the process of searching for the folder that he

10   had described, CL Perv.  And at that time he --

11         THE COURT:  Your understanding is that's --

12         THE WITNESS:  He just provided this information.

13         THE COURT:  So when you -- at the end of the first

14   recording, you then left the room to talk to other agents.

15         THE WITNESS:  Correct.

16         THE COURT:  To see what was going on.

17         When you left the room, Special Agent Richardson

18   remained in the room with Mr. Johnson, at least at the moment

19   that you walked out; is that correct?

20         THE WITNESS:  He and I left the room together, but

21   at some point he went back in.

22         THE COURT:  So when you left -- so the two of you,

23   at the end of the recording, you both leave together?

24         THE WITNESS:  Yes, I believe so.

25         THE COURT:  And at that point, who's in the room?

1          THE WITNESS:  I believe my supervisor went into the

2    kitchen.

3          THE COURT:  When you left or earlier?

4          THE WITNESS:  When we left.

5          THE COURT:  I see.  So at that point, your

6    supervisor is in the kitchen with Mr. Johnson.

7          THE WITNESS:  Yes, I believe so.

8          THE COURT:  Did you return to the kitchen at any

9    point prior to the second recording?

10          THE WITNESS:  I did not.

11          THE COURT:  You did not.  So you first come back

12    into the kitchen at or just before the second recording?

13          THE WITNESS:  That's right.

14          THE COURT:  And do you have any knowledge of who

15    else was in the kitchen during that period of time?

16          THE WITNESS:  I believe it was just my supervisor.

17          THE COURT:  And at some point, Special Agent

18    Richardson went back in?  Or no?

19          THE WITNESS:  At some point he went back in, and

20    then he came back out to tell me that information.

21          THE COURT:  I see.  Okay.

22          I don't have any other questions.  Go ahead.

23          MS. PARUTI:  Thank you.

24    BY MS. PARUTI:

25    Q.  You had referenced Mr. Johnson going to the bathroom.  At

1  any point, did Mr. Johnson ask to make any phone calls?

2  **A.**  Yes.  Prior to his arrest, prior to being handcuffed.

3  **Q.**  When you say "prior to being handcuffed," had you already

4  informed him that he was going to be placed under arrest?

5  **A.**  I believe at that point we had.

6  **Q.**  And do you know who he was calling?

7  **A.**  He was calling his employer.

8  **Q.**  And did you or other agents allow him to make that call?

9  **A.**  Yes.

10  **Q.**  How did he make that call?

11  **A.**  He made the call from a house phone, a landline.

12  **Q.**  Did he ask to use some other phone to make the call?

13  **A.**  He -- he -- I didn't recall immediately.  Subsequently I

14  learned that he wanted to use his cell phone.

15  **Q.**  Is there a reason why he wasn't allowed to use his cell

16  phone?

17  **A.**  That was evidence, pursuant to the search warrant.

18  **Q.**  Okay.  You said that if he had asked to leave, you would

19  have let him leave.

20          Did he ask to leave?

21  **A.**  No.

22          MS. PARUTI:  No other questions.

23          THE COURT:  Go ahead, Ms. Fried.

24          MS. FRIED:  May I have just a moment?

25          THE COURT:  Certainly.

| | |
|---|---|
| 1 | MS. FRIED:  Thank you. |
| 2 | **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT** |
| 3 | BY MS. FRIED: |
| 4 | **Q.**  Good morning, Agent Connolly. |
| 5 | **A.**  Good morning. |
| 6 | **Q.**  All right.  So you arrived, along with the other people |
| 7 | that were executing the search warrant, this party of |
| 8 | officers, arrived at Mr. Johnson's and Ms. Kryzak's house at |
| 9 | 6 o'clock in the morning, right? |
| 10 | **A.**  Yes. |
| 11 | **Q.**  And you told us that it was dawn, so it was not fully |
| 12 | light out, correct? |
| 13 | **A.**  I don't believe it was a sunny day. |
| 14 | **Q.**  And this -- well, this was April 27th? |
| 15 | **A.**  Yes. |
| 16 | **Q.**  Of 2017.  Do you know whether the clocks had flipped |
| 17 | forward yet, and we were already into daylight savings time |
| 18 | on that date or not? |
| 19 | **A.**  I don't recall. |
| 20 | **Q.**  You don't know.  So this could have been regular Eastern |
| 21 | Standard Time, or it could have been daylight savings time by |
| 22 | then, correct? |
| 23 | **A.**  Yes. |
| 24 | **Q.**  And you're not sure which it was? |
| 25 | **A.**  I'm not. |

1  **Q.**  If it had been daylight savings time, it's true, isn't

2  it, that it would have been darker than it would have been at

3  Eastern Standard Time at 6:00 a.m., correct?

4          MS. PARUTI:  Objection.

5          MS. FRIED:  The clocks go forward.

6          THE COURT:  I actually don't know the answer to

7  that question off the top of my head.  So I think that from

8  my -- I think the relevant issue is what was the light like.

9          MS. FRIED:  (Nods head.)

10          THE COURT:  And that would be evidence bearing on

11  how light it would be.  I think the two of you could look at

12  that after the hearing, if you want, to determine -- and I

13  think you ought to be able to stipulate as to when the clocks

14  turned back.

15          MS. FRIED:  Right.

16          THE COURT:  And if you want --

17          MS. PARUTI:  When the sunrise was or something.

18          THE COURT:  Sunrise on that date, according to

19  the -- that might be the easiest.

20          MS. PARUTI:  I'm happy to do that.

21          MS. FRIED:  All right.  That's fine.

22          THE COURT:  Go ahead.

23  BY MS. FRIED:

24  **Q.**  All right.  Now, you said that -- well, first of all,

25  let's look at -- do you have the exhibit in front of you that

1  has the schematic of the house?  I think it's Exhibit 12.

2  **A.**  Yes, I do.

3  **Q.**  And you told us that there were somewhere in the

4  neighborhood of 13 to 15 different law enforcement there at

5  the house when you arrived at 6 o'clock, correct?

6  **A.**  Yes.  Can I clarify?

7  **Q.**  From different agencies, right?

8  **A.**  Yes.

9  **Q.**  But in total, the number of people actually there was,

10  you said, six to eight Homeland Security officers, correct?

11  **A.**  Uh-huh.  Correct.

12  **Q.**  And you told us that there were four Framingham police

13  officers?

14  **A.**  Yes.

15  **Q.**  So that's either ten to 12 people altogether, correct?

16  **A.**  Yes.

17  **Q.**  And you told us that there were two task force officers

18  that were forensic people.  So that's another two, correct?

19  **A.**  The task force may have been part of that six to eight,

20  because they're task force officers with Homeland Security

21  Investigations.

22  **Q.**  You mean you're not sure.

23  **A.**  Yeah, I'd have to --

24  **Q.**  It may be, there may not be.  There may be two extra

25  people, there may not be two extra people?

1  **A.**  Yes.

2  **Q.**  And you said there was a Mass. State Police task force

3  officer also from forensics?

4  **A.**  Yes.

5  **Q.**  So we've got somewhere more than 10, and perhaps up to 15

6  officers, correct, at the house?

7  **A.**  Not inside the house, but at the house.

8  **Q.**  Well, at the house.

9  **A.**  Yes.

10  **Q.**  At the house, before you make entry into the house,

11  correct?

12  **A.**  Yes.

13  **Q.**  And it's true, isn't it, that when you walk up to the

14  front door of the house, there is a little screened-in porch

15  that wraps around to the right side of the front door, and

16  goes on to the outside of the house, correct?

17  **A.**  Yes.

18  **Q.**  And it's got a hard wall.  It's not like a screen, but

19  it's got a hard wall, and it's a porch, right?

20  **A.**  Yes.

21  **Q.**  And if you were stepping out of the house, before you

22  stepped onto the stoop to go down the stairs, you would be on

23  the landing to this porch, this outer porch that wraps to

24  your left, around the sides of the house, correct?

25  **A.**  That wraps to your left?

```
 1            THE COURT:  When you're walking out to your left.
 2   BY MS. FRIED:
 3   Q.  As you're walking out of the house?
 4   A.  Oh.  Out of the house, yes.
 5   Q.  As you're walking out the front door, it would wrap
 6   around to your left?
 7   A.  Yes.
 8   Q.  So as you are entering the house, it's to the right,
 9   wrapping around the house?
10   A.  Yes.
11   Q.  It's true, isn't it, that there were officers, also -- a
12   number of officers who had stationed themselves on that
13   porch, in addition to being on the lawn and at the front door
14   before entry was made to the house?  Correct?
15   A.  I don't recall.
16   Q.  You don't recall.
17   A.  No.
18   Q.  Okay.  And that at least all of the people from
19   Department of Homeland Security were wearing these ballistics
20   vests that you described to the Court earlier, right?
21   A.  Vests or a raid jacket that had police markings.
22   Q.  Okay.  And these are big, bulky items, items of clothing
23   that are bulletproof, right?
24   A.  Yes.
25   Q.  And they give people a lot of bulk.  You look big and
```

1  bulky when you're wearing these things, right?

2  **A.**  Sure.  Yes.

3  **Q.**  And you also told us that you were wearing what you call

4  your duty weapon, right?

5  **A.**  Yes.

6  **Q.**  And that's a gun, right?

7  **A.**  Yes.

8  **Q.**  And you had it holstered, but you had a gun on your

9  person, right?

10  **A.**  I did.

11  **Q.**  And Agent Richardson, was he also wearing his duty

12  weapon?

13  **A.**  Yes.

14  **Q.**  And how many other people who were there were wearing

15  their duty weapons?

16  **A.**  Any sworn member of law enforcement, which I believe was

17  everybody -- no.  I'm sorry.  One person from my agency was

18  not a sworn member.  So all but one would have been wearing a

19  duty weapon.

20  **Q.**  Okay.  So everybody there, except one person, would have

21  had a firearm on their side, on their person, correct?

22  **A.**  Yes.

23  **Q.**  Now, and this breaching equipment, this battering ram,

24  could you describe what that is, how that looks, please?

25  **A.**  Yes.  I don't have a specific memory of it from that day,

1    but we generally do bring a ram that is --

2    **Q.**  What's it made of?

3    **A.**  I'm not sure what it's made of.

4    **Q.**  Is it metal or is it --

5    **A.**  It's heavy.  It's heavy, and it's meant to break a lock,

6    if necessary.

7    **Q.**  Uh-huh.  And is it handled by one person or more than one

8    person?

9    **A.**  One person.

10   **Q.**  What are the dimensions of this object?

11   **A.**  I would say roughly three feet.

12   **Q.**  Three feet in one direction and -- but that's the length?

13   **A.**  That's the length.

14   **Q.**  And the width?

15   **A.**  It's maybe an eight-inch diameter, roughly.

16   **Q.**  Is it cylindrical or is it a bar?  What does it look

17   like, what is it shaped like?

18   **A.**  It's cylindrical.

19   **Q.**  It's a big, heavy, metal cylinder of some kind?

20   **A.**  Yes.

21   **Q.**  And it's used to break a lock?

22   **A.**  If necessary, yes.

23   **Q.**  If necessary.

24   **A.**  Uh-huh.

25   **Q.**  And in this case, it wasn't necessary?

**A.** No.

**Q.** Because people knocked, or somebody knocked. You weren't at the door, right?

**A.** No, I was not.

**Q.** But you heard somebody from the team knock on the door and announce "police," correct?

**A.** Yes.

**Q.** And shortly after that, somebody came to the door, and you don't know who it was, correct?

**A.** That's correct.

**Q.** You knew -- you do know, however, that there were two occupants of the house: Mr. Johnson and Ms. Kryzak.

**A.** Yes.

**Q.** So it was one or the other of them who came to the door, correct?

**A.** Yes.

**Q.** And you know that neither of them impeded anybody's entry into the house, correct?

**A.** As far as I know, they did not.

**Q.** Okay. Now -- just a minute.

Now, you told us that by the time you saw Mr. Johnson yourself, he was already in the kitchen, with a couple of other agents, right?

**A.** Yes.

**Q.** And you don't remember how he was dressed, do you?

**A.** I don't.

**Q.** Well, could he have been dressed simply in a pair of shorts and a pair of flip-flops?

**A.** He may have been.

**Q.** He might have been. In other words, he might have been shirtless and pantless and wearing only a pair of flip-flops, right?

MS. PARUTI: Objection.

MS. FRIED: If she remembers.

MS. PARUTI: She said she didn't remember. She also -- she's testified that he might have been wearing shorts, with something on his feet. I think that establishes it. And it's kind of exploiting her lack of memory and getting into hypotheticals at this point.

THE COURT: Sustained. I get the point.

BY MS. FRIED:

**Q.** Now, it's true, isn't it -- well, you told us already, when Ms. Paruti was asking you questions, that it is not protocol to let people, occupants of a house that is being searched, to move freely about the house, at least unaccompanied, right?

**A.** That's right.

**Q.** And you know, of course, that the purpose of a search warrant is to assert control over a space, so that it can be searched for evidence, correct?

```
1                    MS. PARUTI:  Objection.

2                    THE COURT:  Sustained.

3      BY MS. FRIED:

4      Q.  In order for you to execute a search warrant completely,

5      you would agree with me, wouldn't you, that it is necessary

6      for the group of agents executing the search warrant to have

7      control over the premises, so that evidence isn't lost or

8      destroyed, right?

9      A.  Yes.

10     Q.  And are you familiar with the Supreme Court case of

11     Michigan vs. Summers, and how that has an impact on the work

12     of officers executing a search warrant?

13                   MS. PARUTI:  Objection.

14                   THE COURT:  Sustained.

15                   THE WITNESS:  No.

16     BY MS. FRIED:

17     Q.  Well, are you aware that police officers have -- people

18     executing a search warrant have the authority to detain

19     people on the premises while they are executing a search

20     warrant?  You're aware of that through your training, are you

21     not?

22                   MS. PARUTI:  Objection.

23                   THE COURT:  What's the relevance?

24                   MS. FRIED:  Well, I'm just trying to get into the

25     the --
```

1         THE COURT:  It's fine to ask her what she actually

2  did.  But what difference does it make what she knows about

3  the law or doesn't know about the law?

4         MS. FRIED:  Well, let me pursue this.

5  BY MS. FRIED:

6  **Q.**  It's often the case that you want people to remain there

7  so that they can help you execute the search warrant; isn't

8  that right?

9         MS. PARUTI:  Objection.

10         THE COURT:  Overruled.

11         THE WITNESS:  Only if they agree to.

12  BY MS. FRIED:

13  **Q.**  Well, for example, during the course of this interview

14  with Mr. Johnson, after the tape was turned off --

15         Well, let me ask you this.  Do you know whether

16  other agents, either Agent Richardson or your supervisor,

17  asked him where things were in the house?

18  **A.**  During --

19  **Q.**  Asked -- yes.

20  **A.**  I'm sorry.  During our interview with him, we --

21  **Q.**  During any of the time, whether it was recorded or

22  unrecorded, were there questions put to Mr. Johnson about

23  where they might find things that were the object of the

24  search warrant, such as computer equipment?

25  **A.**  Mr. Johnson offered that information.

**Q.** Well, but I'm asking whether --

MS. PARUTI: Can she finish?

THE COURT: Let her finish answering the question.

I don't know if she's finished with the answer.

MS. FRIED: Go ahead.

THE WITNESS: He, at some point, offered that information about where the contraband was located.

BY MS. FRIED:

**Q.** Did anybody ask him where they might find the computers?

**A.** Specifically, no, I don't think we did.

**Q.** Well, let me ask you this. Do you know where --

Well, first of all, do you know how many pieces of computer equipment were taken from the house?

**A.** I believe there were -- there were maybe -- I want to say about six thumb drives total taken, a phone, an iMac, and maybe one other piece of equipment.

**Q.** So your memory is that thumb drives, a telephone, and an iMac were taken from the house, and nothing else?

THE COURT: No, that's not what she said. She said one phone, one iMac, six thumb drives, and she thought something else.

BY MS. FRIED:

**Q.** And what was the something else?

**A.** I can't remember off the top of my head.

**Q.** Well, let me ask you this. Did you, yourself, personally

1  find any of those items to remove them?

2  **A.**  No.

3  **Q.**  Do you know who did find those items to remove them?

4          MS. PARUTI:  I'm just going to object, Your Honor,

5  based on relevance, given the scope of the motion.  I just

6  don't see how it's related to the statements and the issue of

7  whether or not Mr. Johnson was in custody.

8          MS. FRIED:  Your Honor, it has to do with whether

9  or not he's being questioned and the amount of police control

10  that's happening.  The Government's position on this case is

11  that he's not in custody at all during the time that this is

12  happening.  To the extent that the -- it's clear he was

13  certainly interrogated during at least the first part of the

14  interview, but there's a long, one-hour period of unrecorded

15  time.

16          We know during that time, from this agent's

17  testimony, that actual physical evidence is removed and

18  examined during the house.  This witness claims not to have

19  been a party to the conversations about how any of that

20  evidence was discovered or how it was discovered itself, but

21  it is relevant to the extent to which the police are

22  asserting control or using his presence in order to forward

23  the aims of the search.

24          THE COURT:  What's the question that you want to

25  ask?

1    MS. FRIED:  I wanted to ask -- if I can remember

2    exactly how.

3    BY MS. FRIED:

4    **Q.**  I was going to ask whether you know -- well, whether you

5    know who took these other pieces of equipment.  You said you

6    did not remove them yourself.  Do you know who did remove

7    these other pieces --

8    THE COURT:  When you say "remove," it would be the

9    person who took it out of the house?

10    MS. FRIED:  Yes.  It would be the person who

11    retrieved --

12    THE COURT:  As opposed to the person who found it.

13    MS. FRIED:  Either one.  Do you know any -- do you

14    know who either found --

15    THE COURT:  I agree with you that the scope of the

16    hearing is the statements, not the execution -- not, per se,

17    the search warrant.  That's not what I'm thinking about.

18    But nonetheless, for now, I overrule that

19    objection, and you can answer that --

20    MS. FRIED:  Okay.  Let me try to back up, and maybe

21    I can get this.

22    BY MS. FRIED:

23    **Q.**  First of all, do you know who removed any of these items

24    from the house that you've talked about?

25    **A.**  Who removed them?

1   **Q.**   Yes.

2   **A.**   Someone who was part of our search team.

3   **Q.**   You don't know specifically?

4   **A.**   Today, no, I don't recall off the top of my head.

5   **Q.**   Now, let me just ask you this.  After the recording

6   was -- the first part of this recording that happened between

7   6:08 and 6:34, you told us that you were in the kitchen

8   during that part of the interview; is that right?

9   **A.**   Yes.

10  **Q.**   When that recorder was turned off at 6:35, I just want to

11  be clear, did you say that at that point you left the

12  kitchen?

13  **A.**   Yes.

14  **Q.**   Okay.  And in the hour that took place between 6:34 and

15  7:35, when the recorder was not turned on, did you ever go

16  back into the kitchen yourself to have any conversation with

17  Mr. Johnson?

18  **A.**   I don't believe that I did.

19  **Q.**   At all?

20  **A.**   I don't recall ever going back.

21  **Q.**   So you're telling us, just so we're clear, that in the

22  hour that took place between 6:34 and 7:35, you, yourself,

23  did not go into the kitchen to have any conversation with

24  Mr. Johnson while the search of the house was taking place?

25  **A.**   I went back in with Special Agent Richardson, prior to

1  the second recording.

2  **Q.**  When you say "prior," how long prior?

3  **A.**  Not long.

4  **Q.**  So just prior?

5  **A.**  Just prior.

6  **Q.**  So some time -- some time well after 7 o'clock?  The

7  recording was turned back on at 7:35?

8  **A.**  Yes.

9  **Q.**  So some time well after 7 o'clock, you finally went back

10  into the kitchen yourself?

11  **A.**  Not by myself, but, yes, I went back into the --

12  **Q.**  Yourself, you went back into the kitchen?

13  **A.**  Yes.  With Special Agent Richardson?

14  **Q.**  With Special Agent Richardson.  But in that interim

15  period of about an hour, you were not in the kitchen?

16  **A.**  No, I don't recall going back in there.

17  **Q.**  Also, I just want to be clear.  Are you also telling us

18  that during that one-hour period of time, you do not know

19  where Mr. Johnson was?

20  **A.**  I knew he was still in the house, but that's it.

21  **Q.**  But you didn't know where in the house he was.  Is that

22  what you're telling us?  You didn't know that he was still in

23  the kitchen?

24  **A.**  That's correct.

25  **Q.**  Okay.  All right.  So you don't have any -- just to be

1  clear about this, are you saying that you have no personal

2  knowledge of any conversation or any questions that were put

3  to Mr. Johnson in that hour period between 6:34 and 7:35, as

4  related to the execution of the search warrant?

5  **A.**  I did learn from Special Agent Richardson about his

6  conversation with Mr. Johnson while I wasn't there.

7  **Q.**  So what you have is some secondhand information from

8  Richardson about conversations that he had with Mr. Johnson

9  in that hour period, correct?

10  **A.**  Yes.

11  **Q.**  And you have no personal knowledge of those

12  conversations, and you weren't a party to them; is that

13  right?

14  **A.**  I wasn't there.  That's right.

15  **Q.**  You weren't there.  Okay.

16       During that hour period, did you stay on the

17  premises?

18  **A.**  I know I walked outside, because we had the mobile

19  forensics van outside.  And at that point, I was still trying

20  to explain that there was a folder -- we believe there was a

21  folder called CL Perv that contained all the contraband.  So

22  I was outside with them for a while, and then I was inside

23  for a while.  And I was on the porch.

24  **Q.**  But you didn't leave 20 Burdette Avenue, except to go out

25  to this truck to talk to the forensics people?

**A.** That's right.

**Q.** So you stayed on the premise, and you were in and out of the house, correct?

**A.** Yes.

**Q.** And did you see other officers or agents or people or members of the search party going into and out of the house during that hour period after you left the kitchen?

**A.** I don't have any memory of that, of who came in or out.

**Q.** Well, I'm just asking you -- I didn't ask you who, I was asking you whether you saw people go in and out of the house?

**A.** I don't recall.

**Q.** You don't remember.

Well, what were you doing when you weren't out at the truck? You doing.

**A.** If I wasn't out of the truck, I was inside the house.

**Q.** And what were you doing inside the house?

**A.** Either speaking to my supervisor or making a phone call to the US Attorney's Office.

**Q.** And who was your supervisor?

**A.** My supervisor is Richard Sabatini.

**Q.** And he was there?

**A.** He was there.

**Q.** And -- well, let me ask you this. Did you ever see what was going on in the living room at the house?

**A.** No.

1   **Q.**  Not at all?

2   **A.**  I know that I -- I saw into the living room at some

3   point, but that's all I remember.

4   **Q.**  Well, I'm just going to ask you a little bit.  You said

5   earlier that this is a small home, correct?

6   **A.**  Yes.

7   **Q.**  When you walk in, there's a small entryway, correct?

8   **A.**  Uh-huh.

9   **Q.**  A small foyer.  And just to the left of this foyer,

10   there's a small living room, correct?

11   **A.**  Yes.

12   **Q.**  And as you walk -- straight ahead toward foyer, as you're

13   walking towards the back of the house, you're then in a small

14   dining room, correct?

15   **A.**  Yes.  Room C.

16   **Q.**  And then through that dining room, there is the kitchen,

17   correct?

18   **A.**  That's right.

19   **Q.**  And then the nonpublic areas of the house, that is the

20   two bedrooms and bathroom, were off to the left of these

21   three more-public areas, right?

22   **A.**  Yes.

23   **Q.**  Now, I just want to ask you, just show you Exhibit 8 --

24   **A.**  Uh-huh.

25   **Q.**  -- which is a photograph of the kitchen.  That depicts

1  the island, this kitchen island that the conversation that

2  was happening between you, Mr. Johnson, and Agent Richardson,

3  between 6:08 and 6:34, right?

4  **A.**  Yes.

5  **Q.**  And that door was closed.  There's a door on the left

6  that goes to a hallway, correct?

7  **A.**  That's right.

8  **Q.**  And who closed that door?

9  **A.**  I did.

10  **Q.**  You closed that door.

11  **A.**  Yes.

12  **Q.**  And you asked whether you could close the door that went

13  between the -- the kitchen and the dining room, correct?

14  There's a doorway there, isn't there?

15  **A.**  There is a doorway there.  And I can't remember if it

16  was -- if I closed that door or --

17  **Q.**  Did Mr. Johnson tell you that you couldn't close that

18  door, because there is no door hanging on those hinges?

19  **A.**  That's possible.

20  **Q.**  You don't remember being told that right now?

21  **A.**  No.  But probably.

22  **Q.**  Okay.  Now, so we know -- just want to recapitulate your

23  testimony.  Exhibit 8 is the kitchen.  You were not in this

24  room between 6:34 and 7:35, right?

25          MS. PARUTI:  Your Honor, I think that particular

1  question has been asked multiple times.

2          THE COURT:  Sustained.

3  BY MS. FRIED:

4  **Q.**  I just want to ask you, going to Exhibit 3, which is the

5  living room, were you in that room at all during that hour

6  time between 6:35 and -- 6:34 and 7:35?

7          THE COURT:  Between the end of the first recording,

8  and just before the second recording?

9  BY MS. FRIED:

10  **Q.**  That's right.  In the hour period between the two

11  recordings, were you in that room at all?

12  **A.**  I may have stepped in there, but I don't remember

13  spending any time in there.

14  **Q.**  You don't remember spending any time in there?

15  **A.**  No.

16  **Q.**  Okay.  I'm going to show you Exhibit 4, which is the

17  dining room.

18  **A.**  Yes.

19  **Q.**  Were you in that room at all?

20  **A.**  Yes.

21  **Q.**  During that one-hour period?

22  **A.**  Probably.

23  **Q.**  What were you doing there?

24  **A.**  I think I may have had the conversation with Special

25  Agent Richardson about the polygraph.  It might have been in

1    this room.

2    **Q.**  And how long did that conversation take?

3    **A.**  Maybe a couple minutes.

4    **Q.**  Okay.  So I'm just trying to figure out what your memory

5    is of where you were during that hour.

6              MS. PARUTI:  Objection, Your Honor.

7              One, I don't think that's a question.

8              Two, I think she's described, pretty thoroughly,

9    what she was doing, and what rooms she wasn't in and where

10   she did go.  So I just don't see how this is helpful at all

11   to reiterate or recapitulate the same information.

12             THE COURT:  Why don't you rephrase the question.  I

13   think the question is just sort of trying to figure out what

14   her memory is, might not be that precise.

15   BY MS. FRIED:

16   **Q.**  Well, let me ask you, did you ever -- did you ever go

17   into the bedroom that Mr. Johnson and Ms. Kryzak slept in?

18   **A.**  I don't believe I went into it.  I saw it, but I didn't

19   go in there.

20   **Q.**  Okay.  Did you ever go into the back room, the back

21   bedroom?

22   **A.**  Yes.

23   **Q.**  The small room?

24   **A.**  Yes, I did.

25   **Q.**  And when did you go into that room?

1    **A.**  It was during that break.  There were so many people --

2    there were so many computer forensics agents in the van

3    outside, that at least one, if not two of them, were set up

4    at a little table inside that back room.

5    **Q.**  Okay.  So you remember that a couple of forensics people

6    came out from the van and went into that room?

7    **A.**  I don't know if they came out of the van or there just

8    wasn't room in the van.

9    **Q.**  Okay.

10   **A.**  So they set up their equipment.

11   **Q.**  And they stationed themselves this that back room?

12   **A.**  That's right.

13   **Q.**  And what were they doing?

14   **A.**  They were previewing.

15   **Q.**  And what were they previewing?

16   **A.**  I'm not sure which devices in particular they were

17   previewing.

18   **Q.**  Do you know how they got the devices that they were

19   looking at to preview?

20   **A.**  No.

21   **Q.**  You don't know who gave them to them?

22   **A.**  Someone from the search party.  Today I don't --

23   **Q.**  You have no idea who that was?

24   **A.**  Not today.  Not sitting here today.

25   **Q.**  Now, in that hour that you were not in the kitchen, do

1    you know whether other agents went into that kitchen?

2    **A.**   I know that my supervisor was in there, and I know that

3    Special Agent Richardson went in there at some point.  And

4    beyond that, I'm not sure.

5    **Q.**   Okay.  Now, do you remember Mr. Johnson -- do you

6    remember being present when Mr. Johnson asked if he could be

7    allowed to put on some jeans and a shirt because he was cold?

8    **A.**   I don't have a clear memory of that, but that doesn't

9    surprise me, if he asked that.

10   **Q.**   You don't remember that?

11   **A.**   That's right.

12   **Q.**   You don't remember -- do you remember whether he asked

13   you that?

14   **A.**   No.

15   **Q.**   Okay.  And if he asked that, to somebody, you don't

16   remember who that was?  Or you weren't there?

17   **A.**   It probably would have been me or Special Agent

18   Richardson.  I just don't -- I don't recollect it today.

19   **Q.**   Okay.  And is it the case, then, that you don't remember

20   that when Mr. Johnson asked if he could put on a shirt and

21   some pants, being told that he didn't need them?

22   **A.**   No.

23   **Q.**   You don't remember that?

24   **A.**   No, I don't.

25              THE COURT:  Just so I'm clear, so as to the request

1    for shirt and pants, you just don't have a memory either that

2    he did or that he didn't?

3              THE WITNESS:  No.

4              THE COURT:  And then as to the statement of being

5    told -- of someone telling Mr. Johnson that he doesn't need

6    to put on a shirt and pants, you're saying you have a --

7    that, as far as you know, didn't happen?  As opposed to:  I

8    don't know whether it happened or not.

9              Do you know what I mean?

10             THE WITNESS:  I don't recall anyone saying that,

11   and I'd be surprised if someone said it in that way.

12             THE COURT:  Okay.

13             MS. FRIED:  Okay.

14   BY MS. FRIED:

15   **Q.**  When you first got into the house, and after you talked

16   with Ms. Kryzak and showed her the warrant, you told us that

17   you went into the kitchen?

18   **A.**  Yes.

19   **Q.**  And Mr. Johnson was already there?

20   **A.**  Yes.

21   **Q.**  Who was with him?

22   **A.**  Special Agent Richardson, I believe, was already in

23   there.

24   **Q.**  And who else?  I think you said there were one or two

25   others with them?

**A.** Possibly.

**Q.** Do you remember who they were?

**A.** No.

**Q.** Were they HSI agents or Framingham police or somebody else?

**A.** I'm not sure.

MS. FRIED: Okay. All right. Just a minute, Your Honor.

BY MS. FRIED:

**Q.** Now, you just want to get a couple of -- a couple of sequence points on --

How did you learn what Mr. Johnson's employment background had been? You mentioned that you knew that he had worked as a track coach and that he had done special ed?

**A.** Yes.

**Q.** When did you learn that?

**A.** Prior to us going to the search warrant. I believe there were -- there was some open source material on the Internet that I found about him.

**Q.** Okay. So is it the case, then, that there were no questions put to him about his employment, at any time during the interview, whether they were recorded or unrecorded?

**A.** Not that I'm aware of.

**Q.** Okay. Now -- now you said at some point -- tell us -- tell us how you remember -- what you remember about the

1   sequence of learning that something of interest -- I think

2   those were the words that you used -- that something of

3   interest was found at some point after you turned off the

4   recorder the first time?

5           MS. PARUTI:  I just don't -- I'm just objecting

6   because I don't understand the question.  I don't know that

7   the witness could.

8           MS. FRIED:  Well, let me rephrase it.

9   BY MS. FRIED:

10  **Q.**  You told us, when Ms. Paruti was asking you questions,

11  that people started reviewing things because you learned

12  information about the CL Perv file, and then you learned

13  information about the thumb drives, or something, and that

14  there were people, forensics people who set themselves up in

15  the house and started reviewing material.  Right?  Do you

16  remember that testimony?

17  **A.**  Right.

18  **Q.**  Am I right that that happened?

19  **A.**  That's right.

20  **Q.**  What I'm simply trying to ask you is, when did you first

21  learn?  When was the first time that you learned that there

22  was something of interest found, that needed to be reviewed,

23  before you left the premises?

24  **A.**  It was some time before we began the second part of the

25  recording.

1   **Q.** When, after you shut off the interview for the first part

2   of the recording, did you first learn that something had

3   happened?

4   **A.** I'd say -- to my best memory, I'd say about 30 minutes or

5   so after.

6   **Q.** And what was it that you learned at that point?

7   **A.** That Mr. Johnson described thumb drives that contained

8   contraband and where they were located.

9   **Q.** Okay. So you -- what you learned, essentially, was that

10  he had had a conversation with somebody, in which he

11  disclosed the presence of thumb drives, correct?

12  **A.** He told Special Agent Richardson.

13  **Q.** And you weren't a party to that conversation, right?

14  **A.** No.

15  **Q.** And you learned that about -- some time about 30 minutes

16  after the first tape recording had been turned off?

17  **A.** More or less.

18  **Q.** And what did you do with that information?

19  **A.** The -- when Special Agent Richardson learned that, he

20  told not only me, but I believe one of the computer forensics

21  agents who was there. And they -- they located the thumb

22  drives and began to preview them.

23  **Q.** And did you tell them to do that?

24  **A.** I didn't tell them to, no.

25  **Q.** Okay. What, if anything, did you do after learning that

1    information yourself?

2    **A.**  I waited to see what the computer forensics agents

3    located on them.

4    **Q.**  Okay.  And you don't remember doing anything yourself,

5    other than sort of waiting around.  Is that it?

6    **A.**  Yes.

7    **Q.**  Okay.  Let me ask you this.  You said that your practice

8    is to let people leave the house, if they ask to do so.

9    **A.**  Yes.

10   **Q.**  How many times have you executed search warrants of this

11   type for a child sexual exploitation material?

12   **A.**  Dozens.

13   **Q.**  Okay.  And in how many of those instances has the person

14   who was the target of the search warrant, who was -- lived --

15   the occupant of the house, been given permission to leave the

16   house while you were there?

17              MS. PARUTI:  Objection.

18              THE COURT:  I think you need to rephrase the

19   question.  I'm a little confused.  Are you asking how many

20   times has the person who was the target, or how many times

21   has the person who was the occupant?  And you're asking

22   permission, or just left?

23   BY MS. FRIED:

24   **Q.**  Well, I guess the question that I'm asking -- maybe I

25   need to break this down a little bit.

1          In these cases, this dozen cases that you're
2     talking about, was the person who was actually there at the
3     house, when you came to execute the search warrant, the
4     actual suspect or target?
5     **A.**  Sometimes not.
6     **Q.**  How many times, of those dozen times, was the person who
7     was there at the house the actual target, the actual person
8     you were targeting, of those dozen times?
9               MS. PARUTI:  Objection.
10              THE COURT:  Overruled.
11              THE WITNESS:  I'm sorry, did you say dozens,
12    singular?
13    BY MS. FRIED:
14    **Q.**  Well, yes.  Of those dozen.  You told us about --
15    **A.**  Dozens.
16              THE COURT:  She used the word plural.  She said
17    "dozens."
18              MS. FRIED:  Oh.  I'm sorry, I misheard.  I thought
19    she said dozen.
20              I misheard.  I thought you said dozen.
21    BY MS. FRIED:
22    **Q.**  Okay.  Let me get it straight.  Of those dozens of times,
23    how many times was the person who was the occupant of the
24    house, at the time that you executed the warrant, the actual
25    target of the investigation?

1  **A.**  Off the top of my head, I can think of at least one

2  occasion where it was not the target.

3  **Q.**  Okay.  So on one occasion you can think of, the person

4  wasn't the target.

5  **A.**  At least one.

6  **Q.**  But is it fair to say then, in 90 percent of these cases,

7  the person who is there, is the target?

8  **A.**  In my experience, I'd say that's more or less true.

9  **Q.**  Okay.  Of those -- of those times, how many times has the

10  person who was the target requested permission to leave and

11  then left with your permission?

12  **A.**  On at least one occasion, off the top of my head.  But

13  not often do people request to leave.

14  **Q.**  Okay.  So it's your experience that you can remember at

15  least one time when a person left.

16  **A.**  Yes.

17        THE COURT:  Does anyone leave without requesting

18  permission?

19        THE WITNESS:  Not in my experience.

20  BY MS. FRIED:

21  **Q.**  Okay.  So not in your experience.

22  **A.**  That's right.

23  **Q.**  Nobody has ever left without requesting permission.

24  Okay.

25        So isn't it also the case when -- you had a

1   conversation with Mr. Johnson about taking this polygraph.

2   You said that you wanted to give him the opportunity to sort

3   of clear up any confusion and rule out any kind of suspicion

4   that he might have been guilty of contact offenses.  I think

5   that's what you told us; is that right?

6   **A.**  Yes.  Something to that effect, yes.

7   **Q.**  It's also true, isn't it, that either you or Agent

8   Richardson stressed to him that cooperating with the

9   investigation would be good for him in the end.

10  **A.**  I don't recall ever using that -- that --

11  **Q.**  Well, let me rephrase the question.  Are you saying that

12  you don't remember, at any time during your conversations

13  with Mr. Johnson, whether when the recording was turned on or

14  whether the recording was turned off, any time, that either

15  you or Agent Richardson mentioned that it would be a good

16  thing for him to cooperate with the investigation, because it

17  might help him with his sentencing?

18  **A.**  No.

19  **Q.**  You never said that, or you never heard that being said

20  by anybody to him?

21  **A.**  I never heard that being said.

22  **Q.**  You never heard that.

23  **A.**  I never said that.

24  **Q.**  Well, I didn't ask me that.

25  **A.**  Well, you asked me both, and my answer to both is no.

**Q.** Okay. Now, you also were shown Exhibit 9, which is the
Miranda waiver form.

Just a second.

Do you have that in front of you?

**A.** Yes.

**Q.** Now, this does not tell us, this form, what time it was
signed, does it?

**A.** No.

**Q.** Okay. Well, what time was it signed?

**A.** This would have been signed during the recording,
which -- the second part of the recording, more specifically.

**Q.** Uh-huh.

**A.** Which was just a few minutes in duration, I believe.

**Q.** So some time between 7:35 and 7:38 in the morning?

**A.** Yes.

**Q.** It was signed in that period of time, during the second
little snippet?

**A.** Yes. That's right.

**Q.** Okay. And it's true, you told us before that these
warnings were not read out loud to him, right?

**A.** No, not out loud.

**Q.** And that's basically because either you or Agent
Richardson didn't see that there was a need to read them out
loud to him, correct?

**A.** If we had deemed that Mr. Johnson didn't fully understand

1   or know how to read -- sometimes we don't know if they know

2   how to read, we'll read it out loud.  But I had no doubt that

3   Mr. Johnson knew how to read.

4   **Q.**  So you made the assumption, based on your conversation,

5   that he was competent to look at this, read it, and sign it,

6   without having it actually explained to him.

7   **A.**  Yes.  As long as he -- that's why we asked him to initial

8   each line.

9   **Q.**  And it was at that point -- he was -- at that point, you

10  had already decided that he was going to be placed under

11  arrest; isn't that correct?

12  **A.**  No.

13  **Q.**  Well, at that point, isn't it true that your forensics

14  people had already recovered contraband from one of the thumb

15  drives?

16  **A.**  Yes.

17  **Q.**  And at that point, you had already also called the US

18  Attorney's Office to let them know that contraband had been

19  discovered on one of the thumb drives; isn't that right?

20  **A.**  I believe I called twice, and I'm not sure if the second

21  conversation, after -- I believe the second conversation that

22  I had, when I contacted the US Attorney's Office, was to let

23  them know what was located on the thumb drive.

24  **Q.**  But you knew what was located on the thumb drive before

25  you had him sign that waiver.

1   **A.**  I knew it.

2   **Q.**  Right.  Well, so you're saying that --

3       THE COURT:  I'm just confused now.  I thought you

4   said that in the second call, you received authorization or

5   sign-off from the US Attorney's Office to proceed with an

6   arrest, and then you placed -- and thereafter, at some point,

7   you placed him under arrest.

8       THE WITNESS:  Yes.

9       THE COURT:  And I thought that happened before --

10  maybe I just have my sequence wrong, but I thought you said

11  that happened before the second recording.

12      THE WITNESS:  No.  No.  I'm sorry --

13      THE COURT:  So that authorization, which you were

14  awaiting --

15      THE WITNESS:  Right.

16      THE COURT:  -- to place him under arrest, occurred

17  after the second recording.

18      THE WITNESS:  That's correct.

19      THE COURT:  I see.  Okay.  All right.

20  BY MS. FRIED:

21  **Q.**  Now -- and so you're saying that the second recording

22  happens, that Miranda waiver is signed.  That advisement of

23  rights, I should say, is signed.  And then you make a

24  second -- and then you make another phone call to the US

25  Attorney's Office?

1    **A.**   Yes.

2    **Q.**   To apprise them of what your forensics people have found,

3    and to get permission to make an arrest?

4    **A.**   Yes.

5    **Q.**   And you're the person who made that call?

6    **A.**   Yes, I made the call.

7    **Q.**   And are you saying, then, that Mr. Johnson -- it was only

8    after that call had been made, that Mr. Johnson requested

9    permission to call his job, to say that he wasn't going to be

10   coming to work?

11   **A.**   That's my best memory, is that's the sequence.  We

12   made -- I made the call to the US Attorney's Office.  I was

13   given authorization to make an arrest.  And I believe we

14   notified Mr. Johnson that he would be placed under arrest,

15   and he expressed a desire to notify his employer, and I

16   believe that's when it was made.

17   **Q.**   You think that that was the sequence of events?

18   **A.**   I believe so.

19   **Q.**   And was Ms. Kryzak still in the house at that point?

20   **A.**   She was still in the house.

21   **Q.**   Okay.  Now -- and do you know anything about her

22   movements during the course of this time in the house?  I

23   don't want to ask you questions, if you don't know anything

24   about it.

25   **A.**   I believe at some point she came into the kitchen, prior

1  to Mr. Johnson being handcuffed.

2  **Q.**  And when she came into the kitchen, how was she attired?

3  **A.**  I don't recall what she was wearing.

4  **Q.**  Okay.  And that's the only time that you saw her, other

5  than at the beginning of -- or the only time you had any

6  interaction with her, let me put it that way.

7  **A.**  Yes.

8  **Q.**  Other than the at the very beginning when you came into

9  the house?

10  **A.**  Yes.

11  **Q.**  Okay.  Now, you then told us -- oh, just a minute.  Then

12  you told us that the Framingham Police Department came, and

13  they're the one who transported Mr. Johnson down to the

14  department?

15  **A.**  Yes.

16  **Q.**  And they did what you called a courtesy booking, and that

17  happened some time around 8:30?

18  **A.**  Yes.

19  **Q.**  Where were you in that interim period of time between the

20  time that you left Mr. Johnson -- between the time that

21  Mr. Johnson left the house and at 10:40 in the morning, when

22  you had him sign the consent to take a polygraph?

23  **A.**  I followed the Framingham officer, or whoever transported

24  Mr. Johnson, back to the Framingham police station.  And I

25  used -- they allowed me to use some conference room, or

1  something, where I worked on the descriptions of the images

2  and videos that were added to the complaint.

3  **Q.** Did you see anything that happened with Mr. Johnson after

4  he arrived at the police station, before you sat down with

5  him and Agent Braga?

6  **A.** No.

7  **Q.** Nothing at all?

8  **A.** I don't believe so, no.

9  **Q.** And so that's like a two-hour period, correct?

10  **A.** Yes. There was a wait for Agent Braga to get there.

11  **Q.** Okay. So that was the reason for the wait, you were

12  waiting for Agent Braga?

13  **A.** Yes.

14  **Q.** And who was it that contacted him to get him to come down

15  to the Framingham police station?

16  **A.** Special Agent Richardson.

17  **Q.** You didn't have anything to do with that?

18  **A.** No.

19  **Q.** With calling him?

20  **A.** No.

21       MS. FRIED: Okay. I think I'm almost done, Your

22  Honor.

23       THE COURT: Okay.

24       MS. FRIED: I just want to check.

25  BY MS. FRIED:

**Q.** Oh, yes, I wanted to ask you this. Who put the labels on
the rooms?

**A.** That may have been the intel analyst, who also did the
sketch. That's oftentimes her role, that's why I would say
that.

**Q.** And what's that person's name?

**A.** Anne Davy.

**Q.** So she was there?

**A.** She was there.

**Q.** Were there any other female agents there, or were just
the two of you?

**A.** She's not an agent. She's an intel analyst in our group.
But she often plays a role in our search warrants.

**Q.** Okay. So she's a -- she's a part of the party.

**A.** Correct.

**Q.** Were there any other female agents or other parties who
were part of the party?

**A.** I don't believe so. I believe it was just myself, as an
agent, and Ms. Davy.

**Q.** Okay. Now, to your -- it would not have been your
protocol or her protocol to ask for permission to paste these
numbers on the walls; is that right? Or these letters?

            MS. PARUTI: Objection.

            THE COURT: Overruled.

            MS. FRIED: You can answer.

1    THE WITNESS:  I'm sorry?

2  BY MS. FRIED:

3  **Q.**  It would not have been part of her protocol to ask the

4  homeowner's permission to put these designations, these

5  letter designations around the house, would it?

6  **A.**  No.  That's part of our search warrant process.

7  **Q.**  So that's not something that you ask permission to do,

8  correct?

9  **A.**  No.

10    MS. FRIED:  I'm just reviewing my notes.  I think

11  I'm almost done, Your Honor.

12    THE COURT:  Okay.

13    MS. FRIED:  Okay.  I don't have any further

14  questions.

15    THE COURT:  Any redirect?

16    MS. PARUTI:  Just one discrete point of

17  clarification.

18    THE COURT:  Okay.

19    **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

20  BY MS. PARUTI:

21  **Q.**  Ms. Connolly, you said you went out and there were so

22  many agents in the mobile van.  Can you just tell us, like,

23  literally, what are you talking about as far as numbers?

24  **A.**  The mobile van, if it's jam packed, could probably fit

25  six people, and some standing.  There's a counter on either

1    side, and seats, and they have all of their forensic tools

2    available to them there.  And it's powered.  The van is

3    powered.

4    **Q.**  Do you have any memory of, for what portion of the hour

5    and a half, or so, or two hours that you were at the house,

6    the forensics agents were in the mobile van?

7    **A.**  The whole time, I believe.

8    **Q.**  Okay.  Thank you.

9         Oh, actually, one other question.  I'm sorry.

10        You said, in response to counsel's question about

11   Mr. Johnson's pants situation, and when asked about whether

12   you or somebody else said he didn't need pants when he asked

13   for them, you said that you would be surprised if somebody

14   said it that way.  Why would that surprise you?

15   **A.**  We try to deal with everyone professionally and

16   respectfully, and I -- I would be very surprised if someone

17   used that kind of tone or used that type of language.

18             MS. PARUTI:  Thank you.  No further questions.

19             THE COURT:  Any recross?

20             MS. FRIED:  No.

21             THE COURT:  Thank you very much, Special Agent

22   Connolly.  You're excused.

23             THE WITNESS:  Thank you, Your Honor.

24             THE COURT:  Next witness?

25             MS. PARUTI:  Agent Richardson.  If you could just

1  grab him --

2          THE COURT:  Hold on one second.

3          You know what?  Before you call Special Agent

4  Richardson, we'll take a five minute break, go to the

5  bathroom and the like, and then we will reconvene and proceed

6  with Special Agent Richardson.

7          SPEAKER9:  All rise.  This matter is in recess.

8          (Court in recess at 11:14 a.m.

9          and reconvened at 11:22 a.m.)

10          THE COURT:  Special Agent Richardson?

11          THE WITNESS:  Yes.

12          THE COURT:  Go ahead, take the witness stand.

13                  **SPECIAL AGENT JAMES RICHARDSON**

14          having been duly sworn, testified as follows:

15          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

16  BY MS. PARUTI:

17  **Q.**  Sir, would you please state your name and spell it for

18  the record.

19  **A.**  James Richardson, R-i-c-h-a-r-d-s-o-n.

20  **Q.**  Where do you work?

21  **A.**  HSI, in Providence, Rhode Island.

22  **Q.**  What's your role there?

23  **A.**  I'm a special agent and --

24  **Q.**  How -- go ahead.

25  **A.**  I was going to say, I'm a special agent assigned to the

1 Internet Crimes Against Children task force.

2 **Q.** And how long have you been an agent -- and you said in

3 Providence?

4 **A.** In Providence, yeah.

5 **Q.** And how long have you been and agent in Providence?

6 **A.** Since 2013.

7 **Q.** And were you assigned anywhere else prior to that?

8 **A.** I was assigned to Hartford Connecticut from 2009 to 2013.

9 **Q.** And you said you're currently assigned to the Internet

10 Crimes Against Children task force?

11 **A.** I am.

12 **Q.** And how long have you held that designation?

13 **A.** Since 2013.

14 **Q.** Now did you -- on April 27th of 2017, did you purchase

15 and participate in the execution of a search warrant at 20

16 Burdette Drive in Framingham, Massachusetts?

17 **A.** Yes.

18 **Q.** What was your role within that execution?

19 **A.** I conducted an interview with the case agent, Janet

20 Connolly.

21 **Q.** And were you -- so to your memory, how many -- were you

22 involved in the entry team?

23 **A.** I was not.

24 **Q.** Where were you -- do you recall approximately what time

25 it was that you entered the house?

1   **A.**  It was approximately 6:00 a.m.

2   **Q.**  Do you recall where you were for purposes of the entry

3   into the residence?

4   **A.**  I was in my vehicle.

5   **Q.**  Okay.  Did you observe the entries?

6   **A.**  I did not.

7   **Q.**  At some point, did you, yourself, enter the residence?

8   **A.**  I did.

9   **Q.**  Do you remember what was happening around the time that

10  you, yourself, entered?

11  **A.**  I remember that there was a female occupant of the house

12  when I entered.  She was in the room to the left, and

13  Mr. Johnson was in the kitchen.

14  **Q.**  Okay.  Did you, yourself, go to any particular part of

15  the house?

16  **A.**  I went to the kitchen.

17  **Q.**  Okay.  And who -- was Mr. Johnson there when you got

18  there?

19  **A.**  He was.

20  **Q.**  Was anybody else with Mr. Johnson in the kitchen when you

21  got there?

22  **A.**  I believe Janet Connolly was there.

23  **Q.**  Okay.  Do -- do you recall anything about what

24  Mr. Johnson was wearing when you encountered him on that day?

25  **A.**  I don't.

**Q.** Now, at that point, do you remember when you first
encountered him, what his demeanor was like?

**A.** His demeanor was fine throughout the course of the
morning.

**Q.** So what do you mean by that?

**A.** He was cordial. We had conversation.

**Q.** Okay. You said that you don't recall how he was dressed.
Do you recall how you were dressed on that day?

**A.** I would have been wearing, probably, jeans, mostly likely
possibly like a T-shirt and a vest.

**Q.** When you say "vest," what do you mean?

**A.** It's my tactical vest.

**Q.** Specifically, what is a tactical vest? What does it look
like?

**A.** It's just basically a vest. It goes over your clothes,
bulletproof vest. It's got an HSI patch, it says "special
agent," and another patch on the back that says "police."

**Q.** When you entered the home, did you have any weapons on
you?

**A.** I did.

**Q.** What weapons or weapon did you have with you?

**A.** I had my Glock 26.

**Q.** Is that a department-issued weapon?

**A.** No. That's actually a personally owned weapon that's
approved to be carried by the department.

1   **Q.**  So you carry it in the course of your duty?

2   **A.**  I do.

3   **Q.**  Where -- when you entered the home, where, physically,

4   was that weapon?

5   **A.**  In my holster.

6   **Q.**  And where is your holster?

7   **A.**  On my belt.

8   **Q.**  And for the record, you're reaching to your right-hand

9   side?

10   **A.**  Correct.

11   **Q.**  At any point during the time that you were at 20 Burdette

12   Drive, or Avenue, in Framingham, Massachusetts, did you take

13   your weapon out of the holster?

14   **A.**  No.

15   **Q.**  You said that you saw, at some point, Janet Connolly,

16   Agent Connolly, in the kitchen area, when you were with

17   Mr. Johnson; is that correct?

18   **A.**  Correct.

19   **Q.**  Did you note whether or not she ever had her weapon drawn

20   or displayed at any point during the interactions that you

21   observed between her and Mr. Johnson?

22   **A.**  I didn't see anyone with their weapons drawn.

23   **Q.**  Okay.  Anyone at the house?

24   **A.**  Anyone at the house.

25   **Q.**  Okay.  Now, at some point, did you, in fact, conduct an

1  interview with Mr. Johnson?

2  **A.** I did.

3  **Q.** Where did that happen?

4  **A.** In the kitchen.

5  **Q.** You have some exhibits on the table in front of you.  Can

6  you take a look at the one that's marked "Exhibit 8."

7  **A.** 8, did you say?

8  **Q.** 8.  And let me know if you need help finding that.

9  **A.** Yes.

10  **Q.** Do you recognize what's depicted in that photo?

11  **A.** That's the kitchen at Mr. Johnson's house.

12  **Q.** Now, you'll see a door on the right-hand side.  Where did

13  that door go?

14  **A.** The door with the window led out the back door.  That was

15  the back door to the back of the house.

16  **Q.** Okay.  And you'll also see something that's marked -- a

17  diagram that's marked "Exhibit 12" on your desk there, in

18  case you need it for reference.

19  **A.** Yes.

20  **Q.** You see in Exhibit 8 the picture of the kitchen.  There's

21  a closed door.  Do you recall where that door went to?

22  **A.** Yes.  There was like a small hallway area that led off

23  the kitchen.

24  **Q.** Okay.  When you got there, do you remember whether or not

25  that door was open or closed?

**A.**  I don't recall if it was open or closed.

**Q.**  Okay.  Now, you said that you met with Mr. Johnson in the kitchen area, and that another person, another female was present in the house in one of the front rooms.  Did you have any interaction with the female occupant of the house?

**A.**  I did not.

**Q.**  At any point during that course of that morning?

**A.**  No.

**Q.**  Did you personally observe any other agents interacting or staff interacting with that female occupant?

**A.**  I would -- I would think that they would be searching that room, so at least one person, if not more, would be in there.  At least two, usually.

**Q.**  But did you personally observe any, like, conversations between agents and that woman, or anything?

**A.**  I did not personally observe anything like that, no.

**Q.**  Okay.  Now, the original --

Did you bring the recorder that was used to record the interview with Mr. Johnson?

**A.**  Yes, it was my recorder.

**Q.**  Now, when you first came upon him in the kitchen, did you have any conversation before you turned the recorder on?

**A.**  I believe we would have.  Normally what I would tell the person I'm going to interview is that the reason that I have the recorder is so that I don't have to take notes.  And then

1  that way the conversation can just go, and I don't have to

2  keep stopping to take notes.

3  **Q.**  And did you -- just to backtrack and talk a second about

4  your experience.  You said you were assigned to the Internet

5  Crimes Against Children task force.  How does that influence

6  your day-to-day activities as an agent?

7  **A.**  In terms of --

8  **Q.**  What types of stuff do you do as an agent?

9  **A.**  We do -- we do a lot of -- we do a lot of search

10  warrants, whether it be state or federal.

11  **Q.**  Okay.  Approximately how many, if you can estimate,

12  either on a weekly basis or monthly basis?

13  **A.**  Between state and federal, I would say a couple of

14  warrants a week.

15  **Q.**  Okay.  That you're participating in the execution?

16  **A.**  Yes.

17  **Q.**  And this one happened in 2017?

18  **A.**  Yes.

19  **Q.**  Has that pattern of activity held up for you in the

20  intervening time period?

21  **A.**  Yes.

22  **Q.**  So back to April 27th of 2017, when you were speaking

23  with Mr. Johnson, looking at Exhibit 8, do you have a memory

24  of where you all were situated in that room?

25  **A.**  I believe that myself and Special Agent Connolly were

```
 1   sitting where the three silver chairs are, and that
 2   Mr. Johnson was sitting where the other silver chair is, to
 3   the right of the bowl on the island.
 4   Q.  On the exhibit?
 5   A.  On the exhibit?  Okay.
 6            MS. FRIED:  I'm sorry, could you repeat where
 7   Mr. Johnson was?
 8            MS. PARUTI:  It's right here.
 9            MS. FRIED:  Oh.  Okay.  Uh-huh.  That's at the end
10   of the island?
11            THE WITNESS:  Yes.  So right here (indicating).
12            MS. FRIED:  Thank you very much.
13   BY MS. PARUTI:
14   Q.  For the record, you're pointing to the single chair --
15   A.  Right.
16   Q.  -- on the right-hand frame, side of the picture?
17   A.  Correct.
18   Q.  Now, have you listened to that recording since that day?
19   A.  I did.
20   Q.  And you're aware that it's been admitted -- or it's been
21   offered as Exhibit 1 for purposes of this hearing?
22   A.  Yes.
23            THE COURT:  I think I admitted both Exhibit 1,
24   which is the two recording, and 1-A, as an aid to
25   understanding the recordings.
```

BY MS. PARUTI:

**Q.**  Which is a transcript?

**A.**  Correct.

**Q.**  Now, after the -- you finished that initial portion of the interview, that was captured on the recording, did you have further conversation with Mr. Johnson at any point?

**A.**  Yes, I believe I did.  When we took the initial break in the interview, we went to the bedroom 2, which is F on the diagram, and that is where the preview of the computer was being done by a forensic agent.

THE COURT:  Who's the "we"?

THE WITNESS:  I saw "we" as in -- I believe it was me and Janet Connolly.

THE COURT:  Not Mr. Johnson.

THE WITNESS:  Not Mr. Johnson, no.  Mr. Johnson stayed in the kitchen.

So what we would normally do at that point when we take the break is we would go in and check with the forensic agent to see if and what had been found up to that point of the forensic preview.

BY MS. PARUTI:

**Q.**  So you said Mr. Johnson did not accompany you?

**A.**  He did not.

**Q.**  Was Mr. Johnson left alone in the kitchen at that point?

**A.**  No.

1  **Q.**  Do you recall specifically who was with him at that

2  point?

3  **A.**  I don't.

4  **Q.**  Is there a reason why he wasn't left alone when you left

5  the room to go check with forensics?

6  **A.**  Typically, when search warrants are being executed, we do

7  not allow occupants of the house to roam freely for officer

8  safety purposes and for evidence preservation.

9  **Q.**  Okay.  What are your specific concerns regarding officer

10  safety?

11  **A.**  You know, like, for instance, if I was searching in a

12  closet and I had my head, basically, in the closet, and I'm

13  searching in there, my weapon is exposed over here.  I mean,

14  somebody could easily come up behind you and take a your

15  weapon.  Somebody could also gain access to something that we

16  might not have found yet, a weapon.

17  **Q.**  Now, at some point you said you checked in with

18  forensics.  At some point, did you have a specific

19  consultation with the forensics agents about information that

20  Mr. Johnson had given you during the course of that

21  30-minute, or so, conversation you had with him?

22  **A.**  Yes.  Mr. Johnson had told me a specific folder name that

23  we would find images of child pornography in.

24  **Q.**  Do you remember what that folder name was?

25  **A.**  I believe it was CL Perv.

1   **Q.**   Okay.  And that's on the recording, correct?

2   **A.**   That is.

3   **Q.**   And so what did you do with that information when you

4   were talking to the forensics?

5   **A.**   I passed it on to him, saying that, basically, to look

6   for that specific folder.

7   **Q.**   Okay.  At some point, did you learn anything from the

8   forensics people about their ability to find that folder on

9   the machine they were working on?

10  **A.**   Yes.  I was told that they were not able to find a folder

11  entitled CL Perv.

12  **Q.**   So what did you do once you got that information?

13  **A.**   That's when I went back and talked to Mr. Johnson about

14  the fact that the forensic agent was not able to find the

15  folder CL Perv on the computer that he was looking at.

16  **Q.**   Okay.  Where you were you when you had that conversation?

17  **A.**   That was back in the kitchen.

18  **Q.**   And who else was there, if anyone?

19  **A.**   Janet Connolly.

20  **Q.**   Okay.  And do you remember anything about specifically

21  what you said to Mr. Johnson?

22  **A.**   I just would have said to him that the forensic agent

23  wasn't able to find the folder that he had told us about, and

24  then Mr. Johnson actually told me where the folder could be

25  found, that it wasn't on the computer, that it was actually

1  on a thumb drive.

2  **Q.**  Okay.  And did he tell you anything specific about that

3  thumb drive?

4  **A.**  He did.  He told me that I would find it in the closet,

5  in bedroom 2, Room F, on top of the door frame, on the inside

6  of the closet.

7  **Q.**  Okay.  Now, you said you do two to three search warrants

8  a week?

9  **A.**  Uh-huh.

10  **Q.**  Or, excuse me, a couple search warrants a week, or so.

11  Is that the type of place that you would normally look for

12  digital evidence in a case like this?

13  **A.**  We search everywhere, especially in cases like this,

14  because we're looking for stuff as small as a micro SD card.

15  **Q.**  So at that point, when you had that conversation with

16  Mr. Johnson, was that portion of your interaction recorded?

17  **A.**  That was not.

18  **Q.**  Okay.  Why not?

19  **A.**  Honestly, I don't know why it wasn't recorded.  I think

20  it was just a matter of Mr. Johnson was being cooperative and

21  told us where the folder was.  And so just to basically let

22  Mr. Johnson know that we were unable to find the folder, and

23  maybe it was named something else, something like that, and I

24  didn't think to turn the recorder back on for that.

25  **Q.**  How long was that interaction between you and

1    Mr. Johnson?

2    **A.**   That wasn't very long.

3    **Q.**   So like --

4    **A.**   Minutes?

5    **Q.**   When you interacted with him, on that particular

6    occasion, what was your demeanor like?

7    **A.**   Same as it was the entire time I was there.

8    **Q.**   Okay.  What was his demeanor like when he responded to

9    you?

10   **A.**   The same, also.  Like I said, he was cordial the whole

11   time.

12   **Q.**   Okay.  Do you know -- did you stay with Mr. Johnson --

13   apart from that interaction with the forensics people that

14   you just described, did you stay with Mr. Johnson the rest of

15   the time that you were on scene?

16   **A.**   With the exception of towards the end of the warrant, I

17   was actually on the front porch with Special Agent Connolly,

18   while she was on the phone with the US Attorney's Office.

19   **Q.**   Okay.  The rest of the time?

20   **A.**   The rest of the time, though, besides that, I was in the

21   kitchen.

22   **Q.**   And when you were in the kitchen with Mr. Johnson, did he

23   ever ask you to leave at any point?

24   **A.**   I believe he asked to go to the bathroom at one point.

25   **Q.**   Okay.  And to your knowledge, was he allowed to go to the

1    bathroom?

2    **A.**   He was.

3    **Q.**   Did you accompany him to the bathroom?

4    **A.**   No, I did not.

5    **Q.**   Do you know whether any other agent or person who was

6    there as part of the law enforcement team, accompanied him to

7    the bathroom?

8    **A.**   Another agent did, yes.

9    **Q.**   Did you -- did you see that happen?

10   **A.**   I don't recall seeing it happen.

11   **Q.**   Okay.  But you know about it now?

12   **A.**   Yes.

13   **Q.**   After the fact?

14   **A.**   Yes.

15   **Q.**   Do you know -- do you have any direct knowledge about the

16   female --

17          First of all, do you know the female occupant's

18   name?

19   **A.**   I think I know her first name as Patricia, that's it.

20   **Q.**   And do you -- what was your understanding of her

21   relationship to Mr. Johnson?

22   **A.**   We had actually discussed that during the recorded part

23   of the interview.  He said that was his girlfriend of like

24   ten years.  So I think I said something along the lines of I

25   would refer to her as his wife for the interview.

1    **Q.**  And did you have any specific firsthand knowledge about

2    her movement within the house during the course of the

3    search?

4    **A.**  Not during.  Not during the course of the search warrant

5    being executed and the interview of Mr. Johnson, no.

6    **Q.**  At some point after the fact, did you learn anything

7    about her movements within the house?

8    **A.**  I did.  I learned that she had to get to work that

9    morning and that she was allowed to get clothes to get

10   dressed for work, get ready for work.

11   **Q.**  Okay.  And do you know where she went to do that?

12   **A.**  Her bedroom.

13   **Q.**  And looking at the diagram that is Exhibit 12, is that

14   the room that's bedroom 1?

15   **A.**  Yes.

16   **Q.**  Or D?  Okay.

17           Did you learn anything about whether or not she was

18   accompanied by any agent or any person to get dressed in that

19   bedroom?

20   **A.**  No.  Well, what I had learned afterwards was that the

21   room was already searched, and it was already cleared.  So

22   they allowed the female occupant to go in the room to get

23   dressed for work.

24   **Q.**  Without somebody being there.

25   **A.**  Without somebody, yes.

1 **Q.** Did you learn whether or not somebody actually walked in
2 on her at some point?
3 **A.** I did hear, after the fact, that they allowed her to
4 enter the bedroom through the door leading from Room C into
5 Room D, and that an agent, not knowing that somebody was in
6 that room, the door that leads out to the hallway towards the
7 bath and the kitchen, that door was closed. And I did learn,
8 after the fact, hearing other agents talk, that somebody did
9 open the door, not knowing that she was in there.
10 **Q.** To your knowledge, when that happened, did the agent who
11 had walked in on her stay or otherwise monitor her presence
12 in that room?
13 **A.** No.
14 **Q.** You said that Mr. Johnson had asked to go to the bathroom
15 and did go to the bathroom at one point. Did you ask -- I'm
16 sorry.
17 Do you know if somebody was in the bathroom with
18 him when that happened?
19 **A.** No. I don't know if somebody was in the bathroom.
20 Typically what we would do, common practice would be the door
21 would be cracked. The bathroom would be searched to make
22 sure that there was no weapons or evidence of interest to us,
23 and then the person would be allowed to go into the bathroom
24 and go to the bathroom and usually leave the door cracked.
25 **Q.** Okay. Do you have any memory of Mr. Johnson asking for

1    clothing or asking to get dressed or anything like that?

2    **A.**   I don't -- I didn't remember it, until I reviewed the

3    stuff yesterday from the case.

4    **Q.**   Uh-huh.  Do you remember it now?

5    **A.**   I do.  I do remember him asking for clothing, yes.

6    **Q.**   Did he ask you specifically -- or did he ask you directly

7    for clothing?

8    **A.**   I don't know that he asked me directly.  I know that he

9    just asked for clothing, because he was dressed in whatever

10   he slept in, I guess.

11   **Q.**   And do you know whether or not he was provided with

12   clothing?

13   **A.**   He was.  I believe agents went into his bedroom and got

14   like, I think, maybe a sweatshirt or, I don't know, some

15   clothes for him to wear after he requested it.

16              MS. PARUTI:  Okay.

17              THE COURT:  Do you know when that was, in the

18   sequence of events?

19              THE WITNESS:  It would have happened -- it would

20   have happened in between.

21              THE COURT:  In between the two recordings?

22              THE WITNESS:  I believe it would have happened in

23   between the two recordings, if not right after the second

24   one.

25              MS. FRIED:  Objection.

1      THE COURT:  Overruled.

2      When you say "would have," what you mean is that's

3  your best memory?

4      THE WITNESS:  Well, that would be -- because I

5  believe the first interview started at 6:04, approximately,

6  and we went to the house at 6:00.  And so it definitely would

7  not have happened during that interview, because we would

8  have heard it on the recording.  So I would have to assume

9  that it happened after that first recording.

10     THE COURT:  Okay.  Overruled.  Go ahead.

11     MS. PARUTI:  Thank you.

12 BY MS. PARUTI:

13 **Q.**  And you said, obviously, at one point, you went back on

14 tape.  And have you listened to that portion of the

15 recording?

16 **A.**  I did.

17 **Q.**  Prior to that portion of the recording where Agent

18 Connolly administers the so-called Miranda rights to

19 Mr. Johnson, had you had any conversation with him about sort

20 of next steps?

21 **A.**  We had discussed the possibility of Mr. Johnson taking a

22 polygraph.

23 **Q.**  And when you discussed that with Mr. Johnson, do you

24 recall anything about -- specifically about what you told him

25 about the polygraph?

**A.**   We used polygraphs a lot in our cases in Rhode Island,
and that's how I was actually in contact with Special Agent
Braga from the FBI, because he did all of our polygraphs for
our task force in Rhode Island.

The purpose of the polygraph is to determine if
there is a hands-on offense that has happened in the past
that has gone on undetected.  That's the purpose of the
polygraph.

**Q.**   Did you relay that to him?

**A.**   I did.

**Q.**   Do you recall whether he asked you any questions about
it, or told you anything specifically in response to your
suggestion that you do a polygraph?

**A.**   He was pretty adamant about the fact that he was not a
hands-on offender.  I remember that.  And agreed to take the
polygraph.

**Q.**   After that will second portion of the recording, so
around 7:30 or so, did you have any further conversation with
Mr. Johnson?

**A.**   From what I remember, he wanted to contact his job, to
let them know that he wouldn't be in that morning.

**Q.**   Uh-huh.

**A.**   So we allowed him to call his job.

**Q.**   And how did he do that?

**A.**   He did it from the landline.  And the reason he did it

1   from the landline is because we had already seized his cell

2   phone as evidence, because it accesses the Internet.  And we

3   went into his phone and got the number and gave it to him to

4   dial on the landline.

5   **Q.**  And you allowed him to make the call, you didn't call for

6   him?

7   **A.**  No, he called by himself.

8   **Q.**  Were you -- at some point after that, was Mr. Johnson

9   placed into custody?

10   **A.**  He was.

11   **Q.**  Do you have any memory about approximately when that

12   happened in the chain of events?

13   **A.**  I don't, actually.  No.

14   **Q.**  Was it -- do you recall whether it was prior to or after

15   the second recording?

16   **A.**  It was after the second recording.  Because after the

17   second recording is when I was out on the front porch with

18   Janet Connolly, when she was talking with the US Attorney's

19   Office.

20   **Q.**  And just to be clear, do you know what the outcome of her

21   conversation with the US Attorney's Office was at that point?

22   **A.**  She was given approval from the US Attorney's Office to

23   take Mr. Johnson into custody.

24   **Q.**  Okay.  So at some point after she gained that -- do you

25   recall -- strike that.

1         Do you recall how long after the second recording,

2    the porch conversation happened?

3    **A.**  I don't.

4    **Q.**  Do you have a specific memory of what time you actually

5    cleared that residence when you left?

6    **A.**  I also don't have that, no.

7    **Q.**  At some point after Agent Connolly got authorization to

8    place Mr. Johnson under arrest, did that actually happen?

9    **A.**  It did.

10   **Q.**  And how did that happen?

11   **A.**  I believe Framingham police took Mr. Johnson into custody

12   and brought him over to the Framingham Police Department.

13   **Q.**  Did you accompany them to the Framingham Police

14   Department --

15   **A.**  I did not accompany them.  I had my own vehicle.  And

16   that's where the polygraph was going to be administered.

17   **Q.**  Did you go to Framingham PD?

18   **A.**  I did.  I went to Framingham Police Department, but I did

19   not actually see Mr. Johnson the entire time that I was

20   there.  I think what I did was I logged on to my laptop and

21   downloaded the interviews off of my digital recorder so that

22   I could turn them over to Agent Connolly.

23   **Q.**  Okay.  Do you remember anything about how many people

24   were on scene?

25   **A.**  I don't remember from --

1 **Q.** From law enforcement. Excuse me.

2 **A.** I don't remember the exact number. I would say that it

3 was probably -- probably double-digits, like ten or maybe

4 more.

5 **Q.** Okay. And do you remember where the forensics people

6 were set up on scene?

7 **A.** They were set up in bedroom 2, Room F.

8 **Q.** Was there any other place, either inside the house or

9 outside the house, where they were set up?

10 **A.** I believe there was a mobile forensic truck outside.

11 **Q.** Did you personally go out there at any point to see how

12 many people were in that truck?

13 **A.** I did not.

14 **Q.** Do you remember when you had the first interview with

15 Mr. Johnson in the kitchen, that was recorded? You said that

16 you had entered with your bulletproof vest that had HSI

17 markings.

18 **A.** Yup.

19 **Q.** Did you keep that on, take it off, something else?

20 **A.** I would typically leave it on. But there have been times

21 in the past where I have taken it off.

22 **Q.** Do you have a specific memory of this day?

23 **A.** I don't have a specific memory of whether or not I took

24 it off.

25 **Q.** At any point, did you brandish your firearm to

1   Mr. Johnson?

2   **A.**  No.  No.

3   **Q.**  When you all were sitting in the kitchen for that first

4   recorded portion of the interview, were you actually sitting

5   in the chairs that you had talked about or standing or some

6   combination?

7   **A.**  I remember sitting.

8   **Q.**  What about Mr. Johnson?

9   **A.**  Mr. Johnson was sitting in the chair that -- the one that

10   I pointed to earlier.

11   **Q.**  And what about Agent Connolly?

12   **A.**  I believe she was sitting, also.  She was sitting next to

13   me.

14   **Q.**  At any point during your interactions with Mr. Johnson,

15   either on tape or off tape, did you ever threaten him to

16   cooperate with you or to be cooperative?

17   **A.**  No.

18   **Q.**  Did you ever make any promises to him about like

19   sentencing or anything like that?

20   **A.**  No.

21   **Q.**  Is that the type of promise that you would ever make to

22   any defendant?

23           MS. FRIED:  Objection.

24           THE COURT:  Overruled.

25           THE WITNESS:  No, I would never make that promise.

1    MS. PARUTI:  Okay.  I have no further questions at

2    this time.

3           THE COURT:  Cross?

4           MS. FRIED:  Yes.  Thank you.

5    **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

6    BY MS. FRIED:

7    **Q.**  Good morning, Agent Richardson.

8    **A.**  Good morning.

9    **Q.**  When you got -- just to set the scene a little bit at the

10   end -- at the beginning, when you first arrived there.  This

11   all started 6 o'clock in the morning; is that right?  Or

12   shortly thereafter?

13   **A.**  It actually started before that, when we brief.  Before

14   the warrant, we brief and talk about the execution of the

15   warrant.

16   **Q.**  Well, what time did you arrive at 20 Burdette Avenue?

17   **A.**  It would be around 6:00 a.m.

18   **Q.**  I gather, from what you told us, that you were not one of

19   the first people into the house?

20   **A.**  I was not.

21   **Q.**  So a bunch of people, agents, law enforcement, holding

22   the warrant, went into the house before you ever did,

23   correct?

24   **A.**  I don't know who was holding the warrant, because I

25   wasn't present.

1  **Q.** So you know nothing, personally, about their manner of

2  entry. Is that accurate? That is, you didn't see it.

3  **A.** That particular warrant, no.

4  **Q.** With this specific case that we're talking about, you

5  didn't see it?

6  **A.** No. Correct.

7  **Q.** How long after officers first gained entry into the house

8  did you go in?

9  **A.** As soon as I got notified by the group supervisor who was

10  on scene that the house had been cleared for safety.

11  **Q.** And how long after you were -- how long were you sitting

12  in your car at Burdette Avenue, waiting to get that

13  notification?

14  **A.** Probably a couple of minutes.

15  **Q.** A couple of minutes?

16  **A.** Yes.

17  **Q.** And can you explain to that, about what that means when

18  you say that you got a notification that the house was

19  cleared for safety? What does that mean? What did you take

20  that to mean?

21  **A.** So when we execute a warrant, when we enter the house, we

22  clear the house to basically identify all the occupants in

23  the house. We check for weapons. We do an immediate sweep

24  of the house to make sure there's no weapons. And then once

25  that's done, once we've identified all the occupants of the

1    house and we've looked in the rooms for weapons, then we

2    consider the house to be clear at that point for officer

3    safety purposes.

4    **Q.**   And that was done by the first group of people who

5    entered the house?

6    **A.**   Correct.

7    **Q.**   And you didn't have anything to do with that, yourself?

8    **A.**   I did not.

9    **Q.**   You got a notification remotely by a radio or telephone,

10   that that had already happened.  And it was at that point

11   that you went into the house?

12   **A.**   I don't recall how I got the notification.  It could have

13   been something as simple as the group supervisor walking out

14   of the house and waiving us in.

15   **Q.**   Okay.  When you went into the house yourself, were you

16   alone, or were you accompanied by anybody?

17   **A.**   I don't recall if I was accompanied by anybody.

18   Normally, if the house was cleared for entry, I could walk in

19   by myself or with other agents.

20   **Q.**   But you don't have any memory?

21   **A.**   I don't.

22   **Q.**   And when you went into the house, when and where did you

23   first see Walter Johnson?

24   **A.**   In the kitchen.

25   **Q.**   How long after you entered the house did you go into the

1  kitchen?

2  **A.** Right away.

3  **Q.** When you went into the house and you saw him in the

4  kitchen, who did you see him with?

5  **A.** I don't recall who he was with. I just know that I

6  conducted the interview of Mr. Johnson in the kitchen with

7  Janet Connolly.

8  **Q.** Was he alone when you first saw him in the kitchen?

9  **A.** I don't believe he was.

10  **Q.** Do you recall how many people were in the kitchen with

11  him when he was there?

12  **A.** I don't.

13  **Q.** Let me ask you this: Do you remember whether he was --

14  how he was dressed or whether he was wearing a shirt?

15  **A.** I don't.

16  **Q.** You have no memory of that whatsoever?

17  **A.** I don't.

18  **Q.** Okay. Now, at the time that you entered the house, after

19  it was cleared for safety --

20  Well, let me ask you this. Do you know how many

21  people were dispatched to go into the house to clear it?

22  **A.** I don't.

23  **Q.** When you went into the house, do you recall how many

24  people you actually saw in the house?

25  **A.** I don't recall the exact number. Like I said, I think it

was approximately double-digits, ten or more.

**Q.** Okay. All right. And you say that you had no
interaction, whatsoever, with Pat Kryzak, or Patricia, as you
called her, at all while you were on the scene?

**A.** Correct. I don't even recall going into the living room.

**Q.** So you don't have any memory, for example, of seeing her
in the living room or anyplace else?

**A.** Like I said, I do recall, when I walked into the house,
that I could see her sitting in that portion of the house, in
the living room to the left.

**Q.** You did see her there?

**A.** I saw the female occupant, I said earlier, the female
occupant sitting in that room. Yeah.

**Q.** And that's the only thing that you remember?

**A.** That's the only thing that I remember about the female
occupant of the house, throughout the entire warrant.

**Q.** Okay. And -- well, let me ask you this. When you got
into the kitchen, how long were you in the kitchen before you
turned on the tape recorder and started interviewing
Mr. Johnson?

**A.** Like I said, typically what I would do is tell the person
that I was interviewing that I would be turning the recorder
on for the purposes of recording the interview, so I wouldn't
have to take notes. So it would have been fairly quick.

**Q.** Was Agent Connolly in the kitchen with you already?

1    **A.**  She was.

2    **Q.**  Do you remember whether she was already there, or did she

3    come -- did she follow you into the --

4    **A.**  She could have already been there.  She could have

5    already been in the kitchen.

6    **Q.**  But you're not sure?

7    **A.**  I'm not, because, like I said, I entered the house after

8    the initial entry.

9    **Q.**  Okay.  All right.  Now -- okay.  So you have this

10   recorded interview with Mr. Johnson.  And that interview

11   lasts approximately 25 minutes, something like that, from

12   6:08 until about 6:34, something like that?

13   **A.**  Something like that.

14   **Q.**  And then you turned the recorder off, correct?

15   **A.**  Correct.

16   **Q.**  And then an hour went by before the recording was turned

17   back on, correct?

18   **A.**  Yes.  The next recording didn't start for almost an hour,

19   yeah.

20   **Q.**  In that hour period of time, I just want to be clear, is

21   it accurate that you were in the kitchen with Mr. Johnson

22   nearly all of that time?

23   **A.**  I don't know that I would say nearly all of that time.  I

24   spent some time in the bedroom 2 and Room F with the forensic

25   agent.  And then after Mr. Johnson told me where the thumb

1  drives were in the closet in that room, I'm actually the one

2  that went into the room and took them down from the -- so I

3  wouldn't say the entire time, but I was in there for a good

4  portion of the time.

5  **Q.**  Well, about how much time do you think you were not in

6  the kitchen with them?

7  **A.**  In the hour in between the interviews?

8  **Q.**  Yes, in the hour.

9  **A.**  I might have been in there for maybe half the time.

10  **Q.**  For maybe half that time?

11  **A.**  For maybe half that time.

12  **Q.**  Do you remember who was in the kitchen with him when you

13  were not with him?

14  **A.**  I remember Janet, Agent Connolly, was in there, and I

15  remember her supervisor, Rick Sabatini, was also in there.

16  **Q.**  And we're talking about the hour.

17  **A.**  We're talking about throughout the course of the hour,

18  yes.  Because I remember that her group supervisor -- Janet

19  Connolly -- I'm sorry.  Janet Connolly's group supervisor was

20  also my acting boss prior to that position, down in Rhode

21  Island, and I remember him standing on the other side of that

22  island from where the chairs are where myself and Janet

23  Connolly were seated.

24  **Q.**  So you think that he was in the kitchen a lot of the

25  time, as well?

1  **A.** Yes.

2  **Q.** In that one-hour period between the time that the

3  recorder was turned off and it was turned back on?

4  **A.** Correct.

5  **Q.** Now, when you -- when you first started talking with him

6  in the kitchen, it's true, isn't it, that you -- either you

7  or Agent Connolly asked if you could close the doors to the

8  kitchen.

9  **A.** Yes.  I don't think that we asked.  I think we closed the

10 doors because of all the noise and commotion in the

11 background that was going to be picked up on the recording,

12 which is why we did that.

13 **Q.** So it wasn't out of any particular concern for privacy,

14 it was more just for noise?

15 **A.** In my recollection, it would have been the noise.

16 Because the noise in the house from the front and to the

17 hallway, in the hallway right there, where the searches were

18 being done, a lot of the agents were talking, and it was loud

19 coming into the door.

20 **Q.** Okay.

21 **A.** I suppose you could say that would be for privacy, also,

22 so that we could have the conversation with Mr. Johnson and

23 not be interrupted by somebody.

24 **Q.** Let me ask you this.  How many people were moving around

25 in the house while all of this was going on?

**A.** Probably approximately ten or more, like I said.

**Q.** Now, it's accurate, we would describe this as a small house?

**A.** It was a smaller house, yeah.

**Q.** For -- okay. And Mr. Johnson was at that one chair that you told us about, in the photograph, the entire time?

**A.** The entire time, my recollection is that he was there, yes.

**Q.** He's seated in that one place?

**A.** Yes.

**Q.** And he didn't move around. He didn't move around in the kitchen. He didn't stand up, get up, walk around, or anything like that.

**A.** Went to the bathroom.

**Q.** He went to the bathroom.

**A.** Yeah.

**Q.** Now, isn't it true that -- well, first of all, this was early in the morning on an April -- on a spring day, correct?

**A.** Uh-huh.

**Q.** It was not particularly warm outside, was it?

**A.** I don't recall. That's what I don't recall. I normally wear a hoodie sweatshirt when I do these warrants, with a vest over the top. I could have been -- depending on the temperature, it would have been that or like a marked -- an HSI-marked T-shirt underneath the vest.

**Q.**   Okay.  And Mr. Johnson asked if he could go get some
clothes.  Didn't he ask for -- if he could put on some jeans
and a shirt while you guys were sitting in the kitchen?

**A.**   I believe after the first portion of the interview he
did, yes.

**Q.**   And didn't you tell him that he didn't need to get
dressed right then?

**A.**   I don't recall that.

**Q.**   You don't recall that?

**A.**   No.

**Q.**   Okay.  So you talked to him for half an hour, and agents
are searching through the house at this point.  And let me
ask you, do you know what was taken from the house that day?

**A.**   I don't.  It wasn't my case.

**Q.**   At all?  It wasn't your case?

**A.**   No.  It's Agent Connolly's case.  I referred the lead to
her, off of a case that I had in Rhode Island, where the
communication happened between my target and Mr. Johnson.

**Q.**   Yes.  Okay.  So you were not -- you were now, sitting
here in this courtroom, not aware of what was taken out of
the house?

**A.**   No.  Because like I said, it's not my case.  The case
file is not mine.  I don't have it.  All I know, I could tell
you right now that his cell phone was probably seized.  Like
I said, we had that.  And the thumb drives that we found, I

1    could say those were -- because they're going to bring them

2    back to the lab and they're going to do full forensic

3    analysis on them.

4    **Q.**  Now, at some point, though, after the tape recorder was

5    turned off, you and Agent Connolly went into bedroom 2, the

6    back bedroom, because there was some forensic people there

7    setting up, looking through a computer, correct?

8    **A.**  Correct.  They were looking through a desktop computer

9    that was in there that Mr. Johnson had identified as his.

10   **Q.**  And they couldn't find this file on the computer called

11   CL Perv, right?

12   **A.**  The folder, yes.

13   **Q.**  A folder.

14   **A.**  Yes.

15   **Q.**  Excuse me.  So you went back into the kitchen and

16   informed him of that fact, correct?

17   **A.**  I did.

18   **Q.**  Why?  Why did you tell him that your forensic people

19   couldn't find that folder?

20   **A.**  To see if he possibly had missed -- or told us that it

21   was one thing when it might have been another, in terms of

22   the title of the folder.  Because at that point, Mr. Johnson

23   had been very cooperative with us, and I had no reason to

24   believe that he would send us in the wrong direction.

25   **Q.**  What words did you say to him, and how did you

1   communicate this to him, that you wanted some more

2   information?  Do you remember what words you said?

3   **A.**  I don't remember the exact words that were said, but I

4   would have said something along the lines of, "The folder

5   that you told us that we would find the images in, the

6   forensic agent isn't finding it on the computer.  Would there

7   be another name of the folder or another location that we

8   would find that folder?"

9   **Q.**  So you did ask, in other words, is there someplace else

10   that we should be looking to find this folder that you're

11   talking about?

12   **A.**  I would ask him to -- yes, like we did before, during the

13   interview, in terms of aiding us and finding the folder that

14   he was speaking of, yes.

15   **Q.**  And in response to this, he told you about a thumb drive

16   that was located in a certain location in that bedroom?

17   **A.**  Correct.

18   **Q.**  Now, is it -- how many times have you executed these

19   kinds of search warrants in these kind of pornography cases?

20   **A.**  A lot.

21   **Q.**  Let me ask you this.  In any of those cases, has the

22   person who was the target of the warrant, if they were on

23   premises when the warrant was being executed, were they --

24   did any of them -- were any of them ever allowed to leave?

25   **A.**  If they had asked to leave, they would have been allowed

1  to leave and told that they would not be able to return until

2  the warrant was done being executed.

3  **Q.**  But let me ask you this.  Did any of them ever leave?

4  **A.**  No.  Nobody left the premises.  In one situation we

5  allowed a person to go outside the back door and smoke a

6  cigarette.  That was my -- that's my recollection of people

7  leaving.

8  **Q.**  Okay.  So -- so you allowed somebody to go leave there --

9  leave the premises to go smoke a cigarette, but they were not

10  allowed -- but they were expected to come back in?

11  **A.**  They weren't expected to come back in.  Like I said, if

12  somebody asked to leave the premises, they would be told that

13  they would be allowed to leave, but they would not be allowed

14  to come back until we had exited the premises.

15  **Q.**  So in all of the instances in which you've executed these

16  warrants, there's only one instance where you know of when

17  somebody left?

18  **A.**  Yes.

19  **Q.**  And that was to go smoke a cigarette and come back?

20  **A.**  Correct.

21  **Q.**  So you've never had an instance in your career where

22  somebody left and stayed gone?

23  **A.**  Yes.  Nope.

24  **Q.**  That's never happened?

25  **A.**  No.

1    **Q.** And did you also -- it's true, isn't it, that during this

2    time when you were trying to find out where the CL Perv file

3    was or anything else was, didn't you say words to Mr. Johnson

4    to the effect of, you know, "It's good for you to be

5    cooperating, because if you make your job easier, it can go

6    easier for you on the other side when this is over"?

7    **A.** I don't recall saying that.

8    **Q.** You never said anything like that?

9    **A.** I don't recall saying that.

10   **Q.** You don't recall. You might have, but you just simply

11   don't remember?

12   **A.** I'm not saying that I might have. I'm saying that I

13   don't recall saying that.

14   **Q.** So you don't remember one way or the other?

15   **A.** Like I said, I don't recall saying that.

16   **Q.** So you never said -- you don't recall saying anything

17   about: Being cooperative is good for you, and it will -- it

18   can help you later on down the road or help you with your

19   sentence?

20   **A.** I just said I don't recall saying that. And like I said,

21   Mr. Johnson was cooperative throughout the entire morning.

22   **Q.** I guess what I'm trying to find out is whether he was

23   cooperative because you informed him that being cooperative

24   would be a good thing. Did you ever do that?

25   **A.** I don't recall telling him that being cooperative would

1   be a good thing one way or another, no.  And I would have

2   never said anything about it helping him down the road, no.

3   **Q.**  Okay.  Now, you said at some point Mr. Johnson asked for

4   clothing and that agents went into the bedroom to get the

5   clothing for him?

6   **A.**  Correct.

7   **Q.**  Why was he not allowed to go into the bedroom and get the

8   clothing for himself?

9   **A.**  Because the search was still going on, like I said

10  before, for officer safety purposes and preservation of

11  evidence.

12  **Q.**  So you said the search was still going on, right?

13  **A.**  Yes.

14  **Q.**  So at what point -- at what point was it that he asked

15  for clothing and these agents went to get it for him?

16  **A.**  Like I said, it was some time after the initial recorded

17  interview.

18  **Q.**  And before the recording was turned back on?

19  **A.**  I don't -- I honestly don't know whether it was in that

20  hour timeframe in between or after the second recording,

21  because the second recording was only a few minutes.

22  **Q.**  Well, you told us at some point, though, that the female

23  occupant was allowed to go into the room to dress, because

24  the bedroom had, quote/unquote, been searched and cleared?

25  **A.**  I found out about this after the fact.

1 **Q.** And you have no idea at what point it was that she went

2 into the bedroom to change?

3 **A.** I do not.

4 **Q.** So is it accurate to say that you don't know what time

5 the bedroom was searched and cleared and made safe for

6 somebody who was an occupant of the house to go into it?

7 **A.** That's correct.

8 **Q.** You don't know?

9 **A.** I don't.

10 **Q.** Okay.

11 **A.** I wasn't involved in the search.

12 **Q.** You weren't involved in the search at all?

13 **A.** I was only there for the purposes of interviewing

14 Mr. Johnson with Ms. Connolly.

15 **Q.** Although you did retrieve the flash drive from that

16 closet, correct?

17 **A.** Correct. Because Mr. Johnson had told me where they

18 were.

19 **Q.** And Mr. Johnson told you where that was after you told

20 him that they couldn't find the CL Perv file. And you did

21 search for and retrieved that thumb drive, correct?

22 **A.** I did.

23 MS. FRIED: Okay. Could I have just a minute?

24 THE COURT: Yes.

25 MS. FRIED: I'm sorry. Thank you.

BY MS. FRIED:

**Q.** Now, just a couple more questions.

At some point you went over to the Framingham Police Department after Mr. Johnson was told that he was under arrest and was transported?

**A.** Correct.

**Q.** But you did not have any interaction with him at the police department while you were there?

**A.** I did not.

**Q.** Who did -- who, if anyone in law enforcement, did you have any interaction with at the Framingham police?

**A.** I was sitting at a table in like an office or a conference room area, it was like a conference table, with Janet Connolly.

**Q.** And this was after you both arrived?

**A.** Yes.

**Q.** And what were you and Agent Connolly doing together there?

**A.** Like I said, I logged onto my laptop and downloaded the interviews of the two interviews of Mr. Johnson onto my laptop, so I could send them to Agent Connolly, because it was my recorder.

**Q.** Okay. Did you give her any instructions about anything that she was to do after you had done this, by chance?

MS. PARUTI: Objection.

BY MS. FRIED:

**Q.**  What conversations did you have with Agent Connolly while you were there in the conference room together?

**A.**  I don't recall any conversations with Janet Connolly in the conference room, other than the fact that I was giving her the recordings.  And I left shortly thereafter, because, like I said, it wasn't my case.

**Q.**  I was going to ask you, how long did you stay at the Framingham Police Department?

**A.**  I was not there very long.  I transferred the recordings over to her, and I packed my stuff up and I left.

**Q.**  15 minutes?  Half an hour?

**A.**  I don't recall the exact time.

MS. FRIED:  Okay.  I don't have any other questions, Your Honor.

THE COURT:  All right.  You don't have any redirect, do you?

MS. PARUTI:  No, Your Honor.

THE COURT:  All right.  Thank you very much.

Special Agent, you're excused.

Any other witnesses for the Government?

MS. PARUTI:  No, Your Honor.

THE COURT:  Any witnesses, Ms. Fried?

MS. FRIED:  Yes, I do.  Could I call Ms. Kryzak?

THE COURT:  Yes.

1    Do you want to go out and get her, or do you want

2    the --

3    MS. FRIED:  Yes, I can go get her.  I was just

4    going to remove these from the table.  I'll go get her.

5    THE COURT:  Ms. Kryzak, come forward to the witness

6    stand, and remain standing.

7    You can bring your pocketbook, if you want.

8    MS. FRIED:  Do you want it?

9    THE WITNESS:  No.

10    (The witness was duly sworn.)

11    THE COURT:  Go ahead.

12                    **PATRICIA KRYZAK**

13    having been duly sworn, testified as follows:

14    **DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

15    BY MS. FRIED:

16    **Q.**  Ms. Kryzak, could you say your name and spell your last

17    name for the court reporter.

18    **A.**  All right.  It's Patricia, and last name is K-r-y-z-a-k.

19    **Q.**  Where do you live?

20    **A.**  20 Burdette Avenue, in Framingham.

21    **Q.**  And are you employed?

22    **A.**  Yes, I am.

23    **Q.**  What do you do?

24    **A.**  I'm an elementary school teacher in Framingham.

25    **Q.**  Can you tell us what your education is?

**A.**   Yes.  I have a bachelor's degree in elementary education from UMass Amherst, and master's degree in social work from Columbia.

**Q.**   Are you acquainted with Walter Johnson, who is sitting here in court?

**A.**   Yes, I am.

**Q.**   And how are you acquainted?  What's your relationship with him?

**A.**   I've known Walter since high school.  That was over 50 years ago.  And we've been a couple for 12 years, and lived together and owned our home together for nine years.

**Q.**   Now, Ms. Kryzak, I want to bring your attention around to April 27th of 2017.  So it's almost two years ago.

**A.**   Uh-huh.

**Q.**   A year and nine months ago.  Do you remember the date that I'm talking about?

**A.**   Yes, I do.

**Q.**   And how do you remember it?  Why do you remember it?

**A.**   That 6 o'clock in the morning, there was very loud banging and shouting on our door.  And we were asleep.

**Q.**   When you say "we," you mean --

**A.**   Walter and I, yeah.

**Q.**   Okay.  Go ahead, please.

**A.**   And Walter got up to answer the door, and I -- he went out of the room first to open the door, and I pulled on some

1  pajama pants and went out after him.

2  **Q.**  Let me just ask you a question.

3  **A.**  Yeah.

4  **Q.**  Do you recall what you were wearing?

5  **A.**  Yeah.  Well, pajamas.  I had a nightgown and some pajama

6  pants.

7  **Q.**  And how was Walter dressed?

8  **A.**  He just had shorts that he had slept in.

9  **Q.**  Was he wearing anything on his top?

10  **A.**  No.

11  **Q.**  Anything on his feet?

12  **A.**  Maybe some slippers.

13  **Q.**  Okay.  Please continue.  What happened when --

14       Who got to the door first?

15  **A.**  Walter did.  He opened the door.  By the time I came out,

16  there's a door from the bedroom to the dining room that I

17  went through.  And by the time I came out, the dining room,

18  it seems like it was full of people.  And an agent said they

19  had a warrant -- no, I think I asked if I could see the

20  warrant, or someone said they had a warrant, and the agent

21  put it on the dining room table.  And she left her hand on

22  it, and I noticed that it had Walter's name and our address

23  on it.

24  **Q.**  Okay.  And so they showed you the warrant?

25  **A.**  The first page, yeah.

1   **Q.**  Okay.  And what happened next?  What happened with you?

2   What did you see anybody do with Walter?

3   **A.**  Walter was taken into the kitchen, and I was asked -- I

4   was shown to go into the living room and told to sit down.

5   **Q.**  Okay.  I'm going to interrupt you for a minute, because I

6   just want to show you some photographs.  Okay?

7   **A.**  Sure.

8           MS. FRIED:  Your Honor, I just need a moment to

9   mark some exhibits.

10          THE COURT:  Sure.

11          MS. FRIED:  If you'll indulge me.

12          Your Honor, should I continue numbering the

13   exhibits serially from where we stop?

14          THE COURT:  Yes.  Make it easier.  So the last one

15   is 12.

16          MS. FRIED:  Last one was 12?  Okay.

17          (Discussion off the record.)

18          MS. FRIED:  Your Honor, can I approach the witness?

19          THE COURT:  You may.

20          MS. FRIED:  Thank you.

21   BY MS. FRIED:

22   **Q.**  Ms. Kryzak, I want to show you a series of photographs

23   that I've numbered Exhibits 13 through 19.

24   **A.**  Uh-huh.

25   **Q.**  Can you just look through those, and tell us whether you

1 recognize what's shown in those pictures.

2 **A.** Yes. These are photos of my home.

3 **Q.** Okay. And do those photographs depict the layout of your

4 home, well, first of all, as it exists now?

5 **A.** Yes.

6 **Q.** And do the photographs also depict the layout of your

7 home as it existed on April 27th?

8 **A.** Yes.

9 **Q.** 2017?

10 **A.** Yes.

11 **Q.** And are those fair and accurate depictions of the layout

12 of the rooms and how they were furnished in April of 2017?

13 **A.** It's the same.

14 **Q.** Okay. It's the same? All right.

15 Now, I want to direct your attention to Exhibit 15.

16 MS. FRIED: And for opposing counsel, that's this

17 one. It's a picture of the --

18 THE COURT: Do you have any objection to these

19 exhibits?

20 MS. PARUTI: I don't, Your Honor.

21 THE COURT: Are you offering them?

22 MS. FRIED: Yes, I will offer them, Your Honor.

23 THE COURT: 13 to 19 are admitted.

24 MS. FRIED: Thank you.

25 (Exhibit Nos. 13 through 19 admitted into

1    evidence.)

2         MS. FRIED:  Exhibit 15, for opposing counsel, which

3    is a picture of -- I'll ask the witness to identify.

4    BY MS. FRIED:

5    **Q.**  Do you see what's depicted in that?

6    **A.**  Yes.  It's the front door of the front hallway.

7         MS. FRIED:  And I want to show you Exhibit 14.

8         I'll show this to opposing counsel.

9    BY MS. FRIED:

10   **Q.**  Can you tell us what's depicted in that exhibit?

11   **A.**  It's a view of the living room, from the front foyer.

12   **Q.**  Okay.  And lastly, Exhibit 13?

13   **A.**  It's a picture of the living room.

14   **Q.**  Okay.  Now, when you -- I want to ask you, when the

15   agents -- when you first saw the agents come into the house,

16   did they come into the part of the house that's depicted in

17   Exhibit 14?

18   **A.**  Yes.

19   **Q.**  How many people did you see in that area of that front

20   foyer, you know, near your living room, the foyer that's

21   between your living room and your dining room?  How many

22   people do you remember seeing coming into the house?

23   **A.**  Do you mean at the beginning or all together?

24   **Q.**  Well, at the beginning, first, and then later on.  Let's

25   start with the beginning, first.

1    **A.**   At the beginning, I would say, in that dining room, front

2    foyer area, maybe five or six.

3    **Q.**   Okay.  And what did -- what did they do or say to you

4    when they came in?  What do you remember happening with you

5    as they came in the house?

6    **A.**   I think they said that they have a warrant to search the

7    house.  And one agent asked me if I was Walter's wife, and I

8    said that we weren't married.  But she said -- I don't know,

9    I can't remember exactly the words, but something to the

10   effect of were we in that kind of a relationship, and I said

11   yes.

12   **Q.**   Okay.  And then what happened?

13   **A.**   I asked if I could see the warrant, and she had it on the

14   table.  And I just saw that it was, indeed, for Walter and

15   our address.  And then they took Walter to the kitchen, and

16   they took me into the living room.

17   **Q.**   When you say they took you into the living room, would

18   you describe what that means, what you mean by that, when you

19   say they took you into the living room?

20   **A.**   They gestured with arms, like, pointing to where they

21   were expecting me to move.

22   **Q.**   And what did you do in response to that?

23   **A.**   I went into the living room and sat on the couch.

24   **Q.**   Did somebody come with you into the living room?

25   **A.**   Yes.  I think there were maybe one or two agents then.

1  And then they looked around, and one agent went out and took

2  a wooden chair from the dining room, brought it in, and

3  placed it in front of where I was sitting, and then the other

4  agent sat down there.

5  **Q.**  Now, let me ask you, does Exhibit 13 depict the

6  arrangement of the chair in your living room that you were

7  just describing?

8  **A.**  Yes, it does.

9  **Q.**  Is that chair normally there when you're --

10  **A.**  No.  No.

11  **Q.**  Now, let me ask you this.  Once you've sat down at that

12  living room couch, were you ever -- what was the next time

13  that you left that spot?

14  **A.**  I -- it was maybe a half hour later, I asked if I could

15  get a robe, because I was sitting in my night clothes and all

16  these people were in and out, strangers, fully dressed, and I

17  felt very vulnerable.

18  **Q.**  And was somebody in the room with you when you asked for

19  that?

20  **A.**  Yes.

21  **Q.**  What happened when you asked that person?  Was it a

22  police officer?

23  **A.**  I think it might have been the Framingham officer, yes.

24  **Q.**  What happened when you asked the Framingham officer if

25  you could go get a bathrobe?

1  **A.**  He spoke to someone else in another room, and then I

2  heard them say, "She's going to get her robe," as if to say I

3  had permission to go get it.

4  **Q.**  And when that happened, what did you do?  What were

5  you -- did you go get a bathrobe?

6  **A.**  Yes.  I went through the kitchen, and I saw Walter was

7  sitting at the end of the kitchen counter and still with no

8  shirt on.  And I thought he must have been very uncomfortable

9  with that.  And I walked into the hallway that's off the

10  kitchen and got the robe out of the closet and saw that there

11  were a lot more agents there than I knew about, because they

12  were in the back study, and there was another in the hallway.

13  **Q.**  How many -- how many people do you think you saw in the

14  hallway and in that back -- in that hallway and in that back

15  study?

16  **A.**  Well, I think there might have been three in the back

17  study, and another man in the hallway, plus maybe -- maybe

18  three or four that were still in the kitchen with Walter.

19  **Q.**  Okay.  Now, I want to show you, direct your attention to

20  what is marked -- well, admitted as Defendant's Exhibit 17.

21        MS. FRIED:  I'm showing it to opposing counsel.

22  BY MS. FRIED:

23  **Q.**  And is that the hallway that you're talking about?

24  **A.**  Yes, the closet where my robe was, was in that hallway.

25  **Q.**  All right.  Now, when you went to get your robe, were you

1  alone or were you accompanied?

2  **A.**  No, there was always an officer around, yeah.

3  **Q.**  Okay.  After you got your robe, where did you go?

4  **A.**  Back to the living room.

5  **Q.**  Okay.  And what did you do when you were back in the

6  living room?

7  **A.**  There were times when I was just sitting in the other --

8  and the other officer was sitting in the chair, and sometimes

9  it was silent.  And I know at one point I asked if I could

10  get water, and they said someone would bring it to me, and

11  they brought me a glass of water.

12  **Q.**  When you got your bathrobe, was there a reason that you

13  didn't go on into your bedroom or to some other part of the

14  house?  Why did you go back to the living room?

15  **A.**  I felt like all I had permission to do was go get the

16  bathrobe, and then I needed to go back to where I was told to

17  sit at the beginning.

18  **Q.**  Okay.  And do you remember -- so you go back to the

19  living room, and you are sitting down.

20  **A.**  Uh-huh.

21  **Q.**  Do you remember how many people you saw or what kind

22  of -- let me rephrase that question.

23          What activity did you see going on around you while

24  you were sitting in the living room?

25  **A.**  There were men -- mostly men and some women coming in and

1  out of the front door.  They were coming in and out.

2  **Q.**  And what were they doing, or could you tell what they

3  were doing?  What did they appear to be doing?

4  **A.**  Well, at one -- I mean, later on in this, they were

5  carrying electronics, laptops, I saw.  But sometimes I don't

6  know -- I'm not sure what they were doing.  They were just

7  coming in and out.  And I noticed they were -- when I went to

8  get the robe, I saw out the window, there were two SUVs

9  parked in the driveway and others out in front of the house.

10  But there was a lot of activity in and out.

11  **Q.**  Did you ask anybody any questions?

12  **A.**  At one point I asked if I was going to be able to go to

13  work, because it was already past the time when I could have

14  called for a substitute and I didn't want to leave my class

15  without a teacher.

16  **Q.**  And what happened when you asked about calling in for

17  calling in to work?  What was the response that you got?

18  **A.**  They said I would be.

19          THE COURT:  You wanted to ask if you could go to

20  work.

21          THE WITNESS:  Yes.

22          THE COURT:  That's what you asked, right?

23          THE WITNESS:  Yes.

24          MS. FRIED:  Oh, sorry.

25          THE WITNESS:  And they said I would be able to.

1    And then they asked how long, what time I would have to leave

2    in order to get there on time.

3    BY MS. FRIED:

4    **Q.**   And you told them?

5    **A.**   That I would have to leave like before 8:00.

6    **Q.**   Did there come a point, then, when you went to get ready

7    for work?

8    **A.**   Yes.  I asked if I could go get dressed.  And so I went

9    to the bedroom, and when I was getting dressed, a man walked

10   through the side door that's connected to the dining room.

11   **Q.**   Into the bedroom?

12   **A.**   Yes.

13   **Q.**   Okay.  And did you have any interaction with him?

14   **A.**   Yes.  I told him that I was getting dressed, because I

15   wasn't fully dressed when he walked in.

16   **Q.**   And?

17   **A.**   And he walked -- he walked back out.

18   **Q.**   He walked back out?

19   **A.**   Yes.

20   **Q.**   And he came into your bedroom from the dining room?

21   **A.**   Yes.

22   **Q.**   From the dining room door?

23   **A.**   Yes.

24   **Q.**   Let's see.  Is that door -- it's depicted -- just a

25   minute.

1      MS. FRIED:  Just a minute, Your Honor.

2      THE WITNESS:  Here is one here.

3      MS. FRIED:  Is it right there?

4      THE WITNESS:  Yes.

5      MS. FRIED:  So yes, I'm sorry.  Exhibit 19.  I'll

6  show it to opposing counsel.

7      MS. PARUTI:  That's fine.

8  BY MS. FRIED:

9  **Q.**  So if I can show you what's been admitted as Exhibit 19.

10 **A.**  Uh-huh.

11 **Q.**  What do you see in that photograph?

12 **A.**  There's a dining room -- you see the front door, and then

13 the side door is what leads into the bedroom.

14 **Q.**  And that's on the right edge of that exhibit?

15 **A.**  Yes.

16 **Q.**  There's a door that leads into the bedroom?

17 **A.**  Yes.

18 **Q.**  And that was the door that the officer or the agent came

19 through?

20 **A.**  Yes.

21 **Q.**  While you were getting dressed?

22 **A.**  Yes.  Uh-huh.

23 **Q.**  Now, during any of this time, did you ever see Walter,

24 other than when you told us about going to go get your

25 bathrobe?

1    **A.**  Not until the end of when they were taking him out.  That

2    was the only other time.

3    **Q.**  Okay.  So you had no conversation with him at all?

4    **A.**  No.

5    **Q.**  And you have no personal or direct knowledge of what was

6    going on in the kitchen while he was there?

7    **A.**  No.  I -- no.  I didn't even know why they had a warrant.

8            MS. FRIED:  Okay.  All right.  Just a moment, Your

9    Honor.

10           THE COURT:  All right.  Take a moment.

11   BY MS. FRIED:

12   **Q.**  When you were in the living room, sitting on the couch,

13   how did you feel?

14   **A.**  I felt very overwhelmed.  It was like shock.  And

15   confused, because I didn't know what was happening.  And I

16   felt immobilized, like I didn't -- like I had to just sit

17   there on the couch.

18   **Q.**  Why did you feel immobilized?

19   **A.**  I felt like I was -- well, I was under guard.  There was

20   always someone sitting in the chair in front of me.  And I

21   mean, the chair was like purposely placed there, and it was

22   not -- you know, not the living room recliner.  It was

23   brought in from the other room to sit there on purpose in

24   front of me.

25   **Q.**  What did the person who was sitting in the chair do while

1    they were sitting there in the chair?

2    **A.**   For a while, it was the Framingham officer, and we just

3    sat in awkward silence.  And then at one point, an agent came

4    in, and the officer was still in the chair, and he kind of

5    stood over me and asked me questions about who lived in the

6    house, where I worked, where Walter worked.

7    **Q.**   Did they ask you any questions about where they might

8    find things in the house?

9    **A.**   Yes.  They asked about electronics, like what computers

10   we had and cell phones.  And they asked where they were.

11   **Q.**   Did you answer their questions?

12   **A.**   Yes.  And I told them my phone was charging in the

13   kitchen.  I said I could get it.  And they said, "No, we'll

14   get it.  We'll find it."

15   **Q.**   Okay.  And are these -- did you see them leaving the

16   house with any of these items at some point?

17   **A.**   Yes.  They took the laptops out, and there were some

18   flash drives lying around in the living room, and they took

19   those out, as well, and the phones.

20   **Q.**   What can you remember, the list of things that they took

21   out, as much as you can remember, if you can tell the Court

22   what you remember --

23              THE COURT:  What's the relevance of this?  Isn't

24   there an inventory?

25              MS. FRIED:  Yes, there is.  It's showing the

1  control.  That's really the point of this, is showing the

2  control.

3          THE COURT:  Just that they took them, we know what

4  they took.  You can give me the inventory.

5          MS. FRIED:  Okay.

6          THE COURT:  If there's another aspect of to it.

7          MS. FRIED:  Well, that's the aspect.  That's what

8  I'm asking about.

9          THE COURT:  Okay.

10  BY MS. FRIED:

11  **Q.**  At some point, did you leave the house?

12  **A.**  Yes.  It was after they took Walter out.

13  **Q.**  Can you describe what it was that you saw when they were

14  taking Walter out?

15  **A.**  They let me say goodbye to him.  That was the first

16  contact that we had since they had come in.  That was in the

17  kitchen.  And then they had let him talk to his boss because

18  he had work that day.  He called to say he wouldn't be able

19  to make it.  And then I think he was -- I think he was

20  handcuffed, and they took him out the front door.

21  **Q.**  Were you dressed?

22  **A.**  By then I was, yes.

23  **Q.**  By then you were dressed?

24  **A.**  Yes.

25  **Q.**  And did you leave the house yourself shortly after that?

**A.**   Yes.

                MS. FRIED:  I don't have any further questions.

                THE COURT:  All right.  Any cross-examination?

                MS. PARUTI:  Just very briefly.

                Can I see that Exhibit 13?

                MS. FRIED:  Yes, of course.

                MS. PARUTI:  Thanks.

                THE COURT:  I actually have one question before you

go.

                MS. PARUTI:  Sure.

                THE COURT:  Turning back, and directing your

attention back to the moments just after the officers entered

the home.

                THE WITNESS:  Uh-huh.

                THE COURT:  You were in the foyer or dining room

area, with the officers, and Walter was there.  So then you

said that they took you into the living room.

                THE WITNESS:  Uh-huh.

                THE COURT:  Right?  And Walter went to the kitchen.

                THE WITNESS:  Yes.

                THE COURT:  Can you describe how Walter went to the

kitchen?  If you saw that.

                THE WITNESS:  I can't remember any details, really.

I just remember that he was no longer in the room.  I can't

really remember how they took him in, yeah.

1           THE COURT:  Okay.  Fine.  That's it.

2           Go ahead.

3           MS. PARUTI:  Thank you.

4           **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

5   BY MS. PARUTI:

6   **Q.**  So you said that when they first got -- the first agents

7   that you saw, they sort of pointed you to go into the living

8   room?

9   **A.**  Yes.

10  **Q.**  And nobody took you by the arms or grabbed any other part

11  of your body; is that correct?

12  **A.**  That's correct.

13  **Q.**  And you said that the female agent is the person you

14  remember showing you the front of the warrant?

15  **A.**  Yes.

16  **Q.**  And you saw that it had Walter's name on it and your

17  address on it?

18  **A.**  Yes.

19  **Q.**  And you didn't think you were under suspicion for

20  anything, at any point, right?

21  **A.**  Not under suspicion, no.  But --

22  **Q.**  Like you didn't think you were the target of the

23  investigation, or anything like that?

24  **A.**  No.

25  **Q.**  Correct?  All right.

1         You said that at some point one of the agents came

2  in?

3         MS. PARUTI:  And Your Honor, if I could just

4  approach with Exhibit 13?

5         THE COURT:  You may.

6         MS. PARUTI:  Actually, I don't know, does the Court

7  want to see it?

8         THE COURT:  Yes.  Sure.  I haven't seen it.

9         MS. PARUTI:  I'll offer it to the Court.

10        THE COURT:  Okay.  Thank you.

11  BY MS. PARUTI:

12  **Q.**  Ms. Kryzak -- am I pronouncing it correctly?  *Kryzak*?

13  **A.**  Yes.

14  **Q.**  So this is 13, and it's a little smaller.  I'm just going

15  to reach over.

16  **A.**  Uh-huh.

17  **Q.**  So you said that the wooden chair that is sort of in

18  front of the TV?

19  **A.**  Yes.

20  **Q.**  Isn't normally there, correct?

21  **A.**  Right.

22  **Q.**  And they took it out of the dining room?

23  **A.**  Yes.

24  **Q.**  So looking at 19, it's one of those four chairs that are

25  normally there, correct?

1  **A.** Right.

2  **Q.** And just looking at 19, it looks like you're in the

3  dining room, looking towards the front door?

4  **A.** Front door.

5  **Q.** Right?  Is that -- you can sort of see a sliver of a room

6  right there?

7  **A.** That's the living room, yes.

8  **Q.** So just for the record, underneath one of the lights, you

9  can see a door sliver, and that's the living room?

10 **A.** Yes.

11 **Q.** So fair to say, when you come in, and looking at

12 Exhibit 14, that is a sort of closer-up picture of that

13 entryway to the living room?

14 **A.** Yes.

15 **Q.** And is that the only entry to the living room?

16 **A.** Yes.

17 **Q.** It is.  Okay.  So you can sort of see there's like a

18 little console table and a chair right to the left?

19 **A.** Uh-huh.

20 **Q.** And then it looks like Exhibit 13, the smaller one shows

21 you that there's a couple little tables there on the right,

22 and then the sofa, right?

23 **A.** Right.

24 **Q.** So you were seated, excuse me, on this couch here?

25 **A.** Yes.

1    **Q.**   That's on the right-hand side of Exhibit 13?

2    **A.**   Yes.

3    **Q.**   And did they -- you said they sort of pointed you to the

4    living room.  Did you decide where to sit down or did they

5    tell you to sit on the couch, or how did that work out?

6    **A.**   Yeah, I sat down first.

7    **Q.**   Okay.  So you chose where you wanted to sit down in the

8    living room.

9            Did you take this picture?

10   **A.**   I did.

11   **Q.**   You did.  Why did you take that picture?

12   **A.**   This weekend.

13   **Q.**   Oh, this weekend.  So you sort of recreated the scene as

14   it was?

15   **A.**   To put the chair, yeah.

16   **Q.**   But all the rest of the furniture is in the same place as

17   it was back in 2017?

18   **A.**   Yes.

19   **Q.**   So fair to say that if the agent -- the other options

20   that the agent had for sitting at that point --

21   **A.**   (Indicating.)

22   **Q.**   Was -- so the chair -- you can see in Exhibit 14, is that

23   like a recliner?

24   **A.**   Yes.

25   **Q.**   And that's right next to the window?

1    **A.**   Right.

2    **Q.**   And sort of facing at the TV, right?

3    **A.**   Yes.

4    **Q.**   Okay.  Or they could have sat on the couch next to you?

5    **A.**   Right.

6    **Q.**   Which would have been pretty awkward?

7    **A.**   Right.

8    **Q.**   It was awkward anyway, right?

9    **A.**   (Nods head.)

10   **Q.**   You've never had police in your home like that before?

11   **A.**   No.

12   **Q.**   And that's why you felt sort of overwhelmed and confused

13   and nervous, right?

14   **A.**   With so many.

15   **Q.**   Right.  Because you've never had any in your house

16   before, right?  You've never been arrested?

17   **A.**   No.

18   **Q.**   And Walter has never had any legal problems like this

19   since you've been together?

20   **A.**   No.

21   **Q.**   And you had no idea that he was even involved in anything

22   child pornography up to that point, correct?

23   **A.**   Right.

24   **Q.**   Did the agents -- I'm sorry, I'll get out of your space

25   here.

```
1              You said that -- oh, actually, before I leave, you
2    said you talked to one of the agents at some point.  He came
3    in.  He or she?
4    A.  He.
5    Q.  He.  Do you remember his name?
6    A.  No.
7    Q.  Or what he looked like or anything?
8    A.  I kind of have a picture of his face but --
9    Q.  It doesn't really matter.  It's okay.  But it was a male
10   agent?
11   A.  Yes.
12   Q.  Was he polite with you?
13   A.  Yes.
14   Q.  Okay.  And you said that the Framingham officer was in
15   this chair, right?
16   A.  Yes.
17   Q.  And you were sitting on the couch?
18   A.  Yes.
19   Q.  And you said -- on direct you said that the agent came in
20   and sort of was standing over you?  What do you mean by that?
21   A.  Well, he was standing over here, like at the end of the
22   couch by the far window.
23   Q.  So just for the record, you're pointing to where there's
24   a potted plant right in front of the window that is at the
25   center of the photograph, correct?
```

1    **A.**   Yes.

2    **Q.**   So he was standing right there, so he wasn't blocking,

3    like, the doorway?

4    **A.**   No.

5    **Q.**   So if he had stood here, he would have been blocking the

6    door from you, correct?

7    **A.**   Uh-huh.

8    **Q.**   And if he had sat on the couch, that would have been

9    awkward, right?

10   **A.**   Uh-huh.

11   **Q.**   And the Framingham officer was sitting in that other

12   chair?

13   **A.**   Right.

14   **Q.**   Now, that officer or agent, he didn't, like, take his gun

15   out or anything when he was talking to you; is that correct?

16   **A.**   No.

17   **Q.**   And in fact, no agent who interacted with you at any

18   point, ever took their gun off their hip or other holster

19   that they were wearing, right?

20   **A.**   Right.

21   **Q.**   You said that when you were -- and when you asked --

22   well, back up a second.

23          You said they directed you to the living room.  You

24   said you asked to go get your robe because you were cold or

25   you felt a little vulnerable or exposed, correct?

1  **A.**  Uh-huh.

2  **Q.**  And you said they -- you heard them saying, sort of, oh,

3  she's going to get her robe or get something, correct?

4  **A.**  Yes.

5  **Q.**  Now, you said there were officers, obviously, in the

6  other rooms in your house, right?  At that time?  Did the

7  Framingham officer follow you to go get the robe, or did he

8  stay put in the living room?

9  **A.**  I couldn't say for sure.

10  **Q.**  Okay.

11  **A.**  Yeah.

12  **Q.**  So if he did, it wasn't something that stuck with you

13  enough that you remember it here today, correct?

14  **A.**  Yeah.  Right.

15  **Q.**  Now, you said that when you get to go get the robe, you

16  walked through the kitchen, right?  And Walter was there?

17  **A.**  Yes.

18  **Q.**  And he was sitting?  Standing?  What was he doing?

19  **A.**  He was sitting at the end.  There was a center island.

20  He was sitting at the end, facing like towards the front

21  door.

22  **Q.**  And you said that was maybe about half an hour after the

23  people had gotten there?

24  **A.**  I'd say that, yeah.

25  **Q.**  Was he in the process of talking to agents or anything

1  when he walked through?

2  **A.**  That's what it looked like.

3  **Q.**  They were still talking?

4  **A.**  Yes.

5  **Q.**  Did you hear Walter saying anything at that point?

6  **A.**  No.

7  **Q.**  Did you hear anything specifically that the agents were

8  saying at that point?

9  **A.**  No.  Maybe -- I'm not sure if they stopped talking.  I'm

10  not sure.

11  **Q.**  Okay.

12  **A.**  But I don't remember hearing anything.

13  **Q.**  He -- at that point, do you recall how many agents you

14  saw in the kitchen?

15  **A.**  I'd say three -- at least three, maybe four.

16  **Q.**  Okay.  Did any of them have their guns out or anything?

17  **A.**  No.

18  **Q.**  You got your robe, and then you went back to the living

19  room?

20  **A.**  Yes.

21  **Q.**  No one -- fair to say, nobody told you you had to sit on

22  the couch and you had to stay there the whole time, right?

23  **A.**  Well, no, they didn't say that directly, but the two

24  times I -- when I asked -- when I said I could get water and

25  when I said I could get my phone, they said, no, they would

1  do that.

2  **Q.**  Okay.  And you knew that they were searching at that

3  point for evidence, right?

4  **A.**  Yes.

5  **Q.**  Did you know when the agent came in to ask you some

6  questions about devices, and stuff like that, did you -- or

7  was that before or after you asked to get your phone?

8  **A.**  I think before.

9  **Q.**  Okay.  So he talked to you.  He was asking you questions

10  about the devices.  And then at some point after that, you

11  asked to get the phone to call work?

12  **A.**  No, no.  He asked if he could have my phone.

13  **Q.**  Okay.

14  **A.**  So I said I would get it.  And he said, no, they would

15  get it --

16  **Q.**  They'll get it for you.

17  **A.**  Yeah.

18  **Q.**  Did he tell you why he wanted to look at your phone?

19  **A.**  I think at that -- I think it might have been after they

20  told me what -- the reason that they were there.

21  **Q.**  Okay.  So you knew at that point that the, sort of,

22  investigation was about child pornography, and they used

23  digital devices, like phones and things like that, to commit

24  those crimes, and that's the type of evidence that they were

25  looking for on scene.

1      Fair to say that the agent told you something like,

2  "We'll just look at yours real quick, so we don't have to

3  take it from you"?

4  **A.**  Uh-huh.

5  **Q.**  And he left you use the phone at some point, correct?

6  **A.**  No, I didn't -- I wasn't late, so I didn't have to call.

7  **Q.**  Oh.  I'm sorry.

8  **A.**  It was Walter's.

9  **Q.**  All right.  It was Walter's job.  Excuse me.

10      You said when you did ask if you could go get

11  dressed to go get ready for work, they let you do that,

12  right?

13  **A.**  Yes.

14  **Q.**  And nobody followed you into the bedroom, right?

15  **A.**  No, they didn't follow me in, but someone did come in.

16  **Q.**  So the door that you went into the bedroom, do you

17  remember which door that was, when you went in there to get

18  dressed?

19  **A.**  I think this time I went through the dining room.

20  **Q.**  So I think we all have an idea, but I just want to be

21  clear here.

22      So this is a diagram, which you probably have never

23  seen before.

24  **A.**  No.

25  **Q.**  Okay.  I'm going to give you a second to look at it.

1    This is Exhibit 12 for the record.  And obviously there's

2    labels here, so you might have some inkling of what it is.

3    **A.**  Right.

4    **Q.**  But looking at this, does this appear to be, sort of --

5    obviously not to scale, but the layout of your home, starting

6    with the front door down at the bottom of the exhibit?

7    **A.**  Yes.

8    **Q.**  So you were down here in the living room, which is B

9    here, right?

10   **A.**  Right.

11   **Q.**  And then you said, this is your bedroom, right?

12   **A.**  Yes.

13   **Q.**  This one right off the dining room.  So when you went in

14   from the living room, you would have gone in -- this looks

15   like a big room here, but in reality, it's pretty small,

16   right?

17   **A.**  Yes.

18   **Q.**  A couple steps, the entryway area?

19   **A.**  Uh-huh.

20   **Q.**  So you kind of take a couple steps into the entryway, and

21   then maybe a couple steps into your bedroom from the dining

22   room?

23   **A.**  Yes.

24   **Q.**  And that's the door you went in, and the people in your

25   room knew you were going to that area, correct?

1    **A.**   Uh-huh.

2    **Q.**   And you said somebody came in while you were in the

3    process of getting dressed from the door --

4    **A.**   No, it was this one.  He came in through that one.

5    **Q.**   Oh.  They came in through the dining room?

6    **A.**   Yes.

7    **Q.**   And was that one closed?

8    **A.**   Yes.

9    **Q.**   It wasn't one of the agents -- it wasn't the uniformed

10   officer, right?

11   **A.**   No.

12   **Q.**   And it wasn't one of the agents.  Was there any other

13   agent who knew you were getting dressed at that time that you

14   knew of?

15   **A.**   I don't know.  It's a small house, I didn't know who knew

16   what.

17   **Q.**   Because you could sort of hear some stuff going on, but

18   maybe not details, maybe, of what was happening in different

19   room?

20   **A.**   Right.

21   **Q.**   But in any case, this door was closed, right?

22   **A.**   Yes.

23   **Q.**   And the person who came in, they didn't stay there, did

24   they?

25   **A.**   No.

**Q.** Did they seem sort of caught off guard that you were in there dressing?

**A.** Yes.

**Q.** So fair to say, it didn't seem like it was intentional or they weren't watching over you or something like that, right?

**A.** Right.

**Q.** Just one or two more questions, Ms. Kryzak.

The -- okay. You said that you saw Walter after that sort of pass through the kitchen to get your robe. The next time you saw him was when they were taking him when he was leaving, right?

**A.** Yes.

**Q.** Was he handcuffed at that time?

**A.** No. They let me say goodbye to him first.

**Q.** Okay. Did you ask them to do that?

**A.** No.

**Q.** Did they just offer it to you?

**A.** Yeah, they said I could say -- they said I could talk to him before they took him.

**Q.** Okay. And they let you do that?

**A.** Yes.

**Q.** And you said it's a pretty small house. So could you hear the interactions between the officers and Walter when you were in the other room?

**A.** No.

**Q.**  Okay.  So it would be fair to say that you never heard
anybody like yelling at him or anything like that?

**A.**  No.

**Q.**  And you never heard them really talk to him with any
specificity, right?

**A.**  No.

**Q.**  Or in any particular tone?

**A.**  (Shakes head.)

      MS. PARUTI:  I have no further questions.

      THE COURT:  Anything else, Ms. Fried?

      MS. FRIED:  I just want to show her a diagram and
have her identify a diagram.

      MS. PARUTI:  What is it?

      MS. FRIED:  It's sort of like your sketch.  It's
just a footprint of the house.

      MS. PARUTI:  I'll stipulate to the square footage,
if that's what it's for.

      MS. FRIED:  Yeah, it's -- I just want to show it to
her.  She can authenticate it.

      THE COURT:  Sure.

      MS. FRIED:  I think we were at 19.

      THE COURT:  Yes.  So this is 20.

      Do you object to the admission of 20?

      MS. PARUTI:  Excuse me.  No.

      THE COURT:  All right.  20 is admitted.

1      (Exhibit No. 20 admitted into evidence.)

2      **REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

3   BY MS. FRIED:

4   **Q.**  Ms. Kryzak, I just want to show you what we've marked and

5   we have admitted as Exhibit 20.

6          Do you recognize what's being depicted on that

7   piece of paper?

8   **A.**  Yes.  It's the square footage and the measurements of the

9   footprint of our house from the Town of Framingham.

10  **Q.**  From the Town of Framingham?

11  **A.**  Yes.

12  **Q.**  And are these exterior dimensions?

13  **A.**  Yes.

14          MS. FRIED:  All right.  Thank you very much.  And I

15  don't have any further questions.

16          THE COURT:  Can I just -- before we excuse the

17  witness, can I just see all the exhibits because I haven't

18  had a chance to look at them, in case I have any other

19  question.

20          MS. FRIED:  Sure.

21          Your Honor, could I go to the ladies room?  I'm

22  sorry, I think I need to take a bathroom break.

23          THE COURT:  Can you wait 30 seconds?

24          MS. FRIED:  Yes, of course.

25          (The Court reviews the exhibits.)

```
1              THE COURT:  You have a lovely home, Ms. Kryzak.

2              THE WITNESS:  Thank you.

3              THE COURT:  I don't have any other questions.

4    You're excused.  Thank you very much.

5              Do you have any other witnesses.

6              MS. FRIED:  I was going to call Mr. Johnson, but I

7    would like to --

8              THE COURT:  So why don't you go to the lady's room

9    first, and then we'll talk about scheduling.

10             MS. FRIED:  Well, if you just want to talk about

11   scheduling before taking a break.

12             THE COURT:  So you're going to call Mr. Johnson?

13   How long do you think you'll be with Mr. Johnson?

14             MS. FRIED:  I don't expect my direct -- well, maybe

15   20, 25 minutes.

16             THE COURT:  So maybe what we should do --

17             And then you'll have some cross, right?

18             MS. PARUTI:  Yes.  I wouldn't expect much.

19             THE COURT:  I'm thinking rather than -- I think in

20   fairness, at least to Ms. Lopez, what we should do is break

21   now, we'll take a break.  We'll return.  You can all get

22   lunch, go to the lady's room or men's room, and then you'll

23   call Mr. Johnson, and we'll examine him.

24             Do you expect to have any other witnesses after

25   Mr. Johnson?
```

1    MS. FRIED:  No, I don't.

2    THE COURT:  And maybe during the break, you could

3    find, Ms. Paruti the -- how quickly do you think you'll be

4    able to lay your hands on the disc with the video?  Because

5    I've run down, back and forth, with Ms. Montez, and I'm

6    pretty sure we don't have it.

7    MS. PARUTI:  So I would need to burn it, which

8    seems like a simple task.  My paralegal is out, is furloughed

9    today, so it just depends on whether or not -- it could be

10   very easy, it could be more complicated than like my pay

11   grade.

12   THE COURT:  So two things.  One, if you can get it

13   during the break, get it, and see if you can get it to

14   Ms. Simeone, I'll watch it.  Because then we could have some

15   argument afterwards, and I'll have watched it, in case that

16   occasions any questions.  If not, when you get it, you'll get

17   it.  And you'll give it to me, and then I'll look at it.

18   Second, you can tell Mr. Hafer and Mr. Lelling that

19   in my personal experience, paralegals are essential to the

20   performance of the duties of the prosecution of criminal

21   cases.  And I know from personal experience, at least with

22   Mr. Hafer, that in the absence of a paralegal, he would not

23   have been able to successfully complete a major prosecution.

24   So I do not understand why paralegals are furloughed in a

25   division between essential and nonessential.

1    MS. PARUTI:  I will be sure to relay that message.

2    But I can also offer some insight that this particular

3    paralegal, who sits ten feet from my desk, was here yesterday

4    and will be here tomorrow.  But they're rotating duty, so

5    they're divvying up the essential and nonessential.

6         THE COURT:  I see the rationale, but I'm still not

7    sure.

8         MS. PARUTI:  I would agree.

9         THE COURT:  But you can pass that on to Mr. Hafer.

10        So why don't we break 45 minutes -- let's say come

11   back at like 20 to -- at 1:40.

12        MS. PARUTI:  Sure.  And I'll just let the Court

13   know, the other -- that recording, the polygraph

14   interviews --

15        THE COURT:  It will take me more than 40 minutes to

16   watch it.

17        MS. PARUTI:  It's like an hour and a half.  It's

18   long.

19        THE COURT:  Eat lunch first.

20        MS. PARUTI:  I'll get it now.

21        THE COURT:  That's fine.  I'll see you at 1:40.

22        We stand in recess.

23        THE DEPUTY CLERK:  This matter is in recess.  All

24   rise.

25             (Court in recess at 12:53 p.m.

1       and reconvened at 1:44 p.m.)

2       THE COURT:  Ready to proceed?

3       MS. PARUTI:  Yes.

4       MS. FRIED:  Yes.

5       THE COURT:  All right.  Go ahead.  Call your next

6  witness, Ms. Fried.

7       MS. FRIED:  Your Honor, at this time, the defense

8  calls Mr. Walter Johnson.

9       THE COURT:  All right.  Mr. Johnson, you can take

10  the witness stand right there.

11       (The witness was duly sworn.)

12       THE COURT:  Please be seated.  Go ahead, Ms. Fried.

13       MS. FRIED:  All right.  Thank you.

14                        **WALTER JOHNSON**

15       having been duly sworn, testified as follows:

16       **DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

17  BY MS. FRIED:

18  **Q.**  Good afternoon, sir.  Would you please say your name for

19  the court reporter and the Court.

20  **A.**  Walter Johnson.

21  **Q.**  Mr. Johnson, where do you live?

22  **A.**  20 Burdette Avenue, Framingham.

23  **Q.**  How old are you, sir?

24  **A.**  70.

25  **Q.**  And can you tell us, do you work or are you retired?

1    **A.** I am retired now.

2    **Q.** And also, can you tell us, when you did work, what was

3    your occupation?

4    **A.** I worked in education. I taught high school English for

5    eight years, and then I coached a college track team for 24,

6    and then worked as a teacher's aide for six or seven years.

7    **Q.** And how long ago did you retire?

8    **A.** Three years.

9    **Q.** And can you tell us what your educational background is?

10   **A.** I have an undergraduate degree from Harvard University, a

11   master's in education from University of Massachusetts,

12   Amherst.

13   **Q.** Mr. Johnson, I want to bring your attention around to

14   April 27, 2017. Do you remember that day?

15   **A.** I do.

16   **Q.** Can you tell us how you -- what happened or how you

17   happened to be awakened that morning?

18   **A.** We were awakened by pounding on the front door.

19   **Q.** Where do you live, by the way? I didn't ask you your

20   address?

21   **A.** 20 Burdette Avenue, Framingham.

22   **Q.** Who do you live there with?

23   **A.** Pat Kryzak.

24   **Q.** And what is your relationship with Ms. Kryzak?

25   **A.** We are life partners.

**Q.** Okay. So please continue. You said that you were awakened by pounding?

**A.** Yes. Yes.

**Q.** Tell us what you heard and what you did.

**A.** It was very excessive. It was loud pounding, as someone might be in trouble or -- I ran out, and it was -- it was the police.

**Q.** Did you hear voices?

**A.** When I got out to where they saw me, they said, "It's the police. Open up."

**Q.** And what did you do?

**A.** I opened the front door.

**Q.** Can you tell the judge how you were dressed? What were you wearing?

**A.** I had a pair of shorts on and slippers.

**Q.** You said you were -- what kind of shorts were you wearing?

**A.** They were like a pair of gym shorts.

MS. FRIED: Okay.

THE COURT: Like almost to your knee, as opposed to --

THE WITNESS: No. No.

THE COURT: Like midway sort of between your hip and your knee?

THE WITNESS: Yes. Yes.

BY MS. FRIED:

**Q.** Do you remember what kind of fabric they were made of?

**A.** Polyester.

**Q.** Okay. And who did you see at your door?

**A.** There were -- I could see people's faces, kind of. There's a window at the top of the door, and they said it was the police, open up. So I did. I opened up, and there were people at the door, and I -- I think there were people on the porch, as well. There was a window in the entryway, and there were people out there.

**Q.** Okay. I'm going to show you --

THE COURT: Do you want the exhibits back?

MS. FRIED: Your Honor, can I have the exhibits?

THE COURT: Yes.

MS. FRIED: Thank you.

THE COURT: You just need yours back, right?

MS. FRIED: I think so. There was photographs of the house.

THE COURT: Hold on one moment.

MS. FRIED: They should be the ones 13 through 19.

THE COURT: Yeah, that's what I'm getting. Here you go.

MS. FRIED: Thank you. All right. Thank you.

If I might, Your Honor. I think I need another. I'm trying to mark another exhibit as -- I think

1 we're on 21 now?

2           THE COURT:  Yes.

3 BY MS. FRIED:

4 **Q.**  Mr. Johnson, I want to show you two items that have been

5 marked Exhibits 21 and 22.  And those are photographs.

6           Do you see what's shown in these photographs?

7 **A.**  Yes.

8 **Q.**  Can you tell the Court what we're looking at?  First of

9 all, in Exhibit 22 -- sorry, Exhibit 21.  Excuse me.  Yes.

10 **A.**  This is the window that's in the entryway, the foyer,

11 that -- it's a window on to the porch.

12 **Q.**  It looks on to a porch.

13 **A.**  On to the porch.

14 **Q.**  Okay.  And Exhibit 22, can you tell us what that is?

15 **A.**  It shows the front door and that same window, to the left

16 side.

17 **Q.**  Now, is the front porch in the window arrangement, as

18 shown in these photographs, does that fairly and accurately

19 depict how these rooms in your home were arranged, back in

20 April of 2017?

21 **A.**  Yes.

22           MS. FRIED:  Your Honor, I'd move these into

23 evidence.

24           THE COURT:  Any objection?

25           MS. PARUTI:  No, Your Honor.

1          THE COURT:  Admitted.

2          (Exhibit No. 21 and 22 admitted into evidence.)

3     BY MS. FRIED:

4     **Q.**  All right.  So we're talking about this porch area

5     outside of this front door.  How many officers, if you

6     remember, did you see gathered there on that porch area?

7     **A.**  I'm not sure the number.  I know it was, when the door

8     opened, at least three or four came in all at once, pretty

9     quickly.

10    **Q.**  Okay.  Did you happen to see Pat anywhere near you as

11    this was going on?

12    **A.**  I didn't see her.

13    **Q.**  Tell us what happened after the officers came into your

14    home.

15    **A.**  The first person in came up to me and said that they had

16    a search warrant for the house and guided me, escorted me

17    into the -- basically the dining room, for an instant, and

18    asked, you know, if -- I don't know what he asked, but we

19    stood there for a second, and he said, "This is a dining

20    room," and I said, "Yes, that's what it is."  And then he

21    escorted me further back into the kitchen --

22    **Q.**  Well, I'm going to back up for a moment.  How were the

23    people dressed who came into your home?  Or how did they

24    identify themselves as law enforcement?

25    **A.**  When I first went out to see who was banging on the door,

1    and they saw me, they said, "It's police.  We have -- open up

2    and" --

3    **Q.**  Was anybody in uniform or wearing anything that signified

4    that they were, in fact, police, that you remember?

5    **A.**  I don't recall.

6    **Q.**  Okay.  You mentioned being escorted back.  How did that

7    occur?  How -- what was done or how was it communicated to

8    you that you were to go to the kitchen of your house?

9    **A.**  I wasn't pushed, but I was guided that way.  I was kind

10   of physically guided to the kitchen.

11   **Q.**  Were you touched?

12   **A.**  As I recall, on my arm I was guided back that way.

13   **Q.**  And for the record, you were putting your hand on your

14   left arm.  Is that what you remember?

15   **A.**  Yeah, I -- yes.

16   **Q.**  Okay.  Continue.

17   **A.**  We got into the kitchen, and then went back to the back

18   door.  They asked about what the -- there was a door to the

19   cellar, and they asked what was that door to, and I told them

20   it was a cellar.  And I saw someone out back.

21   **Q.**  Behind your -- outside your back door of your house?

22   **A.**  Yeah.

23   **Q.**  Just a minute.

24          Mr. Johnson, I just wanted to show you what's

25   already been admitted as Exhibit 8.  Do you see this area

1　that you're referring to at the back of your kitchen?

2　**A.** Yes.

3　**Q.** And where is it on that photograph that you saw people or

4　saw somebody outside of your house?

5　**A.** I was standing in front of that -- of that door, and out

6　the window, I saw people in the backyard.

7　**Q.** Okay. Now, Mr. Johnson, can you tell us how you were

8　feeling -- how you felt when these events were taking place?

9　**A.** Well, I was surprised. I was shocked, frightened. And

10　while in the kitchen, I felt kind of humiliated, just because

11　I -- I had to sit with just shorts on.

12　**Q.** Were you wearing anything on your upper half of your

13　person?

14　**A.** No.

15　**Q.** You didn't have a shirt on at all?

16　**A.** No.

17　**Q.** At some point, did you request permission to get some

18　clothing?

19　**A.** I did.

20　**Q.** How long had the police been in the house when you asked

21　to put some clothing on, if you remember?

22　**A.** The first time I asked, it -- I'm not sure if it was --

23　maybe half an hour or so. I -- I'm not entirely sure.

24　**Q.** What did you ask for? What did you ask if you could do?

25　**A.** If I could get some clothes to put on.

1  **Q.**  What was the answer?

2  **A.**  No.  Basically, no, that I couldn't go back there,

3  meaning to my room to get clothes, and that I didn't need

4  them right then.  And if I did need them, someone would get

5  them for me.

6  **Q.**  At that moment, after they said that you didn't need them

7  right then, did somebody get clothing for you at that moment?

8  **A.**  No.

9  **Q.**  Okay.  So when you were in the kitchen how -- where were

10  you sitting in the kitchen?

11  **A.**  At the counter.  There's an island counter, and one side

12  has three chairs, and the end has one.  And I was sitting --

13  I was seated at the one at the end.

14  **Q.**  Is that near your refrigerator in the kitchen?

15  **A.**  Yes.

16  **Q.**  And that's where you were sitting.

17          For the next hour and a half, from 6:30 -- from

18  6 o'clock in the morning, until about 7:30, or so, later that

19  morning, were you ever in any other part of the house,

20  besides the kitchen?

21  **A.**  No.

22  **Q.**  Did you go any other place, for example, to either get

23  dressed or to use the bathroom?

24  **A.**  Before I -- I was taken out into the police cruiser to go

25  downtown, I asked to go to the bathroom, and I was able to go

1  into the bathroom and do that.

2  **Q.**   Okay.  Now, when you went into the -- when you were first

3  brought into the kitchen, how many people came into the

4  kitchen with you?

5  **A.**   I'm going to say at least two, maybe three.  I'm not

6  entirely sure.

7  **Q.**   Okay.  And what did they say to you, if anything?

8  **A.**   They were just concerned about where we were and where

9  other doors went, and if that was the back of the house.  I

10  know at some point someone asked if I had -- if there were

11  any weapons in the house, and I said no.

12  **Q.**   At some point, did there come a time when one or more

13  agents or officers told you that they wanted to have an

14  interview with you and that they wanted to tape record the

15  interview?

16  **A.**   Yes.  Yes.

17  **Q.**   Can you tell us how long -- can you tell us how that

18  started?

19  **A.**   Well, I know I was sitting at the counter, and I remember

20  Agent Richardson saying that he had the recorder, he wanted

21  to record so that it made things easier, notes or something,

22  so there would be no mistakes about what we were saying.

23  **Q.**   Did Agent -- do you know who Agent Connolly is?

24  **A.**   Yes.

25  **Q.**   She was here in court earlier this morning?

1  **A.**  Yes.

2  **Q.**  Was she went present in the kitchen when this was

3  happening?

4  **A.**  Yes.

5  **Q.**  Do you remember whether she made any comments or asked

6  you any questions before the tape recorded interview started?

7  **A.**  I -- I don't.

8  **Q.**  Okay.  Did anybody ever tell you that you had the right

9  to remain silent at that point, give you what we call your

10  Miranda warnings?

11  **A.**  No.

12  **Q.**  Did anybody tell you that you were free to go if you

13  wanted to?

14  **A.**  No.

15  **Q.**  Did you feel you were able to leave if you had wanted to

16  leave?

17  **A.**  No, not at all.

18  **Q.**  Why didn't you feel you were able to leave?

19  **A.**  I couldn't get clothing, and if I were to leave, I would

20  have to walk somewhere.

21  **Q.**  Do you have a car?  Did you have a car at the time?

22  **A.**  I do, yes.

23  **Q.**  Where was that car parked?

24  **A.**  In the garage.

25  **Q.**  Where was that garage located?

1   **A.**   In the back of the house, at the end of the driveway.

2   **Q.**   At the end of the driveway?  Okay.

3   **A.**   Right.

4   **Q.**   Okay.  Did you ever come to learn whether or not there

5   were cars parked, that didn't belong to you, in your driveway

6   that day?

7   **A.**   I could see that when I -- through the window in the --

8   when I went out to open the door for them.  There were cars

9   in the driveway and all along the street.

10   **Q.**   And those were cars that did not belong to you?

11   **A.**   Yes.

12   **Q.**   So is it fair to say that you could not have gotten your

13   car out of your driveway, because there were police cars

14   already parked in the driveway?

15   **A.**   Yes.

16   **Q.**   Okay.  And while this interview was taking place, is it

17   correct to say that you were still only dressed in your

18   shorts?

19   **A.**   Yes.

20   **Q.**   Okay.  Now --

21         THE COURT:  Just to clarify, Mr. Johnson.  So at

22   some point, Agent Richardson turned on the tape recorder, a

23   little bit after you got in the kitchen, right?

24         THE WITNESS:  Yes.

25         THE COURT:  And at that point, you were sitting at

1    the counter?

2              THE WITNESS:  Yes.

3              THE COURT:  And you were without your shirt on,

4    right?

5              THE WITNESS:  (Nods head.)

6              THE COURT:  You have to say yes or no.

7              THE WITNESS:  Yes.  Yes.

8              THE COURT:  And do you recall at some point him

9    turning the tape recorder off?

10             THE WITNESS:  Yes.  After awhile, he turned it off.

11             THE COURT:  And during that whole portion, during

12   that recorded interview, you were without your shirt on?

13             THE WITNESS:  Yes.

14             THE COURT:  And then the inter -- the request that

15   you made to get some clothing, did that come -- that came

16   after that, but before he later turned the tape recording on

17   again?

18             THE WITNESS:  Can you ask that, again?

19             THE COURT:  At some point, you made a request to

20   have clothing.

21             THE WITNESS:  Yes.

22             THE COURT:  And when you made that request, it was

23   after that first recorded interview was done, because the

24   tape recorder had been turned off, correct?

25             THE WITNESS:  Yes.  It was -- and again, I'm not

1  entirely sure.  I may have asked early on, because I didn't

2  have anything on, and it was not a warm morning.

3            THE COURT:  Okay.

4            THE WITNESS:  Or it was during that period of when

5  it was turned off that I wanted to get some clothes on.

6            THE COURT:  Okay.  Go ahead.

7            MS. FRIED:  Yeah.  Sure.

8  BY MS. FRIED:

9  **Q.**  Do you recall that you spoke with Agent Richardson and

10  Agent Connolly during this tape recorded interview, for a

11  period of about 25 minutes or so, and that at some point, the

12  tape recorder was turned off?

13  **A.**  Yes.

14  **Q.**  Do you recall that approximately an hour after that, so

15  it would have been 7:30 or a little after 7:30 in the

16  morning, that the tape recorder was turned back on?

17  **A.**  Yes.

18  **Q.**  Okay.  I want to focus your attention now to that

19  one-hour period of when the tape recorder is not running.

20            First of all, in that one-hour period, where were

21  you, physically, in the house?

22  **A.**  I was in that -- at that seat in the kitchen the whole

23  time.

24  **Q.**  The entire time?

25  **A.**  Yes.

1 **Q.** Were you ever alone in that kitchen during that entire
2 one-hour period?

3 **A.** No.

4 **Q.** Do you remember whether it was only one officer with you
5 during that period, or were there times when there might have
6 been more than one officer with you during that entire
7 one-hour period?

8 **A.** It varied from one to two.

9 **Q.** Okay. Is there a reason that you did not move about the
10 house during that one-hour period of time?

11 **A.** I was told that I couldn't.

12 **Q.** Who told you that? If you know.

13 **A.** When I asked about clothing, it was Agent Richardson --

14 **Q.** Okay.

15 **A.** -- who said that I couldn't move because they were
16 searching. So I felt like I couldn't move. I couldn't -- I
17 had to be where I was.

18 **Q.** So is it accurate that no one ever told you that you were
19 free to leave?

20 **A.** Yes.

21 **Q.** And is it accurate that you did not feel that you could
22 leave?

23 **A.** Yes.

24 **Q.** In that one-hour period of time, were you ever asked
25 questions by anybody about where things were that the police

1 were looking for? Specifically, I'm going to bring your

2 attention around to this CL Perv folder?

3 **A.** Yes.

4 **Q.** What conversation or questions, if any, do you remember

5 about the CL Perv folder?

6 **A.** It -- I recall -- I think I was asked where it was,

7 because there was nothing on the computer with that name.

8 **Q.** Okay. So someone asked you where it was?

9 **A.** Yes.

10 **Q.** And did you answer that question?

11 **A.** I did.

12 **Q.** And what was your answer -- and do you remember who you

13 answered that question to, if it's somebody whose name you

14 know?

15 **A.** Yes. I believe it was Agent Richardson.

16 **Q.** Okay.

17 **A.** And I told him it was in the closet, above the doorway.

18 **Q.** In a certain room in the house?

19 **A.** Yes. In the back.

20 **Q.** In the back of the house, the back bedroom?

21 **A.** Yes.

22　　　　　MS. FRIED: Just a minute, Your Honor.

23 BY MS. FRIED:

24 **Q.** I wanted to ask you something else about that kitchen.

25 Is there a door -- are there doorways from the kitchen to

1  other parts of the house?

2  **A.**  Yes.  There's a doorway to the back hallway that leads to

3  the two bedrooms and the bathroom.

4  **Q.**  Okay.

5  **A.**  And there's a doorway from the dining room into the

6  kitchen.

7  **Q.**  When you first were taken into the kitchen after the

8  police officers arrived, do you remember whether the doorway

9  to the hall was open or closed?

10  **A.**  It was open.

11  **Q.**  At some point, was that door closed?

12  **A.**  Yes.

13  **Q.**  Tell us how that happened.  How did that door come to be

14  closed?

15  **A.**  Agents Connolly and Richardson were getting ready, I

16  guess, for the interview, and they asked if the doorways

17  could be shut.  I told them that the doorway to the hallway

18  could be shut, but the other door had been taken off, so

19  they -- they couldn't shut that door.

20  **Q.**  And who shut the door to the hallway, if you remember?

21  **A.**  I don't remember who did that.

22  **Q.**  Did you do it?

23  **A.**  No.

24  **Q.**  Okay.  By the way, during any of this period that we're

25  talking about, did you see Pat?

1   **A.**  I don't recall seeing her until I was being -- getting

2   ready to leave.  And she was able to come in, and I could say

3   goodbye.

4   **Q.**  So during this entire hour that we're talking about so

5   far, or hour and a half, you did not see or talk to Pat at

6   all?

7   **A.**  No, I don't recall that at all.

8   **Q.**  Okay.  Now, at some point, did you request permission, or

9   did you express your desire to make a phone call?

10  **A.**  Yes.  I had -- I had two things that I had to do that

11  day.  One was almost going to happen right away.  It was a

12  life guarding position at a rehabilitation pool, and I was

13  supposed to be there to open the pool and let the patrons in.

14  **Q.**  Okay.

15  **A.**  And there were supposed to be a track competition that

16  afternoon, so I needed to let both of those people know that

17  I probably wasn't going to be there.

18  **Q.**  At the time that you realized that you weren't going

19  to -- probably weren't going to be there, had anybody told

20  you that you were under arrest?

21  **A.**  No.

22  **Q.**  Why did you think you were not going to be able to be

23  there?

24  **A.**  The pool, I was definitely going to be late.

25  **Q.**  What time were you supposed to be at the pool, if you

1   remember?

2   **A.**   I was supposed to be at the pool, I think, about 8:30.

3   **Q.**   Okay.

4   **A.**   To open up.

5   **Q.**   Okay.  So what did you tell the officers or the agents

6   that were in the house about what your needs were, in terms

7   of using the telephone?

8   **A.**   I needed to call people to let them know, so that they

9   could make arrangements.

10  **Q.**   And in response -- and did you express a way that you

11  wanted to make that phone call?

12  **A.**   I just had to -- if I could have my phone, I could call

13  them.  I didn't know the numbers, but the numbers were on --

14  on my phone.

15  **Q.**   And when you say "my phone," what kind of a phone are you

16  referring to?

17  **A.**   It was an iPhone.

18  **Q.**   Okay.  And in response to that, what did the officers do

19  or let you do?

20  **A.**   They asked -- asked the name -- names of the people I

21  needed to call, and they looked the numbers up, wrote them

22  down, and then gave me the landline phones to make the calls.

23  **Q.**   So is it accurate that they would not let you hold your

24  own phone?

25  **A.**   Yes.

1   **Q.**  And they would not let you look up the numbers or make

2   the call from that phone?

3   **A.**  Yes.

4   **Q.**  Okay.  And it was at this point, you still had not been

5   warned of your right to remain silent or told that anything

6   you said would be used against you?

7   **A.**  No.

8   **Q.**  Okay.  Do you know whether that phone call -- whether

9   that transaction with the telephone happened before they

10   turned the tape recorder back on, or after?  What's your

11   memory about that?

12   **A.**  Before.

13   **Q.**  So was it in this one-hour period of time --

14   **A.**  Yes, I believe it was.

15   **Q.**  -- between 6:30 and 7:30, that that happened?

16   **A.**  Yes.

17   **Q.**  Now, at some point, did you ever notice whether someone

18   was putting numbers on the doorjambs or the doorways to

19   certain rooms in your house?

20   **A.**  No.

21   **Q.**  You didn't notice that happening?  Okay.

22         Did anybody ever ask you if they could put these

23   numbers on your house?

24   **A.**  No.

25   **Q.**  On your door frames or --

```
1                THE COURT:  I think they're letters, Ms. Fried.
2                MS. FRIED:  I'm sorry?
3                THE COURT:  I think you're referring to the
4       letters:  A, B, C, D.
5                MS. FRIED:  Oh, excuse me.  Pardon me.  Pardon me.
6                THE COURT:  I don't know if that would make a
7       difference to Mr. Johnson or not.
8                MS. FRIED:  I beg your pardon.
9       BY MS. FRIED:
10      Q.   Did anybody ever ask you about putting letters on the
11      doorjambs?
12      A.   No.
13      Q.   Or entrances to the rooms in your house?
14      A.   No.
15      Q.   Okay.  Now, during the course of this one-hour period of
16      time for the -- after the tape recorder was turned off and
17      before it was turned back on, was there -- did you hear
18      any -- were any words spoken to you by Agent Richardson
19      regarding cooperation or your being cooperative?
20      A.   Yes.
21      Q.   Tell us about that conversation, what you remember being
22      said to you.
23      A.   I know I was informed a couple times that if I
24      cooperated, so that his job was easier, it would be to my
25      benefit, it would work in my favor.
```

1    **Q.**  Who said that to you?

2    **A.**  Richardson.

3    **Q.**  Keep going.

4    **A.**  That he could let the Court know, the prosecution know

5    that I cooperated, and that could work in my favor.

6    **Q.**  And what impact did hearing that have on you?

7    **A.**  I wanted to cooperate, if I could.

8    **Q.**  Why did you think you should, after hearing that?

9    **A.**  It would work to my benefit to be cooperative, rather

10   than not be cooperative.

11   **Q.**  Did Agent Richardson give you any concrete examples of

12   what being cooperative would consist of?

13   **A.**  Taking the polygraph would indicate cooperation.

14   **Q.**  Did he say that to you?

15   **A.**  I asked if that -- taking it would be cooperative, and he

16   said yes.

17   **Q.**  Okay.  Was there any other context in which he talked

18   about the benefits or what was an example of being

19   cooperative during the course of the search?

20   **A.**  The -- that folder, where the location of the folder,

21   making it less difficult for them to search and find stuff

22   was another example of cooperation.

23   **Q.**  That's the CL Perv folder that he was talking about?

24   **A.**  Yes.  Yes.

25   **Q.**  Okay.  And was it in response to that, that you told them

1  where it might be located, where they could find that

2  material?

3  **A.**  Yes.

4  **Q.**  Okay.  Did there come a time when you were actually told

5  that you were under arrest?

6  **A.**  Yes.

7  **Q.**  And when was that, in relationship to the tape

8  recording -- the tape recording sessions?  There were --

9  there was a half-hour one and then there was a break, and

10  then there was a very short one, correct?

11  **A.**  Yes.

12  **Q.**  At what point, in relation to either of those events,

13  were you told that you were actually under arrest?

14  **A.**  It was either during or after the second session.

15  **Q.**  Okay.  And at the time that you were told you were under

16  arrest, were you still dressed only in your shorts, or had

17  you been allowed to put some clothes on at that point?

18  **A.**  I was still in my shorts.

19  **Q.**  You were still only dressed in your shorts?

20  **A.**  Yes.

21  **Q.**  Okay.  After you were told you were under arrest, what

22  did they do?  What happened there at the house?

23  **A.**  I -- I can't recall.  I do know that, in that time, I

24  asked if I could get clothes, and they had someone go get

25  them.

1  **Q.** So you did not go into your own room to choose the
2  clothes you were going to wear?

3  **A.** No. No.

4  **Q.** Okay.

5  **A.** They went in, brought out a pair of jeans and a t-shirt.
6  And I asked if I could get a different shirt, and they did go
7  back and bring out a different shirt. I asked for shoes, but
8  they said that the slipper-type things that I had on would be
9  just as good, because they would take the shoestrings from my
10 shoes, anyway.

11 **Q.** So they wouldn't let you change into different shoes?

12 **A.** Right.

13 **Q.** Is that correct?

14 **A.** Yes.

15 **Q.** Okay. Now, I want to ask you -- I want to show you
16 what's already been admitted as Exhibit 9.

17 **A.** Uh-huh.

18 **Q.** And do you recognize what that is?

19 **A.** Yes.

20 **Q.** And is that the -- a written statement of your right to
21 remain silent and related rights?

22 **A.** Yes.

23 **Q.** Is it accurate that when -- the time you signed this was
24 the first time anybody had ever talked to you about your
25 right to remain silent?

1  **A.**  Yes.

2  **Q.**  So up until the time that you actually put your signature

3  on that form, it's true that you had never been told of your

4  right to remain silent or told that anything you said could

5  and would be used against you?

6  **A.**  No.  Right.  That's correct.

7  **Q.**  Okay.  And do you remember when you signed that?

8  **A.**  It might have been at the beginning of the second

9  session, taped session.

10  **Q.**  Okay.  So around some time after 7:30, that last little

11  bit?

12  **A.**  Yes.

13  **Q.**  Where it was only short?

14  **A.**  (Nods head.)

15  **Q.**  All right.  At some point, you were taken from your house

16  and driven down to the Framingham Police Department?

17  **A.**  Yes.

18  **Q.**  Do you recall how long it took you to get from your home

19  to the Framingham Police Department?

20  **A.**  It's less than five minutes.

21  **Q.**  Okay.  Once you got to the Framingham Police Department,

22  can you tell the Court what happened to you?  What did you

23  do?  Where did you go?

24  **A.**  I went into, I guess, a booking desk.  I'm not sure.

25  Someone took information, took my -- I had a fleece jacket,

1  they took that.  They took my belt and my eyeglasses.

2  **Q.**  Okay.  And did they put you in any sort of a room or a

3  cell?

4  **A.**  Then I was taken to a cell.

5  **Q.**  Okay.  And how -- were you alone in the cell, or was --

6  **A.**  I was alone.  I was alone in the cell.

7  **Q.**  How long did you stay in the cell?

8  **A.**  I have no idea of the time.  It wasn't -- didn't feel

9  like a short amount of time.

10  **Q.**  Okay.  At some point did someone come to remove you from

11  the cell?

12  **A.**  Yes.

13  **Q.**  And when that happened, where were you taken?

14  **A.**  Taken to a room, just a room that had a table and some

15  chairs in it.

16  **Q.**  And were you alone in that room, or did somebody -- was

17  somebody with you?

18  **A.**  I'm not entirely sure of the sequence.  I know I was

19  alone for a while.  People were there, came in and asked, and

20  asked questions, talked to me.  And people left again.  So I

21  was alone at least once or some part of the time there.

22  **Q.**  And what kind of questions were you being asked?

23  **A.**  I'm not entirely sure, but it had to do, I think, with

24  the polygraph, whether or not I was going to take it.

25  **Q.**  Okay.  At some point, then, did Agent Connolly and a man

1  named Mr. Braga or Special Agent Braga come into the room?

2  **A.**  Yes.

3        MS. FRIED:  Okay.  I don't have any further

4  questions.

5        THE COURT:  Okay.  Cross-examination.

6        MS. PARUTI:  Thank you.

7  **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

8  BY MS. PARUTI:

9  **Q.**  Good afternoon, Mr. Johnson.

10        You said that the job that you were going to first

11  that day, on April 27th, was a life guarding position?

12  **A.**  Yes.

13  **Q.**  So you are a swimmer, I take it?

14  **A.**  The pool is a rehabilitation pool, so the deepest part is

15  six feet.

16  **Q.**  Okay.  Do you have to have any qualifications to be a

17  lifeguard there?

18  **A.**  Yes.  You have to be a water front certified.

19  **Q.**  So you're skilled enough to be able to be hired as a

20  lifeguard in a pool?

21  **A.**  Yes.

22  **Q.**  Is it an indoor pool or an outdoor pool?

23  **A.**  Indoor.

24  **Q.**  And when you go there as a lifeguard, how are you

25  typically dressed?

1   **A.**  A bathing suit.

2   **Q.**  A bathing suit.  Indoors.  Do you wear a shirt or jacket

3   or shirtless, or how does that work?

4   **A.**  I always wear a t-shirt.

5   **Q.**  A t-shirt.  The shorts you wear, do you typically have to

6   go in the water?  Like are they swim trunks?

7   **A.**  I would wear a bathing suit to the pool.

8   **Q.**  And so the bathing suit that you were planning to wear --

9   did you have a particular bathing suit that you wore every

10  time or was it different?

11  **A.**  Yes.  It was a lifeguard bathing suit that I kind of --

12  the uniform for them.

13  **Q.**  Okay.  And you said that you were supposed to be there

14  for 8:30 to open up?

15  **A.**  Yes.

16  **Q.**  Thank you.  You just, for the record, you have to answer

17  audibly, whether it's yes or no or something else.

18         And you called -- you said that you called -- the

19  first time that you used the phone --

20         Is it fair to say that there were two times that

21  you used the phone?

22  **A.**  Yes.

23  **Q.**  So the first time you used the phone was for the life

24  guarding job?

25  **A.**  Yes.

1    **Q.**  Where is that particular job located?

2    **A.**  It was at the wellness center in Framingham.  It's on

3    Worcester Road in Framingham.

4    **Q.**  Okay.  So not too far from your house?

5    **A.**  No.

6    **Q.**  What time would you typically leave your house to get

7    there?

8    **A.**  8:15.

9    **Q.**  So close enough to make it for 8:30.

10            And what time would you normally wake up in the

11   morning, if you had an 8:30 shift?

12   **A.**  7:00.

13   **Q.**  You said that you -- the shorts that you were wearing

14   that day when the agents and officers came to your house,

15   were sort of like halfway up, I think you said gym shorts.

16   Are they like running shorts?

17   **A.**  I can't say they were running shorts.  They're gym

18   shorts.  They weren't the long basketball things.

19   **Q.**  But not in quite as short as like track shorts?

20   **A.**  No, they weren't track shorts.

21   **Q.**  Somewhere in the middle?

22   **A.**  Yes.

23   **Q.**  Thank you.  Now, you said that the -- when you just

24   testified, you said that you were escorted to the dining

25   room.  Do you remember who escorted you?

1    **A.**  I don't know who it was.  It was the first person who

2    came in.

3    **Q.**  Okay.  Was that a male or a female?

4    **A.**  Male.

5    **Q.**  Was that person uniformed or in plain clothes?

6    **A.**  I think he was plain clothed.

7    **Q.**  Okay.  Do you remember anything specifically about him?

8    **A.**  I do not.

9    **Q.**  Did he have his weapon drawn?

10   **A.**  No.

11   **Q.**  In fact, none of the officers who came into your house

12   that day had their weapons drawn at any point, correct?

13   **A.**  No.

14         THE COURT:  "No," as in, no, they didn't have their

15   weapons drawn, or "no," as in her statement that they didn't

16   have their weapons drawn was incorrect.

17         THE WITNESS:  No, they did not have their weapons

18   drawn.

19         MS. PARUTI:  Thank you.

20   BY MS. PARUTI:

21   **Q.**  And you never saw -- you didn't see them outside the

22   house when they were lined up, ready to come in.  Or did you?

23   **A.**  When I went to open the door --

24   **Q.**  Uh-huh.

25   **A.**  -- I saw people outside.  I saw people on the porch.

1   **Q.** Okay. So you saw some people through the window?

2   **A.** Yes.

3   **Q.** And none of those people had their weapons drawn.

4   **A.** No.

5   **Q.** And they didn't have to use the battering ram to get into

6   the house?

7   **A.** No.

8   **Q.** Did you see the battering ram at any point or just heard

9   about it today in court?

10   **A.** Just heard about it.

11   **Q.** So that wasn't a factor for you on that day, right?

12   **A.** No.

13   **Q.** And you answered the door, correct?

14   **A.** Yes.

15   **Q.** They didn't -- sorry to interrupt. They didn't have to

16   force the door?

17   **A.** No.

18   **Q.** And they were loud enough so that you woke up and heard

19   them, right?

20   **A.** Yes.

21   **Q.** And Pat appeared to have heard them, as well?

22   **A.** Yes.

23   **Q.** And she stayed behind to put on additional clothes while

24   you went to go answer the door, correct?

25   **A.** Yes.

1  **Q.**  Now, you said the agent -- you don't know which agency he

2  was from, the one who first met you inside the house?

3  **A.**  Correct.

4  **Q.**  So he guided you to the dining room; is that correct?

5  **A.**  Yes.

6  **Q.**  You said -- well, you said a couple of things.  Did he

7  touch you, or did he not touch you?

8  **A.**  I believe I was touched, yes.

9  **Q.**  Okay.  Did you prepare an affidavit in preparation for

10  this hearing today?

11  **A.**  Yes, I did.

12  **Q.**  You did.  Did you actually author it, or did somebody

13  else author it for you?

14  **A.**  I don't understand the --

15  **Q.**  Do you understand?  So did you type it, or did somebody

16  else type it?

17  **A.**  Somebody else typed it.

18  **Q.**  Before it was typed, did you write out the words that

19  were contained in it, or did somebody else prepare it for

20  you?

21  **A.**  It was prepared.

22  **Q.**  It was prepared.  Do you know who prepared it for you?

23  **A.**  I'm assuming my attorney.

24  **Q.**  Did you read it before you signed it?

25  **A.**  Yes, I did.

1  **Q.** In your affidavit, you didn't talk about being touched at

2  all, did you?

3  **A.** No, I didn't.

4  **Q.** You would agree that that's the point that we've been

5  talking about pretty frequently here today in court?

6  MS. FRIED: Objection.

7  THE COURT: Overruled.

8  THE WITNESS: The question again, please.

9  BY MS. PARUTI:

10  **Q.** Sure. So you've heard the testimony of the other people

11  who came before you here in court today, correct?

12  **A.** Yes.

13  **Q.** And you heard the question asked multiple times of

14  multiple witness whether or not any law enforcement officer

15  ever raised hands on either you or Ms. Kryzak, correct?

16  MS. FRIED: Objection.

17  THE WITNESS: Yes.

18  THE COURT: Overruled.

19  BY MS. PARUTI:

20  **Q.** So it's fair to say it's obviously something that's

21  important for the purpose of this hearing, correct?

22  **A.** Yeah.

23  THE COURT: Sustained.

24  What's important is a legal question. That's a

25  different issue. He's not testifying about that.

1     MS. PARUTI:  Thank you.

2  BY MS. PARUTI:

3  **Q.**  So you're testifying to it right now, that somebody

4  touched you.  But you did not include it in this affidavit;

5  is that correct?

6  **A.**  Correct.

7  **Q.**  Okay.  You said that you -- when the officers got there,

8  you were surprised, you were shocked, you were frightened,

9  and you were humiliated because of what you were wearing?

10  **A.**  Yes.  Yes.

11  **Q.**  Because you were sitting there in shorts and no shirt on.

12     You said slippers.  Can you describe what the shoes

13  were like?

14  **A.**  They were rubber pool shoes.

15  **Q.**  Oh.  Okay.  So like flip-flops, maybe?

16  **A.**  Yes, something like that.

17  **Q.**  So something that could be worn outdoors?

18  **A.**  I never wore them outdoors, but you could, yes.

19  **Q.**  So it wasn't like a soft, like a flurry slipper or

20  something like that --

21  **A.**  No.  No.

22  **Q.**  -- that was clearly an indoor shoe.

23     You said -- well, actually, maybe you can clarify.

24  When was it that you first asked to put on more clothes than

25  the shorts that you were wearing?

**A.** That is where I'm not entirely sure. I know it was either before we started questioning or some time during that hour.

**Q.** In between?

**A.** In between.

**Q.** Okay. Have you listened to the recording of your conversation with Agent Richardson and Agent Connolly?

**A.** Briefly. Some of it, yes.

**Q.** Okay. But not the whole thing?

**A.** No.

**Q.** So assuming that it's not on that tape, there's no request on that tape for clothing, you would agree with me that it started at about 6:04 a.m.?

**A.** Yeah.

**Q.** Okay. I mean, it was relatively quickly after they got there; is that correct?

**A.** Right.

**Q.** And you would agree that they knocked and announced their presence around 6:00 a.m. that morning?

**A.** Yes.

**Q.** So you're saying it would have either been in the four minutes before the tape started or some time after the tape stopped?

**A.** Yes.

**Q.** And you're clear today that it was in between the 6:30

1 stopping time and the 7:30 start-up again?

2        THE COURT: No, that's exactly not what he just

3 said. He said it was -- you mean he's clear that it happened

4 before the second recording?

5 BY MS. PARUTI:

6 **Q.** Let me ask you. Is that what you're saying?

7 **A.** No, I say that I know I asked for clothing.

8 **Q.** Uh-huh.

9 **A.** I'm not sure if it was before the full thing started.

10 **Q.** Uh-huh.

11 **A.** Because I was sitting there without cloths on.

12 **Q.** So I can be clear, I don't want to misrepresent what

13 you're saying. So that you're talking about before -- it's

14 literally before they turned the tape recorder the first

15 time.

16 **A.** Yes.

17 **Q.** So it could have been then, it could have been --

18 continue.

19 **A.** Half an hour, after the tape stopped.

20 **Q.** Before the next tape?

21 **A.** The next tape, yes.

22 **Q.** So either between 6:00 and 6:04, or between about 6:30

23 and about 7:30, that hour period.

24 **A.** (Nods head.)

25 **Q.** So you don't have a memory now of specifically when you

1  asked?

2  **A.**  No.

3  **Q.**  Do you have a memory of specifically how you asked?

4  **A.**  Yes, "Could I get some clothes?"

5  **Q.**  And you said that you directed that question to whom?

6  **A.**  I believe it was to Agent Richardson.

7  **Q.**  Agent Richardson.  And remind me what his response was.

8  **A.**  That I -- I didn't need clothes right now, and that if I

9  needed them, someone else would get them.  I couldn't go back

10 and get them myself, someone else would get them.

11 **Q.**  Okay.  So did you include that in your affidavit?

12 **A.**  I can't -- no, I don't think so.

13 **Q.**  And in fact, in your affidavit, you specifically wrote,

14 "When we started talking, I was wearing only a pair of

15 shorts.  At some point I asked if I could put on some

16 clothes.  I was not allowed to go into my room to get

17 dressed.  Instead, an officer went into my bedroom and came

18 out with a t-shirt and a pair of jeans for me to put on."

19 **A.**  Yes.

20 **Q.**  So in your affidavit you wrote that you asked, they

21 wouldn't let you get it, but they got it for you.

22 **A.**  Correct.

23 **Q.**  But here today you're saying you asked, and they said

24 "No, you cannot get clothing"?

25 **A.**  That's correct.

1  **Q.** You said that your car was in the garage. Is it a
2  covered garage?

3  **A.** Yes.

4  **Q.** Is it enclosed?

5  **A.** Yes.

6  **Q.** Was the door closed?

7  **A.** Yes.

8  **Q.** So fair to say you wouldn't be able to tell that there's
9  a car in there from the street, if you didn't know?

10 **A.** Correct.

11 **Q.** And you didn't ask anybody, at any point, during the time
12 that you were there, if you could leave?

13 **A.** No.

14 **Q.** And you didn't ask anybody at any point if you could get
15 your car out of the garage for any reason?

16 **A.** No.

17 **Q.** Okay. You said that Agent Richardson --

18        THE COURT: Did they search the garage,
19 Mr. Johnson, as far as you know?

20        THE WITNESS: I have no idea. I don't know.

21 BY MS. PARUTI:

22 **Q.** You said here today that Agent Richardson made specific
23 promises to you or representations --

24        MS. FRIED: Objection.

25 BY MS. PARUTI:

**Q.** -- to you about cooperating?

**A.** Yes.

      THE COURT: Overruled.

BY MS. PARUTI:

**Q.** And you said he told you it would be to your benefit if you cooperated?

**A.** Correct.

**Q.** And you're testifying that he told you that he would let the prosecution now if you cooperated?

**A.** He could let the prosecution know.

**Q.** When was it that he told you that?

**A.** Some time in that hour.

**Q.** In the hour in between the two recordings?

**A.** Yes.

**Q.** Okay. You didn't put that in your affidavit, either, did you?

**A.** No.

**Q.** Do you need -- do you need to review the affidavit? If you think it's --

      THE COURT: Do you know whether it's in there or not?

      THE WITNESS: I haven't read that in quite awhile.

      THE COURT: You can look at it if you want to.

      MS. PARUTI: Can I --

      MS. FRIED: I'll just give a copy.

1       MS. PARUTI:  Go ahead.

2            (The Witness reviews the document.)

3       THE WITNESS:  Okay.

4  BY MS. PARUTI:

5  **Q.**  For the record, you've had a chance to review the

6  affidavit?

7  **A.**  Yes.

8  **Q.**  And you can confirm that nowhere in that affidavit did

9  you mention anything about any promises or other conversation

10  about benefit to you for cooperating?

11  **A.**  No, I did not.

12  **Q.**  Okay.  In fact, if you look at paragraph 11, you have

13  that still before you there, in that paragraph, you talk

14  about the conversation that you had with one of the agents

15  about the polygraph.

16            I'll give you a second to read that.

17  **A.**  Yes.

18  **Q.**  Is that Agent Richardson that you're referring to in that

19  paragraph?

20  **A.**  Yes.

21  **Q.**  And nowhere in there, in fact, well, for the record you

22  say, "During the period after the tape recorder was turned

23  off, one of the agents asked me if I would be willing to take

24  a polygraph examination."

25            That's Agent Richardson?

1   **A.**   Yes, I believe so.

2   **Q.**   "He said the reason was that they wanted to confirm

3   whether I was an actual child molester.  They apparently did

4   not believe me when I had said I was not."  Right?

5   **A.**   Correct.

6   **Q.**   Nothing about it would be better for you with the

7   prosecution if you participated in the polygraph?

8   **A.**   No, nothing there.

9   **Q.**   Now, you said that you stayed in the kitchen for the

10  entirety of the time that you were there?

11  **A.**   Yes.

12  **Q.**   And you were seated in that same seat at the end of the

13  bar?

14  **A.**   Yes.

15  **Q.**   Or the island.

16  **A.**   Yes.

17  **Q.**   And the door to the back was sort of behind you from that

18  vantage point; is that correct?

19  **A.**   Correct.

20  **Q.**   You didn't observe -- well, the only time that you really

21  had any contact with Ms. Kryzak was as she was leaving or you

22  were leaving, correct?

23  **A.**   Yes.

24  **Q.**   But you didn't hear -- you didn't -- they didn't prevent

25  you from saying goodbye to her when you were leaving?

1    **A.**  No.

2    **Q.**  In fact, they let you embrace?

3    **A.**  Yes.

4    **Q.**  Now, you said you've listened to parts of the recorded

5    interview with Agent Richardson and Agent Connolly.  Did you

6    listen to any parts that had you talking on it, like so that

7    you could hear your voice?

8    **A.**  Yes, I'm pretty sure I did.

9    **Q.**  Okay.  And did you listen to any parts of that recording

10   that had Agent Richardson's voice on it, so you could hear

11   his voice?

12   **A.**  Yes.

13   **Q.**  Did you listen to any parts of it that had Agent

14   Connolly's voice on it, so that you could hear her voice?

15   **A.**  I would probably say yes.  I mean, I don't remember

16   everything that I heard.  But if we were there and talking,

17   yes.

18   **Q.**  Okay.  Apart from the interaction on tape, so that first

19   recorded part and then the very short recorded part about an

20   hour later, was -- did you interact at all with Agent

21   Connolly?

22   **A.**  I remember interacting mostly with Agent Richardson.

23   **Q.**  Okay.

24   **A.**  But I know that Agent Connolly was out and in.

25   **Q.**  Okay.  Any of the interactions that you had with her, was

1  her tone with you any different than it was on tape?

2  **A.**  No.

3  **Q.**  At any of the interactions that you had with Agent

4  Richardson, was his tone with you any different than it was

5  on tape?

6  **A.**  No.

7           MS. PARUTI:  May I approach, Your Honor?

8           THE COURT:  You may.

9  BY MS. PARUTI:

10  **Q.**  Let's see.  Do you have the diagram up there, sir.

11  Probably Exhibit 12.

12           MS. FRIED:  I have my version of it, which you're

13  welcome to borrow, if you want to.  I wrote some things on

14  it.  I just wrote the --

15           THE COURT:  I have my copy, if you want, but I

16  wrote the names of the rooms.

17           MS. FRIED:  That's what I did, too.  I wrote the

18  names of the rooms.

19           MS. PARUTI:  For now I'll use Ms. Fried's version.

20           THE COURT:  Oh.  Wait.  I'm sorry.  Here's the

21  other 12.  I have it.  My apologies.

22           MS. PARUTI:  As long as it's not my fault.

23  BY MS. PARUTI:

24  **Q.**  All right.  Sir, this is the real Exhibit 12.  So I know

25  you were in Court when you saw when we were going through

1   this, but you may not have had an opportunity to review this.

2   So take a quick look.  And once you're ready to answer a

3   couple of questions, let me know.

4   **A.**  Okay.

5   **Q.**  Okay.  Does that appear to be an accurate sort of layout

6   or depiction of the layout of your home?

7   **A.**  Yes.

8   **Q.**  Okay.  And in looking at the kitchen, which is labeled G,

9   all right, so this up at the top, the door, that's the back

10   door that we're talking about, correct?

11   **A.**  Yes.

12   **Q.**  And then the island is somewhere sort of right in the

13   middle of this, correct?

14   **A.**  Correct.

15   **Q.**  And for the record, I'm just motioning near the G letter

16   there.

17        And then we've seen in some of the picture

18   exhibits, which we'll take out in a second, there's a very

19   small, little hallway, correct?

20   **A.**  Correct.

21   **Q.**  In fact, it might be kind of generous to call it a

22   hallway.  It's sort of -- is your wingspan bigger than that

23   hallway, would you say?

24   **A.**  Well, It's only about 40 inches wide, and maybe ten feet

25   long.

1    **Q.**  So you're pretty -- how tall are you, sir?

2    **A.**  6'2".

3    **Q.**  So probably a little bit close, right?

4    **A.**  Close.

5    **Q.**  So fair to say that if you're in the kitchen, you can

6    take maybe like two steps and make it into this back bedroom

7    or "study," as Ms. Kryzak was calling it?

8    **A.**  Yes.

9    **Q.**  And this room, which we have as bedroom 2, that's where

10   that thumb drive was found?

11   **A.**  Yes.

12   **Q.**  And in fact, that's where you told them it would be?

13   **A.**  Correct.

14   **Q.**  And fair to say that Agent Richardson had been in -- when

15   you were in here, he left you, right?  At some point.

16   **A.**  Yes.

17   **Q.**  Could you hear him talking with the forensics agents that

18   were in this room?

19   **A.**  No.

20   **Q.**  Could you hear sort of like the muffled sound of voices

21   at all?

22   **A.**  Not really.

23   **Q.**  So they weren't like screaming in there?

24   **A.**  No.

25   **Q.**  Because initially, when you were sitting at the island

1    there -- initially when you were sitting at the island there,
2    you can hear on the tape, the noise of some of the other
3    people moving around.  Was that just because it was sort of
4    in the beginning?  Did it die down from there?
5    **A.**  Yeah, it was probably being -- because that door was
6    open.
7    **Q.**  Okay.  So then they shut it.
8    **A.**  They shut the door, yeah.
9    **Q.**  After they finished with that first part of the interview
10   with you, did they reopen the door, or did it stay shut?  If
11   you remember.
12   **A.**  I don't know.
13   **Q.**  So nothing that sticks in your mind about that?
14   **A.**  No.
15   **Q.**  Okay.  But you know that Agent Richardson left this room,
16   kind of hopped into this bedroom 2, and at some point came
17   back to you and asked you about the CL Perv folder, right?
18   **A.**  Yes.
19   **Q.**  So fair to say, that would literally take him like two
20   seconds to get in here, right?
21   **A.**  (Nods head.)
22   **Q.**  You're agreeing?
23   **A.**  Yes.
24   **Q.**  Hold on.  Let me check one thing.
25           And so he would have -- he asked you or he told

1  you, "Hey, they're not finding the -- they're not finding

2  that folder on the computer that they're looking at,"

3  something to that effect; is that correct?

4  **A.** I -- I would say I don't know.

5  **Q.** Okay. All right. But he communicated something to you

6  about the fact that they weren't finding it in a folder,

7  right? Or excuse me, they weren't finding the folder on that

8  computer, right?

9  **A.** Yes.

10 **Q.** Okay. And you told him, "Well, it's because it's not on

11 the computer. It's on a thumb drive that I have in there,"

12 or --

13         MS. FRIED: Objection. That wasn't the testimony.

14         MS. PARUTI: I'm asking him now.

15         THE COURT: Overruled.

16         Maybe just repeat the question.

17         MS. PARUTI: Sure.

18 BY MS. PARUTI:

19 **Q.** So he asked you something about that CL folder, right?

20 Do you remember that?

21 **A.** Yes, at some point he did. Yes.

22 **Q.** And you gave him information about where that folder

23 would be found, correct?

24 **A.** Yes.

25 **Q.** Okay. And you told him -- you told him that it wasn't on

1    the computer, they would find it on the thumb drive, right?

2    **A.** Yes.

3    **Q.** So that interaction wouldn't have lasted more than maybe

4    a minute, tops?

5    **A.** I can't say how long any of these interactions took.

6    **Q.** Okay.

7    **A.** I don't know.

8    **Q.** All right.  Pardon me just one moment, I just need to

9    find this one picture.

10           While I'm looking for that, after you told

11   him where the thumb drive -- or you told him exactly where it

12   was, right?  On the ledge?

13   **A.** Yes.

14   **Q.** And that was just not out in the open, but it was just on

15   top of the ledge of the door frame; is that correct?

16   **A.** Correct.

17   **Q.** It wasn't secreted in any sort of box or hideaway or

18   something like that, right?

19   **A.** Right.

20           MS. PARUTI:  We don't have this picture here.

21           It's okay.  It's not a big deal.

22   BY MS. PARUTI:

23   **Q.** So after you told him where the thumb drive was, then he

24   left you to go back into that room?

25   **A.** Yes.

1   **Q.**  And you're aware that they subsequently did search --

2   they did search some of the thumb drives that they found in

3   the house, including that one, correct?

4   **A.**  Yes.

5   **Q.**  When you were brought to -- I'm sorry, will you remind

6   me, do you recall exactly when agent -- one of the agents

7   told you that you were going to be arrested?

8   **A.**  Exactly when?

9   **Q.**  So maybe "exactly" isn't a good term for today.  Maybe

10  how about in relation to the second recorded interview at the

11  home.

12  **A.**  It was either during or right after that.

13  **Q.**  Okay.  And when she told you that you were going to be

14  placed under arrest or arrested that day, did she tell you

15  what you were going to be arrested for?

16  **A.**  No, not that I recall.

17  **Q.**  You don't remember that?  Okay.

18             And did she put handcuffs on you right away?

19  **A.**  No.  I needed clothes.

20  **Q.**  So in fact, she gave you the heads up that you were going

21  to be arrested, and that's when they got you clothes to wear

22  out of the house.  And that's when they let you say goodbye

23  to Pat, right?

24  **A.**  Yes.

25  **Q.**  And then at some point after that, you don't know how

1  long, you were placed in handcuffs and transported by

2  Framingham, correct?

3  **A.** Correct.

4  **Q.** You had no problem understanding the advisement that you

5  signed before you left the house?

6  **A.** No.

7  **Q.** Okay. I mean, you have the right to remain silent?

8        THE COURT: The written advisements.

9        THE WITNESS: Right.

10  BY MS. PARUTI:

11  **Q.** The written advisement. Do you know what I'm talking

12  about?

13  **A.** Yes.

14  **Q.** That exhibit. You read each of those lines, correct?

15  **A.** I did.

16  **Q.** And you initialled every line, indicating that you

17  understood, correct?

18  **A.** Correct.

19  **Q.** And you wrote the initials because you actually read it

20  and understood it, right?

21  **A.** Yes. And I was told to initial.

22  **Q.** But you did, in fact, understand each of those short

23  lines, correct?

24  **A.** Yes.

25        MS. PARUTI: No further questions.

1          THE COURT:  Redirect?

2          MS. FRIED:  Uh-huh.

3          Your Honor, I have two of the photographs, two that

4   I've already showed to the witness that I'll be moving in.

5   They don't have stickers on them.  I'm going to put stickers

6   on them.  I've assigned them numbers.

7          THE COURT:  Ms. Simeone has stickers.  She can put

8   them on for you.

9          MS. FRIED:  I appreciate that.

10         **REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

11  BY MS. FRIED:

12  **Q.**  Mr. Johnson, I'm going to show you what's marked, and I

13  will move into evidence.

14         THE COURT:  23 and 24 are the next exhibits.

15         MS. FRIED:  23 would be the next.  Yes.  Okay.

16  BY MS. FRIED:

17  **Q.**  Okay.  What's been marked as Exhibit 23, do you recognize

18  what's in that photograph?

19  **A.**  Yes.

20  **Q.**  Tell the Court what it is?

21  **A.**  It's a view of the doorway -- part of the island counter

22  and the doorway leading from the kitchen into the back

23  hallway.

24  **Q.**  Okay.  So this door that was closed at some point during

25  the course of the interview is depicted in that photograph?

**A.**  Yes.

MS. FRIED:  So Your Honor, at this time I think I want to move into evidence -- I think there were three exhibits, 21 and 22, and 23.

THE COURT:  21 and 22 are already admitted.

MS. FRIED:  So 23 I would move in.

THE COURT:  Any objection to 23?

MS. PARUTI:  No.

THE COURT:  23 is admitted.

(Exhibit No. 23 admitted into evidence.)

THE COURT:  Just give it to Ms. Simeone so we can put a sticker on it before it gets mixed up.  It's in your left hand, I think.

MS. FRIED:  Actually, I wrote the numbers on the back, I'll get it straightened out.

THE COURT:  Fine.

BY MS. FRIED:

**Q.**  Mr. Johnson, you had a chance -- you were asked some questions about your affidavit in support of your motion to suppress.  I just want to direct your attention to the very last paragraph, which is numbered paragraph 14.  Could you read that aloud to the Court?

**A.**  "The above facts are true and are not everything that I know about the events of April 27, 2017."

**Q.**  Okay.  Thank you.

1              Lastly, are you aware of the actual measurements

2    and square feet of, you know, eight by ten, five by whatever,

3    of the -- of various of the rooms in your home?

4    **A.**  I do know some of them, yes.

5    **Q.**  Okay.  And how is it that you know these measurements?

6    **A.**  Well, over the years that I've been there, I've measured,

7    for various reasons, redo the room, redo the floors.  But we

8    also measured last week.

9    **Q.**  And when you say "we," you're referring to who, exactly?

10   **A.**  You and I.

11   **Q.**  Very good.  I want to ask you about some of these

12   measurements.  Okay?  First of all, I want to ask you what

13   the measurement is.

14             THE COURT:  Is there another exhibit?

15             MS. PARUTI:  Well, I have an objection just to the

16   scope.  This is --

17             MS. FRIED:  She asked him questions about the

18   diagram.

19             THE COURT:  Well, you're putting in basically the

20   square footage of each room.

21             MS. FRIED:  I am.

22             MS. PARUTI:  No, I have no objection to that.

23             MS. FRIED:  That's what I'm doing.  I'm putting in

24   the square footage of the rooms.

25             THE COURT:  Okay.  Do you have it in a document, or

1    are you getting it from him by question and answer.

2         MS. FRIED:  I can write it down, but I was going to

3    get it from him.

4         THE COURT:  No, no, that's fine.  Go ahead.

5    BY MS. FRIED:

6    **Q.**  First of all, Mr. Johnson, that little entry hallway,

7    that little entranceway as you come into the room --

8    **A.**  Yes.

9    **Q.**  As you come into the house, it has a little Pakistani rug

10   on the front, what are the dimensions of that little hallway?

11        THE COURT:  How about for simplicity purposes, on

12   Exhibit 12, how about if he writes down on Exhibit 12, for

13   each room, what his view is as to what the square footage is.

14        MS. FRIED:  That's fine.

15        THE COURT:  That would be easiest.

16        MS. FRIED:  That's fine.

17        THE COURT:  You can just ask him to write it down

18   as to the extent he knows for each room.

19   BY MS. FRIED:

20   **Q.**  Can you write for us, in feet and inches, first of all,

21   the dimensions of that entryway?

22   **A.**  (Witness complies.)

23        THE COURT:  If he knows it, why not just do all the

24   rooms?  Or all the rooms you want.

25   BY MS. FRIED:

1    **Q.** And can you say for the record?

2    **A.** The entryway is five foot five inches by eight feet.

3    **Q.** And then the living room, which is marked at B on that

4    exhibit?

5    **A.** The living room is 14 feet by 11 feet four inches.

6    **Q.** Okay. If you can write that down.

7    **A.** (Witness complies.)

8    **Q.** And then the dining room, which is C on that exhibit?

9    **A.** Dining room is 12 feet by 12-six.

10   **Q.** 12 feet six inches?

11   **A.** Yes.

12   **Q.** Okay. If you can write that on the diagram, please, on

13   the exhibit.

14   **A.** (Witness complies.)

15   **Q.** And then the kitchen, which is G on the exhibit?

16   **A.** The kitchen is 16 feet by 12 feet.

17   **Q.** And then that back bedroom, which is also a study, it's

18   labeled F on the exhibit?

19   **A.** That is ten feet by 11 feet five inches.

20   **Q.** And then that hallway that runs between the main bedroom

21   and the back bedroom?

22   **A.** That is ten-feet long and 40-inches wide.

23   **Q.** And could you put that in the diagram, please.

24   **A.** (Witness complies.)

25   **Q.** And is it correct that you and I did not measure the

1   dimensions of the main bedroom, as marked as D?

2   **A.**   Correct.

3            MS. FRIED:  All right.  I think that may be all.  I

4   just want to check.

5            THE COURT:  Okay.

6            MS. FRIED:  I have no other questions.

7            THE COURT:  You don't have anything else, do you?

8            MS. PARUTI:  (Shakes head.)

9            THE COURT:  All right.  Thank you very much,

10  Mr. Johnson.  You are excused.  You can step down.

11           Do you have any other witnesses, Ms. Fried?

12           MS. FRIED:  I have no other witnesses.

13           I am just going to gather up these exhibits.

14           THE COURT:  Sure.

15           THE DEPUTY CLERK:  I'll take 23 and 24.

16           THE COURT:  And give the one, 23, to Ms. Simeone to

17  mark.

18           MS. PARUTI:  And Your Honor, while Ms. Fried is

19  doing that, I have a new disc for the Court.

20           THE COURT:  Oh.  Great.

21           MS. PARUTI:  I'll note, this does have a password.

22  You can get special exemptions to not have passwords.  So I

23  know the clerk's office can't accept it, but I know Your

24  Honor will be able to do it.

25           THE COURT:  I can take it.  That's fine.

1          MS. PARUTI:  And I'll provide a normal one that's

2   unencrypted to the clerk's office at some point this week.

3   The password is on the front of the disc, and it's case

4   sensitive.

5          THE COURT:  Let me make sure I see it.

6          MS. FRIED:  Maria, I have another exhibit, I'm just

7   trying to get my hands on it.  Here it is.  I've got 21, 22,

8   and 23.

9          THE DEPUTY CLERK:  Okay.

10         MS. FRIED:  I put them on the back, but you might

11  want to slap them on the front.

12         THE DEPUTY CLERK:  I will.  Thank you very much.

13         MS. PARUTI:  I also, Your Honor, during the break,

14  I took the liberty of printing out some data from the

15  *Farmers' Almanac* for April 27th of 2017 for the zip code

16  01702, which is the zip code the residence in issue is

17  located in.

18         I'm happy to stipulate to this, if Ms. Fried still

19  wants to stipulate to it.  I'm happy to offer this for the

20  Court's information, to the extent that the information was

21  something that she sought to get in during the hearing.

22         MS. FRIED:  That's fine.  I'll stipulate to that.

23         THE COURT:  Fine.  I'll take it.  We'll make this

24  Exhibit 24.

25         (Exhibit No. 24 admitted into evidence.)

1      THE COURT:  Can I see it for a minute, Maria?

2      THE DEPUTY CLERK:  Yeah.

3      MS. FRIED:  I take it my client's affidavit need

4  not be marked as an exhibit.  It was filed earlier in the

5  paper.

6      THE COURT:  I suppose, since he testified and

7  Ms. Kryzak testified, and they were subject to

8  cross-examination, I can accept their affidavits and would

9  treat them as part of the evidence in the record.

10      MS. FRIED:  Okay.

11      THE COURT:  So I will do that.

12      MS. FRIED:  Do they need to be marked as exhibits?

13      THE COURT:  No, I don't think they do, because

14  they're on ECF already.

15      MS. FRIED:  Okay.

16      THE COURT:  And I'll be looking over all the

17  exhibits.  I have the -- now the video exhibit from the

18  Government.  I'll be looking over all the exhibits, the

19  briefs, and whatever exhibits there were to the briefs, as I

20  consider it.

21      I'm happy to -- I intend to take it under

22  advisement to think about it and digest all of the

23  information and evidence.  But I'm happy to, if you wish --

24  first of all, if you don't argue now, you haven't waived

25  anything.  Everything that you have advanced is already

1    before me, is not waived, unless you stand up now and

2    specifically say "I waive" something.

3            So with that, you're welcome to argue it, if you

4    wish.  But -- and say whatever you wish to say.

5            MS. FRIED:  I do want to argue, but what's the

6    Court's pleasure.  Perhaps you'd rather get something in

7    writing?  I certainly --

8            THE COURT:  So here's what I'm thinking about.  I

9    would like to -- if you want to submit something in writing,

10   that's fine.  I'm not requiring further briefing.

11           MS. FRIED:  Right.

12           THE COURT:  I do not need further briefing on -- I

13   don't need further briefing, and I discourage, though I don't

14   prohibit, further briefing on anything related to other than

15   the statements and what transpired at the home.  I have

16   extensive briefing on the search warrant questions; I don't

17   think I need anything else on that.

18           MS. FRIED:  Okay.

19           THE COURT:  If you wish to submit something

20   further, you may do so.  I'm not ordering that, I'm not

21   requiring it.  But if you want to do that, that's perfectly

22   fine.

23           MS. FRIED:  Okay.

24           THE COURT:  I'm happy, if you wish, to be heard

25   now -- I'm happy to hear you now.  If you don't argue now --

1   you could argue now and submit something in writing.  You

2   could not argue now and submit something in writing.  But I

3   don't know whether I'll have another hearing just for

4   argument.  If in digesting this, that lead me to the point

5   where there's specific sort of questions about the law or

6   application of the law to the facts that I would want to hear

7   from you about, then I would schedule a hearing, whatever you

8   do or don't do today or later.  But other than that, I

9   wouldn't be having another hearing.

10          MS. FRIED:  I guess what I would like to do, then,

11  if the Court will be patient enough to hear me, I'd like to

12  spend ten minutes arguing my piece --

13          THE COURT:  Sure.

14          MS. FRIED:  -- making at least an oral

15  presentation.  I don't know whether the Government wants to.

16          THE COURT:  You absolutely can.  You're not trying

17  my patience, and I'm happy to.  If you'd like to, that's

18  fine.

19          MS. FRIED:  Thank you.

20          I think the main question here -- I think the main

21  question we're trying to raise is whether or not my client

22  was in custody at the time that he was interrogated.  I don't

23  think that there's any real question about whether or not

24  there was interrogation in the case.  I mean, we have plenty

25  of evidence of interrogation.  The tape recorded interviews

1  that, you know, start and end --

2          THE COURT:  I don't understand the Government to be

3  arguing that there's not interrogation.

4          MS. PARUTI:  No.

5          THE COURT:  I think the whole question is custody.

6          MS. FRIED:  The whole question is custody.

7          I think the facts of the case are very, very

8  analogous to the facts of *United States v. Mittel-Carey*.

9  About the only different -- the only fact missing from this

10 case is whether or not there was an unholstered weapon.

11 Other than that, the facts are practically on all fours.  And

12 I don't think *Mittel-Carey* turned on whether or not there was

13 a gun out at some point during the interview.

14         We have a situation in this house where --

15         THE COURT:  Agent Travaglia -- Is that how you say

16 his name?

17         MS. FRIED:  Yeah, I think it's Travaglia or

18 *Travaglia*.

19         THE COURT:  -- made more or went further, at least

20 as described by the circuit, went --

21         MS. FRIED:  In terms of the cooperation stuff.

22         THE COURT:  Went further than it revealed on the

23 recordings.  And I think even, in terms of what Mr. Johnson

24 described occurring in between the two recordings, I think

25 Agent Travaglia still went further.  Because he expressly

told the defendant in that case what a lawyer would do --
essentially what a lawyer would do and why that would be a
bad thing.

MS. FRIED:  You mean in terms of telling him to
assert his rights.

THE COURT:  Yes.  He told the defendant that a
lawyer would tell him to not talk, and that would be bad for
him.

MS. FRIED:  Well, I guess here's what I want to
say, and that is, was my client objectively reasonable in
believing that he was not free to leave, you know, in terms
of the question before him --

THE COURT:  But I'm not sure what your client's
feelings were.  I think the question is what were the
objective circumstances.  And certainly his feelings are
evidence of what objectively --

MS. FRIED:  Right.  Of whether he -- I mean, he
testified that he did not feel free to leave, and where the
facts and circumstances of what was going on there, did that
make that an objectively reasonable belief?  Maybe that's
another way of saying it.  I don't think that that misstates
what the legal standard is.

And here what we've got is a pretty small house,
with somewhere between ten and 15 police officers running
through it.  We've got my -- we have Ms. Kryzak being ordered

1     in a room where she, you know, testified that she didn't

2     think that she was allowed to get up, because she had to ask

3     for permission to get water and they wouldn't let her go get

4     it --

5           Well, there are a couple of things that I want to

6     sort of --

7           THE COURT:  I think the agents were pretty clear

8     that they weren't going to allow the people in the home to

9     wander freely about the house.

10          MS. FRIED:  Well, that's right.  They weren't going

11    to allow, and because that's part of their search warrant

12    protocol that they don't want people moving around the house.

13    I guess my only -- the only point that I want to reinforce on

14    that is that simply because this is an allowable Fourth

15    Amendment thing, in terms of making control of the situation,

16    simply because that's okay under the Fourth Amendment,

17    doesn't mean that that doesn't have Fifth Amendment

18    implications for the presence of custody.

19          THE COURT:  Clearly.  The First Circuit made that

20    point expressly in that case.

21          MS. FRIED:  That's right.  There is a Fifth

22    Amendment dimension -- a Fifth Amendment dimension to the

23    fact that you have to sort of put some controls on the place

24    in order to execute the search warrant.  And these controls

25    that were put in place here I think would very reasonably

1  lead my client to believe that he was not free.  And in fact,

2  I think regardless of what the agents' testified, you know, I

3  think there's, frankly, a degree of disingenuousness about

4  saying they would allow this man to walk out the door.  They

5  didn't allow him to get dressed.  It was April 27th, he was

6  there in his shorts and his pool shoes, with his car parked

7  in the garage.  Where is he going to go?  How is he supposed

8  to leave the house in his underwear, while they tear the

9  place apart?  No.  That's not reasonable -- it's not

10  reasonable for him to believe that he could go anywhere, when

11  they wouldn't let him go ten foot into his bedroom to go put

12  on a pair of pants, and when there are multiple officers

13  around and when they start asking him questions about his

14  sexual predilections with a tape recorder running, which is

15  what I think that this shows.

16       And I've got to look back at these cases again, but

17  it seems to me I remember that at least some of the cases

18  make it more indicative that the questioning was not purely

19  for the purpose of forwarding the search, when the

20  questioning is not getting into:  Where are we going to find

21  this in the house?  Where are we going to find that in the

22  house?  Where are we going to find your hard drives?  Where

23  do you keep your porn?

24       Instead, the questions here are all about:  What

25  kind of sex do you like?  Who do you trade pictures with?

1    What kind of conversations do you like?

2              THE COURT:  It's an interrogation.

3              MS. FRIED:  It's an interrogation, and it's not an

4    interrogation that's designed to forward execution of the

5    search warrant.

6              THE COURT:  How would that matter?

7              MS. FRIED:  Again, I might want to submit a writing

8    to you on this, but there is a case that draws a distinction

9    between -- that makes it more indicative of --

10             THE COURT:  Oh, I see.  You mean like, if they

11   walked in and said, "Look, we're here to execute a search

12   warrant for electronic devices.  Can you tell us where all

13   the electronic devices are?  Alternatively, we're going to

14   turn the place upside down until we find them.  But if you

15   show us where they are, we'll go to those, and the search

16   execution will be smoother."  As opposed to --

17             MS. FRIED:  "Tell us about all this other nasty

18   stuff that you're doing, that doesn't really -- so that we

19   can build a case for you on something worse or something

20   different or some other criminal behavior that we think that

21   you're involved in."

22             And I think clearly the subject matter of this

23   interrogation goes off on to that branch.  That is, it's

24   not -- the questions and answers that are being put to this

25   defendant aren't --

1          THE COURT:  So I see how that could matter in a
2    case about why -- I can see how the facts might support that
3    the focus was not on -- though they did ask about this, but
4    not on where are things, to sort of -- facts related to just
5    the pure execution of the warrant.
6          MS. FRIED:  Exactly.
7          THE COURT:  And I can see how that -- potentially,
8    I haven't looked at this case, how that might divide the case
9    law, to some degree, about whether there's an interrogation
10   or not.
11         But if you just come in and ask questions like
12   that, maybe that's less likely to be characterized as
13   interrogation.
14         MS. FRIED:  To trigger a Fifth Amendment.
15         THE COURT:  But here the Government is not
16   arguing -- it was an interrogation.  It's not arguing
17   otherwise.
18         MS. FRIED:  Well, no, I agree.  I know that they're
19   not arguing.  It's definitely an interrogation.  All I'm
20   saying is that I think, for purposes of this question --
21         THE COURT:  Of whether you're in custody.
22         MS. FRIED:  -- of whether you're in custody, to the
23   point where you need Miranda warnings, that the cases do draw
24   a distinction there.  I'll have to look at it, but I know
25   that I've read this and I may have to cite that to you.

1          But I think it's pretty clear that this

2     interrogation -- look, when the tape is turned off, there's

3     evidence that the interrogation turns to, okay, where are we

4     going to find this stuff that we're looking for.  But of

5     course, we don't have that, because the tape gets turned off.

6          THE COURT:  We have a little bit of it.

7          MS. FRIED:  We have a little bit of it.  We have a

8     little bit of it.  But I think it's highly unlikely, frankly,

9     that three questions are asked of my client, during the

10    course of an hour, when there are ten agents in the house or

11    12 agents in the house.  The Government only brought two

12    agents in.

13         THE COURT:  Maybe they're all just the strong,

14    silent type.

15         MS. FRIED:  Well, it's doubtful.  But who knows.

16    But the point is, we don't know.  But we do know --

17         THE COURT:  Well, no, the agents aren't the only

18    witnesses.  Your client testified.  We have his report of

19    what transpired.  We have Agent Connolly's report of what

20    transpired, and Agent Richardson's report of what transpired.

21         MS. FRIED:  No, you're right.  We do have that.

22    What we know is there were a lot of people in the house, that

23    we -- my client is there in his underwear.  And there's

24    really nobody to contradict that, but the other agents who

25    testified, said they didn't even remember what he was

1  wearing.  They said they couldn't even remember what his

2  clothing was.

3          My client's testimony on that score is

4  uncontradicted.  And Ms. Kryzak said the same thing, that he

5  was wearing shorts with no shirt.  And he's sitting, on an

6  April morning, at 6 o'clock in the morning -- nobody would do

7  this voluntarily, would sit basically in their underwear for

8  an hour and a half, if they had a choice, of putting on some

9  proper clothes, especially if they're being interrogated by

10  one, two, three, or however many police officers in their

11  kitchen.  But that was the situation that my client was in.

12          He was clearly in custody, I would submit, for

13  purposes of needing to get his Miranda warnings.  And I think

14  the evidence is also very clear that he didn't get his

15  Miranda warnings until an hour and a half later, or something

16  like that.

17          I also would submit it's -- that it's -- that the

18  Court might take with a grain of salt the notion that these

19  agents did not necessarily intend to arrest him the moment

20  they walked in the door, given the way they treated him,

21  given -- I think that was Agent Connolly's testimony, was

22  that, "We weren't going to arrest him until I called the US

23  Attorney's Office, and we got the go ahead."

24          THE COURT:  Well, that's different than -- that --

25  the -- it seems unlikely to me, in a circumstance like this,

1   that the agents would arrest somebody in Mr. Johnson's shoes

2   without the okay of the US Attorney's Office, absent some

3   emergent, unfolding event.

4           MS. FRIED:  Well, I guess.

5           THE COURT:  But if what you mean is that when they

6   went there, their likely plan was to seek permission to

7   arrest Mr. Johnson at the end of this course of events, that

8   they anticipated that's the likely outcome --

9           MS. FRIED:  Based on the fact that they had a

10  search warrant and based on the information that they had

11  already gathered in the course of the information.

12          THE COURT:  Suppose I agree with you.

13          MS. FRIED:  Uh-huh.

14          THE COURT:  How does that bear on whether --

15          MS. FRIED:  Well, I know that the subjective -- the

16  subjective intent of the police, one way or the other, is not

17  dispositive.  It's not dispositive of this.  But it does

18  inform, I think -- if you -- let's say that you agree with

19  me.  I think that knowing that they came in with that

20  mindset, does inform how the Court looks at what their

21  behavior was in terms of restricting my client's movements,

22  and whether that communicated -- created an atmosphere --

23  created an atmosphere that was custodial, which I think is --

24  which I think, at the end of the day, is what the question is

25  that has to be answered:  Where do the circumstances, the

1    attendant circumstances, looked at objectively as so -- I

2    don't know "coercive" is maybe the wrong word, but so created

3    the situation where a person in that position would not have

4    reasonably believed that they could walk away.

5         And I think the answer in this situation is clearly

6    yes.  I think that it was communicated to the occupants of

7    this house that they did not have that kind of freedom of

8    movement.  They did not have the freedom to leave.  They

9    didn't have the freedom to get -- put clothes on.  You know,

10   I don't know how -- I don't know how you can feel free to

11   leave and walk away, if you don't have the freedom to go put

12   on a pair of pants and a pair of shoes and get your car out

13   of the garage and leave.

14        There are a zillion cases that talk about whether

15   being parked in creates custody.  Granted, it's a different

16   context, but I'm not sure it's entirely irrelevant.  The

17   facts of the case were, my client couldn't go anywhere

18   because his car was parked in the garage, and he didn't have

19   his clothes.  Those are the kinds of things that can create

20   the feeling of custody.

21        Separate and apart from the fact of so many police

22   officers in the house and doing things that really asserted

23   control of the house, like putting these letters on --

24   putting these letters on the doors; the fact that when

25   Ms. Kryzak goes into the bedroom to get ready for work, that,

1    you know, an agent barges in on her, you know, while she's

2    getting dressed, without bothering to knock, even though the

3    room had already been cleared, even though somebody had given

4    her permission; the fact that there was even sort of a chain

5    of command to get permission for her.

6             I mean, I think you can infer that from her

7    testimony, that she asks somebody, "Can I do this?" That

8    person has to go ask somebody else, and then it's relayed

9    back to her, "Okay. Yes, you can go." And that's how things

10   unfold, in terms of the amount of control that's being

11   asserted.

12            So I would say that those attendant facts created

13   custody, such that Miranda warnings were required.

14            THE COURT: Thank you.

15            Anything you want to add?

16            MS. PARUTI: I'm not going to regurgitate things

17   that are in my memo. If the Court has specific questions

18   that you want me to address, I'm happy to do that now. I'm

19   also -- I think the Court can digest everything, and then if

20   there are legitimate issues that need to be ironed out, I'm

21   happy to readdress the Court at some point in the future. As

22   you said, if you're thinking about it and you have questions

23   that believe you need to take argument on, I'm happy to give

24   it at that point.

25            I do want to just, for the clarity of the record, I

1 do want to correct a couple of factual things that I'm

2 hearing. And one is that there's no testimony that

3 Mr. Johnson was in his underwear. I think taking liberties

4 with terminology is important here, because we're talking

5 about minute details.

6 And he's not. He talked about shorts that were

7 longer than running shorts and shorter than basketball

8 shorts. And he was in a situation where he was wearing

9 rubber-soled shoes. He went to the door like that.

10 Is it comfortable? Of course not. That's an

11 uncomfortable situation to be in with federal agents in your

12 kitchen and not wearing a shirt. I understand that.

13 Also, however, though, I think that the other piece

14 of this is that there is an argument or a factual proposition

15 being put forward that the defendant asked and was denied the

16 opportunity to get clothing. And I'm not staying that the

17 defendant is not a credible witness, I am saying, however,

18 that that's a really important fact that, to me --

19 THE COURT: What do I do with the fact that -- he

20 testifies, unequivocally, that he was in his short. I agree,

21 it wasn't underwear. That his life partner testifies --

22 pretty candidly, right? I mean, not gilded testimony by her.

23 MS. PARUTI: Uh-huh.

24 THE COURT: Pretty candidly about what transpired

25 and what she saw, and says he was in his shorts.

1          MS. PARUTI:  Uh-huh.

2          THE COURT:  And I understand the agents execute a

3    lot of warrants.

4          MS. PARUTI:  Uh-huh.

5          THE COURT:  I don't know if it's crystal clear that

6    every one of those warrants that was executed is an in-person

7    execution of a search warrant, as opposed to executing

8    warrants that are -- I'm not fully persuaded that Special

9    Agent Richardson, five days a week, is going out executing

10   in-home or in-office search warrants.  Maybe.

11         MS. PARUTI:  He's part of the ICAC.

12         THE COURT:  So he's doing one every day?

13         MS. PARUTI:  No.  I think he said like twice a

14   week.

15         THE COURT:  Twice a week.  Okay.  But in any event,

16   I understand, if you're doing a lot of them, this is a long

17   time ago, however many that he's doing, that you don't

18   remember each one vividly.

19         MS. PARUTI:  Uh-huh.

20         THE COURT:  But usually, when you prepare for

21   things, you go over.  He clearly prepared, and it would be

22   appropriate to prepare for this.  And then things come back.

23   Just like you may not remember cases from long ago, but then

24   when you reread the papers and look at it, then it all flows

25   back, and you remember quite a lot of it.

1     In the course of the events that transpired when
2 you execute search warrants, it would seem to me that
3 executing a search warrant in a home, in Framingham --
4 executing a search warrant in a very neat, well-kept home,
5 where, when you arrived, you were confronted by --
6     I can say this, Mr. Johnson, because I'm not far
7 behind you.
8     -- but an older man.  An older, mixed-race couple,
9 older man, in shorts, in his home, that's not the typical
10 execution of a federal warrant.  And so it just seems like --
11 if you're there an hour and a half with a person, and you're
12 questioning them for an hour and a half at their kitchen
13 counter, middle of the summer, super hot, windows are open,
14 not really noticeable, necessarily, that people were in
15 shorts, especially if they're working in the backyard.  But
16 April morning, I don't know what the temperature was, but
17 probably wasn't 75 degrees when they arrived at 6:00 in the
18 morning.  It seems like you would remember that he was in his
19 shorts.
20     MS. PARUTI:  Can I address some assumptions that
21 underlie that sort of conclusion.
22     THE COURT:  Yes.  Sure.  That would be helpful.
23     MS. PARUTI:  And I think, obviously, we're taking
24 from the record and we're taking from common sense, because
25 we're addressing what's reasonable.  So I think that, one, in

the context of child pornography federal search warrants, I
would say that finding an older person in the home as a
potential perpetrator is not out of the ordinary.  We're
talking about somebody who is assigned to Internet Crimes
Against Children task force.

THE COURT:  I was saying I was assigned warrants
for nine years.  I've been a district judge for four, for
almost 13, and very few of the defendants are 70.  And a lot
of them, I agree.  There are plenty who are in their 20s, but
unlike drug and gun cases, where they are predominantly 20s
or early 30s, there's a huge swath of people in their 40s and
50s.

But Mr. Johnson's 70, was 68, 69 at the time of the
execution of this search warrant.

MR. JOHNSON:  69.

THE COURT:  So decidedly older than 40s --
different than 40s and 50s.

MS. PARUTI:  I take that point, definitely.

And I think one of the pieces that --

THE COURT:  I'm just struck that no one remembers
shorts.

MS. PARUTI:  Nobody remembers what?

THE COURT:  Being in shorts for an hour and a half.
It seems like a striking fact.

MS. PARUTI:  A what?  I have a cold.

1           THE COURT:  It seems like an unusual fact.

2           MS. PARUTI:  I will say, however, though, that one

3    of the things that Agent Richardson did testify to,

4    repeatedly on cross -- I didn't ask him about this.  But on

5    cross he was examined about this, is whether he took notes or

6    what did he do.  And he said, "It's not my case.  I came to

7    do an interview.  I wasn't involved in the search.   I

8    literally went to" -- he talked to this man for 25 minutes,

9    plus like two for the second recording.

10          THE COURT:  He testified 25 minutes he talked to

11   him tape recorded.  There was an hour lag of which he said he

12   spent one-half the time with Mr. Johnson.  Unclear whether

13   they were talking or not.

14          MS. PARUTI:  Right.

15          THE COURT:  They only reported a very -- about a

16   minutes's worth of conversation.

17          MS. PARUTI:  Right.

18          THE COURT:  But he said he was there about half the

19   time of one hour, then a couple minutes.

20          MS. PARUTI:  Right.  Right.  And then immediately

21   dumped his information, gave it to Connolly, and then was

22   gone, until he came to prepare for this today, or whatever.

23          THE COURT:  Sure.

24          MS. PARUTI:  But I think, also, the shorts piece

25   and the clothing piece, I bring that up not because I think

1    that's a dispositive fact.  What I do think is important,

2    though, is that when you're looking at these -- you're

3    talking about these pieces that go into the factual analogy

4    to some of the -- really to just *Mittel-Carey*, which is

5    really kind of the case that the defense has to build their

6    case on, because that's the one that's best for them.  And I

7    think the facts here are different than the facts there.

8          The fact -- the court in that case talked about one

9    of the more dispositive factors being the level of physical

10   restraint that was exercised on the people in the house.  It

11   also talked about the fact of a weapon being drawn on a

12   defendant in his bedroom in the dark.  And that's not what

13   this case is.

14         And I understand Ms. Fried's comment that this case

15   doesn't hinge on a gun.  And I would agree, it's a totality

16   of the circumstances.  But that's a pretty big thing.

17         And I think on total, I think that the recordings

18   themselves, the recordings that you've listened to, have

19   Agent Richardson and Agent Connolly and the defendant.  I

20   would submit that his demeanor today was very similar --

21   excuse me, the defendant, I'm pointing to the defendant.  His

22   demeanor was very similar, audibly, at least -- obviously we

23   can't see him, but audibly similar, I would say, as to him on

24   the tape.

25         Now, that situation was something that was

1    humiliating.  I think that's credible.  You're being
2    interviewed in your house about child pornography, and you're
3    not wearing a shirt.
4              THE COURT:  I think that's really -- it doesn't
5    mean this is wrongful.
6              MS. PARUTI:  Right.
7              THE COURT:  But it's humiliating to have ten armed
8    federal agents in your home, uninvited.
9              MS. PARUTI:  Right.
10             THE COURT:  They're there lawfully.  There's
11   nothing wrong with the agents having gone there.  They had
12   appropriate reason to go there, they were authorized by the
13   court to go there.  But it would be humiliating if you're the
14   target of that.  These people aren't invited into your home.
15             MS. PARUTI:  I agree.
16             THE COURT:  And they are, with appropriate, lawful
17   right, going through everything.
18             MS. PARUTI:  And I agree.  But one thing, though,
19   humiliation doesn't equal custodial situation.
20             And one thing that you were talking to Ms. Fried a
21   little bit about -- one, I don't think it's disingenuous to
22   believe, especially as the Court pointed out, if you're
23   calling the US Attorney's Office for authority, I don't think
24   that it's disingenuous to believe that they didn't go there
25   with the intent to arrest.  Secondly, it doesn't even matter.

1   That is irrelevant.  The cases don't say it's a minor factor,
2   the cases it's irrelevant.
3          And the same sort of just general sort of baseless
4   attacking of certain statement of the officers that
5   testified, saying that it's disingenuous to say that he would
6   have been allowed to leave, there's no basis for the Court to
7   draw that conclusion.  The fact that other defendants who
8   were told that they can leave when they ask, don't choose to
9   leave, doesn't mean that they're not going to let you leave.
10          And again, the defendant's subjective understanding
11   of the situation is not the deciding factor.  As the Court
12   knows, it might be something that informs a what reasonable
13   person would do or feel.  But that's not what the issue is
14   here.
15          I don't need to -- I don't need to go through the
16   facts here again, unless the Court has specific questions.
17          I do think, on balance here, it's not a custodial
18   situation.  Yes, there were officers in the home.  Yes -- and
19   probably enough to have two in every room, maybe.  Yes, it's
20   a smaller home.  But nobody had guns drawn.  It was light --
21   according to that Almanac thing, sunrise that day was 15, 20
22   minutes --
23          THE COURT:  5:44 a.m. was sunrise.
24          MS. PARUTI:  Sunrise on that day.  That is
25   consistent with the testimony of Agent --

1          THE COURT:  With twilight beginning at 5:14 a.m.,

2    "civil twilight," whatever that means.

3          MS. PARUTI:  So enough to see.  It's not pitch

4    black, as it was in *Mittel-Carey*.  You're not talking about

5    any show of force with respect to the weapons.

6          I would say that the issue of whether or not there

7    was any actual physical touching, or anything, is something

8    that's up in the air right now, based on the testimony.  And

9    that's obviously a credibility determination that the Court

10   will have to make.

11         But I think that certainly with respect to

12   Ms. Kryzak -- now, did Ms. Kryzak and Mr. Johnson not ask if

13   they could go sit together or not ask if they could do X, Y,

14   Z?  Yes, because maybe they're very respectful of authority.

15   But that doesn't mean that it's because law enforcement who

16   were there created a situation where they were on lockdown or

17   on guard.

18         Specifically thinking about Ms. Kryzak, if you

19   listen to her direct testimony, you would think there was an

20   agent literally blocking her in, sitting there.  But when you

21   look at the picture and you think about reality -- and I

22   forget -- I think it's number 13, it's the only small

23   photograph.  You can look at that, and having experience and

24   using your common sense, know that that was the best place

25   for an agent who's in there and somebody who's in there from

1    law enforcement to sit so that her exit is not blocked, so

2    that his back is not to the door, which then creates another

3    safety issue.  And it's something that, in a small room, I

4    would suggest, is as respectful of her space as possible,

5    given the circumstances.

6           And based on what Ms. Kryzak said, I would submit

7    that everyone that she interacted with was as respectful of

8    her space and what else she could observe, as they could be

9    in the circumstances.  And I don't believe that the

10   evidence -- I think the totality of circumstances is that it

11   was not custodial.  It was not such a situation that a

12   reasonable person would feel that they would not be able to

13   leave.

14          I don't think I need to address the -- the

15   polygraphy interview right now.  I think that's really a

16   legal argument.

17          THE COURT:  Yes.

18          MS. PARUTI:  That you'll have to view the tape

19   first.

20          THE COURT:  All right.  You don't need to address

21   that.

22          MS. PARUTI:  Okay.

23          THE COURT:  And there wasn't a whole -- the

24   evidence is -- to the extent we took evidence on that, it's

25   pretty straightforward.

1          MS. PARUTI:  Thank you.

2          THE COURT:  Okay.  The one -- this is an aside, it

3     doesn't -- it doesn't -- this case doesn't turn on what I'm

4     about to say.  But I will just note that -- this may be more

5     for your benefit, Special Agent Connolly, than it is for

6     Mr. Johnson or Ms. Fried, or to maybe some extent to

7     Ms. Paruti.  But I have to say, I am always struck that tape

8     recording and video recordings are --

9          Your job is evidence gathering, right?  That's part

10    of what your job is, isn't it?  And you're always looking to

11    gather evidence.  And the goal is to gather good evidence,

12    right?

13         And tape recording -- audio and video recordings

14    are really excellent pieces of evidence.  They often

15    eliminate -- there are often cases in which there's audio and

16    video recordings, and as a result of which, people don't move

17    to suppress and plead guilty, or do move to suppress, but the

18    issues are much more narrowed.

19         And so I just observe or note that I often wonder,

20    when I look at cases -- and I'm not singling you out, and I'm

21    not singling this case outlet.  I'm more offering this just

22    as a comment from experience, that I find the recordings

23    incredibly helpful, and I find that they're very effective.

24    And I always wonder why people don't do more.  In the drug

25    cases, usually if they don't have recordings, they usually

1    say "We tried to get recordings, but we couldn't get them,

2    because the defendant wouldn't deal with the person who we

3    wired up."  But it's clear they wanted to get recordings.

4          So I just make that observation, because you

5    noticed that, in some ways, the focus -- the biggest factual

6    disagreement that arises in this case concerns what happened

7    when the tape recording wasn't running.  Right?  And that's

8    probably not surprising, right?  In fact, I bet in your

9    experience, that's what you've experienced.

10          And so it doesn't mean that there isn't an argument

11    about what transpired on the tape recording, but actually

12    most of everything else, there isn't much divergence between

13    the testimony.  So just food for thought for other cases.

14          Anyway, I'm going to take it -- unless there's

15    something else --

16          Do you want to submit something?

17          MS. FRIED:  I may very well submit something.

18          THE COURT:  By when?  Just because I want to

19    have --

20          MS. FRIED:  No, I understand.  I'm sort of buried

21    right now, and then I'm having this surgery in a week.

22          THE COURT:  Can you do it before you have the

23    surgery?

24          MS. FRIED:  Well, I will try to.  I will try to do

25    it.  It will probably be very short.

1    THE COURT:  That's fine.  You submitted many pages.

2  So I don't think you need to rehash anything that you've

3  done.  To the extent you want to --

4    MS. FRIED:  It may be just highlighting one issue,

5  and four case citations or something.

6    THE COURT:  That's fine.  And if you only address

7  one thing, you're not waiving anything that's in all your

8  other.  You've covered everything comprehensively, both of

9  you.  The only reason that I would like a deadline --

10    When is the surgery?

11    MS. FRIED:  My surgery is on the 25th, so I --

12  maybe on the 24th?

13    THE COURT:  24th.  I say that only because that way

14  I know for sure, I won't do anything.  I'll wait for the

15  24th.

16    And what I say to you, Ms. Paruti, is if you want

17  to --

18    I'm saying that, right?

19    MS. PARUTI:  Uh-huh.

20    THE COURT:  If you want to file a response, say on

21  the 25th, just tell Ms. Simeone that you want to file

22  something, and e-mail her and say, "I'd like to file

23  something, and I'll do it within a week."  If it's going to

24  be other than a week, explain why, and then I'll know to wait

25  for that.

1    And if you don't want to file anything, then that's
2  fine, too.  And then we'll see where we are.

3    And you're back quick enough that if I wanted to
4  have a hearing after another week, you could do a hearing?

5    MS. FRIED:  Yeah.  And I appreciate the
6  continuance, too.  The more I'm hearing about the surgery,
7  the worse I'm hearing the recovery is, actually.  I may miss
8  a couple weeks of work.

9    THE COURT:  All right.  Good luck.

10    MS. FRIED:  I don't know if I'm going to be back in
11  a week, so I appreciate it.

12    THE COURT:  Okay.  Fine.  But you'll be reading
13  e-mails, so at least if you wanted more time, you could find
14  a way to communicate to Ms. Simeone that you did.

15    MS. FRIED:  Yes, I can.

16    THE COURT:  Thank you.

17    THE DEPUTY CLERK:  All rise.  This matter is
18  adjourned.

19    (Court in recess at 3:36 p.m.)

20

21

22

23

24

25

1    **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4           I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                      Dated this 21st day of February, 2019.

14

15

16

17               /s/ RACHEL M. LOPEZ

18

19

20               _____

                 Rachel M. Lopez, CRR
21               Official Court Reporter

22

23

24

25